## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

COALITION FOR FAIR TRADE IN CERAMIC
TILE,

       Plaintiff,

              v.

UNITED STATES,

       Defendant,

and

WIN-TEL CERAMICS PRIVATE LTD.,
ANTIQA MINERALS,
and
M.S. INTERNATIONAL, INC.,

       Defendant-Intervenors.

**PUBLIC VERSION**

Court No. 25-00095

Business Proprietary Information
Identified by Single Brackets [ ]
and Removed from Pages 3, 19,
20, 22, 23, 25, 29-31.

## PLAINTIFF'S RULE 56.2 MOTION
## FOR JUDGMENT ON THE AGENCY RECORD

Plaintiff, the Coalition for Fair Trade in Ceramic Tile ("the Coalition" or "Plaintiff"), respectfully submits this Rule 56.2 motion for judgment on the agency record challenging certain aspects of the Department of Commerce's ("Commerce") final determination in the antidumping duty investigation of ceramic tile from India. As we demonstrate below, Commerce's final determination is unsupported by substantial evidence and otherwise not in accordance with law.

Plaintiff further moves that the Court remand this determination to the Department of Commerce for disposition consistent with the final opinion and order of the Court.

Respectfully submitted,

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th Street, NW
Suite 1200
Washington, D.C.  20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

COALITION FOR FAIR TRADE IN CERAMIC
TILE,

      Plaintiff,

          v.

UNITED STATES,

      Defendant,

and

WIN-TEL CERAMICS PRIVATE LTD.,
ANTIQA MINERALS,
and
M.S. INTERNATIONAL, INC.,

      Defendant-Intervenors.

**PUBLIC VERSION**

Court No. 25-00095

Business Proprietary Information
Identified by Single Brackets [ ]
and Removed from Pages 3, 19,
20, 22, 23, 25, 29-31.

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th Street, NW
Suite 1200
Washington, D.C.  20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

Dated:  <u>November 17, 2025</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.    INTRODUCTION ...................................................................................................... 1

II.   STATEMENT PURSUANT TO RULE 56.2 ........................................................... 1

      A.    Administrative Determination Under Review ........................................... 1

      B.    Statement Of The Issues .............................................................................. 1

III.  STATEMENT OF FACTS ........................................................................................ 2

IV.   SUMMARY OF ARGUMENT ................................................................................. 6

V.    ARGUMENT .............................................................................................................. 7

      A.    Standard Of Review ..................................................................................... 7

      B.    Commerce Prematurely Granted Antiqa's Reporting Exemptions of
            Marbonite And Segam And Its Failure To Collapse These Affiliated
            Companies With The Antiqa Entity Is Unsupported By Substantial
            Evidence ......................................................................................................... 9

            1.    Commerce prematurely granted Antiqa's reporting exemptions
                  as an abuse of discretion ................................................................. 10

            2.    Commerce's determination to not collapse Marbonite or Segam
                  with the Antiqa entity is unsupported by substantial evidence ............... 13

      C.    Commerce's Determination That Win-Tel And Neelson Are Not
            Affiliated Is Unsupported By Substantial Evidence ............................... 21

            1.    Debt financing demonstrates Win-Tel's control over Neelson ............... 22

            2.    Close supplier relationship of Neelson and Win-Tel evidenced
                  on the record undermines Commerce's lack of affiliation finding .......... 24

      D.    Commerce's Determination To Accept New Factual Information Which
            Was Methodological In Nature During And After Verification Was
            Contrary To Practice And Unlawful ....................................................... 26

            1.    Commerce's request and acceptance of Antiqa's revised sales
                  databases after verification was an abuse of discretion and unlawful ...... 28

2.    Commerce's acceptance of Win-Tel's revised sales databases
during verification was an abuse of discretion .......................................... 30

E.    Commerce's Determination To Grant Win-Tel's Scrap Offset
Was Unlawful ........................................................................................................... 31

VI.    CONCLUSION ................................................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Tubular Products, LLC v. United States*,
   847 F.3d 1354 (Fed. Cir. 2017)..................................................................31

*Arch Chemicals, Inc. v. U.S.*,
   33 C.I.T. 954, 956 (Ct. Int'l Trade 2009) ...............................................31

*Bomont Industries v. U.S.*,
   733 F. Supp. 1507 (Ct. Int'l Trade 1990) ...............................................27

*Carpenter Technology Corp. v. U.S.*,
   510 F.3d 1370 (Fed. Cir. 2007)....................................................................9

*Consol. Bearings Co. v. U.S.*,
   348 F.3d 997 (Fed. Cir. 2003)......................................................................8

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938)......................................................................................7

*Deacero S.A.P.I. de C.V. v. U.S.*,
   996 F.3d 1283 (Fed. Cir. 2021)..................................................................27

*Decatur v. Paulding*,
   14 Pet. 497 (1840)..........................................................................................8

*Dongbu Steel Co., Ltd. v. U.S.*,
   635 F.3d 1363 (Fed. Cir. 2011)....................................................................8

*Dongtai Peak Honey Industry Co., Ltd. v. U.S.*,
   777 F.3d 1343 (Fed. Cir. 2015)....................................................................8

*Eregli Demir ve Celik Fabrikalari v. United States*,
   357 F. Supp. 3d 1325, 1336 (Ct. Int'l Trade 2018) ....................27, 28, 30

*Ghigi 1870 S.p.A. v. U.S.*,
   547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ...........................................29

*Goodluck India Limited v. U.S.*,
   11 F.4th 1335 (Fed. Cir. 2021)..............................................8, 27, 28, 30

*Grupo Acerero S.A. de C.V. v. U.S.*,
   698 F. Supp. 3d 1320 (Ct. Int'l Trade 2024) .............................................8

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024)..................................................................................8

*Nippon Steel Corp. v. U.S.*,
  337 F.3d 1373 (Fed. Cir. 2003).................................................................7

*NSK Ltd. v. U.S.*,
  510 F.3d 1375 (Fed. Cir. 2007).................................................................8

*Oman Fasteners, LLC v. U.S.*,
  125 F.4th 1068 (Fed. Cir. 2025).................................................................8

*Oman Fasteners, LLC v. U.S.*,
  2023 WL 2233642 (Ct. Int'l Trade 2023)....................................................8

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009).................................................................7

*Prosperity Tieh Enterprise Co., Ltd. v. U.S.*,
  965 F.3d 1320 (Fed. Cir. 2020)............................................................9, 10

*Rhone Poulenc, Inc. v. U.S.*,
  899 F.2d 1185 (Fed. Cir. 1990).................................................................9

*SKF USA Inc. v. U.S.*,
  263 F.3d 1369 (Fed. Cir. 2001)............................................................9, 12

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)...............................................................................16

*SolarWorld Americas, Inc. v. U.S.*,
  962 F.3d 1351 (Fed. Cir. 2020).................................................................8

*Ta Chen Stainless Pipe Co. Ltd. v. U.S.*,
  31 C.I.T. 794 (Ct. Int'l Trade 2007) .......................................................11

*Ta Chen Stainless Steel Pipe v. United States*,
  23 C.I.T. 804 (Ct. Int'l Trade 1999) .......................................................24

*TIJID, Inc. v. U.S.*,
  366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ...........................................24

*United States Steel Corp. v. United States*,
  179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016)...........................................26

*Wilmar Trading Pte Ltd. v. U.S.*,
  675 F. Supp. 3d 1215 (Ct. Int'l Trade 2023) .......................................29, 31

**Statutes**

5 U.S.C. § 706(2)(A) ..........................................................................................................8

19 U.S.C. § 1516a(b)(1)(B) ...............................................................................................7

19 U.S.C. §1677(33) .........................................................................................................21

19 U.S.C. § 1677m(i) ...................................................................................27, 28, 29, 32

19 U.S.C. § 1677m(i)(1) ....................................................................................................5

19 U.S.C. § 1977e(a) ........................................................................................................29

**Regulations**

19 C.F.R.
     § 351.102(b)(3) ....................................................................................................21, 22
     § 351.401(f).....................................................................................................10, 15, 16
     § 351.401(f)(1) .........................................................................................................10
     § 351.401(f)(2) ...............................................................................................10, 15, 19

**Other Authorities**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,346
     (Dep't of Commerce May 19, 1997) ("*1997 Preamble*") ..................................10, 16

*Certain Quartz Surface Products from India: Preliminary Affirmative
     Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 68,123 (Dep't
     of Commerce December 13, 2019)........................................................................15

*Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty
     Determination*, 89 Fed. Reg. 85,506 (October 28, 2024) ..................................27, 28

*Statement of Administrative Action accompanying the Uruguay Round
     Agreements Act*, H.R. Doc. No. 103–316, vol. 1 (1994) ("SAA") ..............................10, 21, 24

## I.    <u>INTRODUCTION</u>

On behalf of the Coalition for Fair Trade in Ceramic Tile ("the Coalition" or "Plaintiff),
we respectfully submit the following brief in support of Plaintiff's motion for judgment on the
agency record.

## II.    <u>STATEMENT PURSUANT TO RULE 56.2</u>

### A.    **Administrative Determination Under Review**

The administrative determination under review is the final determination in the
antidumping duty investigation of ceramic tiles from India.  *See Ceramic Tile from India: Final
Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of
Critical Circumstances*, 90 Fed. Reg. 17,030 (Dep't of Commerce April 23, 2025) ("Final
Determination") (P.R. 439)[1], and accompanying Issues and Decision Memorandum ("IDM") (P.R.
434).  The period of investigation is April 1, 2023 through March 31, 2024.  *Id.*

### B.    **Statement Of The Issues**

1.    Whether Commerce's premature reporting exclusion of Antiqa Minerals'
("Antiqa") affiliated entities Antique Marbonite Pvt. Ltd. ("Marbonite") and Segam Tiles Pvt. Ltd.
("Segam") was arbitrary and an abuse of discretion.

2.    Whether Commerce's collapsing analysis of the Antiqa entity and affiliated
producers Marbonite and Segam is unsupported by substantial evidence and is otherwise not in
accordance with law.

3.    Whether Commerce's non-affiliation determination regarding Win-Tel
Ceramics Pvt. Ltd. ("Win-Tel") and its supplier, Neelson Porselano LLP ("Neelson"), is
unsupported by substantial evidence and its otherwise not in accordance with law.

---

[1] Citations to the public record ("P.R.") and confidential record ("C.R.") refer to the record of the
antidumping duty investigation.

4.      Whether Commerce abused its discretion when it accepted methodological corrections and revised sales databases from Antiqa and Win-Tel during and after verification. Moreover, whether in doing so, Commerce failed to abide by the statute's mandate to "verify all information relied upon in making – a final determination in an investigation."

5.      Whether Commerce's determination to grant Win-Tel a scrap offset was not in accordance with law.

## III.  <u>STATEMENT OF FACTS</u>

On April 19, 2024, the Coalition submitted an antidumping duty petition regarding unfairly traded imports of ceramic tile from India.  *See Petition for Antidumping and Countervailing Duties on Imports of Ceramic Tile from India*, (April 19, 2024) (P.R. 17).  Commerce subsequently initiated its antidumping duty investigation covering ceramic tile from India.  *See Ceramic Tile from India: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 42, 836 (Dep't of Commerce May 16, 2024) ("Initiation Notice") (P.R. 98).

In its initiation notice, Commerce stated that it intended to select mandatory respondents based on U.S. Customs and Border Protection ("CBP") data.  *See id.*, 89 Fed. Reg. at 42839-40. Subsequently, Commerce selected Antiqa and Win-Tel, the two exporters or producers that accounted for the largest volume of imported subject merchandise, as mandatory respondents in this investigation.  *See* Commerce Memo, *Less-Than-Fair-Value Investigation of Ceramic Tile from India: Respondent Selection* (July 15, 2024) ("RSM") (P.R. 155).  Accordingly, Commerce issued its Initial Questionnaires to both Antiqa and Win-Tel.  *See Ceramic Tile from India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024) ("Preliminary Determination") (P.R. 363) and accompanying Preliminary Decision Memorandum, at 3 ("PDM") (P.R. 350).

However, before filing its initial questionnaire responses, Antiqa requested that it be allowed to exclude two affiliated companies from its reporting, Marbonite and Segam.  *See* Antiqa's Letter, *Antiqa's Request for Reporting Exclusions* (Aug. 16, 2024) ("Antiqa's First Reporting Exclusion") (P.R. 173).  In its request, Antiqa acknowledged that these companies were affiliated companies.  *Id.* at 1.  Nevertheless, Commerce, without even a cursory affiliation and collapsing analysis, prematurely granted Antiqa's request for reporting exclusions of Marbonite and Segam before Antiqa filed any of its initial questionnaire responses.  *See* Commerce Letter, *Antidumping Duty Investigation of Ceramic Tile from India – Request for Reporting Exclusions* (Aug. 22, 2024) ("First Exclusion Request Grant") (P.R. 184).  During the proceeding, the Coalition submitted comments opposing Commerce's decision to grant Antiqa's exclusion request of Marbonite and Segam as premature.  *See* Coalition's Letter, *Petitioner's Response to Antiqa's Request for Reporting Exclusions & the Department's Allowance Letter* (Aug. 30, 2024) ("Petitioner's Opposition to Exclusions") (P.R. 214-215).

On August 29, 2024, Antiqa submitted its response to Section A of Commerce's initial questionnaire.  *See* Antiqa's Letter, *Antiqa's Section A Questionnaire Response* (Aug. 29, 2024) ("Antiqa's Section A QR") (P.R. 193-206; C.R. 85-129).  In its Section A response, Antiqa requested yet another exclusion for another affiliate, [                    ], publicly referred to as "Affiliate A."  *Id.* at 1.  On the same day, Win-Tel also submitted its Section A response to the initial questionnaire on behalf of itself, Theos Tiles LLP ("Theos"), and Neelson.  *See* Win-Tel's Letter, *Win-Tel, Theos, and Neelson Section A Response* (Aug. 29, 2024) ("Win-Tel Section A QR") (P.R. 207-212; C.R. 130-154).

In response to Antiqa's additional request for a reporting exemption for Affiliate A, Commerce, following its customary practice, rejected such a premature exemption request.  *See*

Commerce Letter, *Second Request for Reporting Exclusion* (Sept. 11, 2024) ("Second Reporting Exclusion Denial") (P.R. 247). Instead, Commerce explained that "final affiliation and collapsing determinations will not be made until {it} more thoroughly review{s} Antiqa's affiliation information." *See id.*

Through the course of the proceeding, Commerce received initial questionnaire response from both mandatory respondents. *See* PDM at 3. These responses required Commerce to issue supplemental questionnaires to both mandatory respondents, to which it subsequently received responses from both. *Id.* Both respondents reported affiliations with various other companies involved in the sale and production of ceramic tile and inputs used in the production of ceramic tile.

Throughout the investigation, the Coalition filed comments which identified various deficiencies in reporting by both mandatory respondents. *See* PDM at 3. Commerce subsequently issued additional rounds of supplemental questionnaires. *Id.* Both mandatory respondents submitted their corresponding responses. *Id.*

On December 2, 2024, Commerce published its preliminary determination in this antidumping duty investigation. *See* Preliminary Determination, 89 Fed. Reg. 95,182. In it, Commerce determined that ceramic tile from India is not being, or is not likely to be, sold in the United States at less than fair value, and calculated 0.00 percent dumping margins for both mandatory respondents. *Id.*, 89 Fed. Reg. at 95,183.

Commerce determined that Antiqa is affiliated with Antiqa Ceramic Pvt. Ltd. ("ACPL"), Shivam Enterprises ("Shivam"), Antiek Vitrified LLP ("AVL"), Antique Non Woven Pvt. Ltd. ("ANPL"), Marbonite, Segam, and Affiliate A and collapsed the first four of these companies into a single Antiqa entity (e.g., ACPL, Shivam, AVL, and ANPL). *See* PDM at 5; *see also* Commerce

Memo, *Antiqa Minerals Preliminary Affiliation and Collapsing Memorandum* (Nov. 22, 2024) ("Antiqa Prelim Collapsing Memo") (P.R. 358; C.R. 645). Commerce determined not to collapse Antiqa with Marbonite, Segam, or Affiliate A. *See id.* Separately, Commerce determined that Win-Tel is only affiliated with Theos based on common ownership and subsequently collapsed the two companies into a single entity. *See* PDM at 5, *see also* Commerce Memo, *Win-Tel Ceramics Pvt. Ltd. Preliminary Affiliation and Collapsing Memorandum* (Nov. 22, 2024) ("Win-Tel Prelim Collapsing Memo") (P.R. 360; C.R. 646). Moreover, Commerce determined that Neelson and Win-Tel are not affiliated within the meaning of the statute. *Id.*

In its preliminary determination, Commerce stated that pursuant to 19 U.S.C. § 1677m(i)(1), it "intends to verify the information relied upon in making its final determination for Antiqa Group and Win-Tel Group." *See* Preliminary Determination, 89 Fed. Reg. at 95,183. Commerce conducted sales and cost verifications of Antiqa and Win-Tel in January and February of 2025. *See* IDM at 2. As part of verification, Commerce accepted new information that Antiqa and Win-Tel presented for the first time at verification. *See id.* at 4. Commerce subsequently issued its corresponding sales and cost verification reports for both mandatory respondents between February 21 to March 18, 2025. *Id.* at 2.

In line with Commerce's briefing schedule, the Coalition, on March 26, 2025, submitted a timely case brief with Commerce requesting that several changes be made to certain aspects of the Preliminary Determination. *See* IDM at 2. Unexpectedly, after verification reports had been issued and briefing had been submitted by the Coalition, Commerce issued a request for Antiqa to submit revised sales databases. *See* Commerce Letter, *Request for Revised Sales Databases* (March 27, 2025) (P.R. 420). On April 1, 2025, Antiqa and Win-Tel submitted a joint rebuttal brief. *Id.* On April 23, 2025, Commerce published the final negative determination on ceramic

tile from India in which calculated a 0.00 percent dumping margin for both Antiqa and Win-Tel. *See* Final Determination, 90 Fed. Reg. 17,030.

For its final determination, Commerce continued to find that the facts on the record do not support collapsing Segam and Marbonite with Antiqa. *See* IDM at Comment 18. Similarly, Commerce also determined that the record did not support a finding of affiliation between Win-Tel and its supplier of subject merchandise, Neelson. *See* IDM at Comment 14. Moreover, Commerce relied on new information submitted by both mandatory respondents during and after verification. *See* IDM at 4. Such information included updated comparison market and U.S. sales databases provided by the respondents, *i.e.*, information that directly impacts the methodology used by Commerce to calculate the dumping margins. *Id.* Finally, Commerce, contrary to its own practice and binding Federal Circuit precedent, granted Win-Tel a scrap offset even though Commerce's own verification report stated that Win-Tel does not track generation of scrap in the normal course of business. *See* IDM at 26.

## IV.    SUMMARY OF ARGUMENT

At nearly every stage of this antidumping duty investigation, Commerce violated the statute, ignored the substantial contrary evidence that undermined its findings, and departed from its common practice to nullify the Coalition's efforts to level the playing field to unfairly priced Indian ceramic tile in the U.S. market. During the questionnaire phase, Commerce abused its discretion when it excused Antiqa's reporting of affiliated entities, Marbonite and Segam, who are involved in the production and sale of subject merchandise. Not only did Commerce prejudge the issue of collapsing early in the proceeding, but it also subsequently failed to consider substantial evidence that weighed in favor of collapsing Marbonite and Segam with the Antiqa entity. Specifically, Commerce's analysis on whether there is a significant potential for manipulation between Antiqa and its affiliates Marbonite and Segam is deficient and unsupported by substantial

evidence.  Moreover, Commerce's determination that Win-Tel and Neelson are not affiliated is also unsupported by substantial evidence because of the existing debt financing and close supplier relationship between the two companies.

Additionally, Commerce's determination to accept new information which is methodological in nature during and after verification was contrary to Commerce's established practice as affirmed by the Federal Circuit.  Furthermore, Commerce acted unlawfully when it allowed parties to place information on the record of the proceeding on which it relied in making its final determination but which was not subject to verification.  Commerce's acceptance of revised sales databases from both mandatory respondents at such a late stage in the proceeding cannot be adequately squared with Commerce's past practice or the statute's mandate that it verify all information relied upon in making a final determination in an investigation.  Finally, Commerce's determination to grant Win-Tel's scrap offset when Commerce's own verification report indicated that Win-Tel does not track production of scrap was contrary to practice and unlawful.

## V.    ARGUMENT

### A.    Standard Of Review

The court shall hold unlawful any determination, finding, or conclusion by Commerce that is unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B).  Substantial evidence requires "more than a mere scintilla" of evidence or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  To determine if substantial evidence exists, the court must review the record as a whole, including evidence that fairly detracts from the substantiality of the evidence.  *See Nippon Steel Corp. v. U.S.*, 337 F.3d 1373, 1379 (Fed. Cir. 2003).

In reviewing whether Commerce's actions are not in accordance with law, the Court reviews questions of law, including questions of statutory interpretation, under the non-deferential, *de novo* standard. *See NSK Ltd. v. U.S.*, 510 F.3d 1375, 1379 (Fed. Cir. 2007). As the Supreme Court recently made clear in *Loper Bright Enterprises v. Raimondo*, "when the meaning of a statute {is} at issue, the judicial role {is} to 'interpret the act of Congress, in order to ascertain the rights of the parties.'" 603 U.S. 369, 385 (2024) (quoting *Decatur v. Paulding*, 14 Pet. 497, 515 (1840)). In overturning *Chevron* deference, the Court explained that "courts interpret statutes, no matter the context, based on the traditional tools of statutory construction," to determine the "best reading of the statute." *See Loper Bright*, 603 U.S. at 400-403.

Additionally, the court reviews Commerce's conduct of its administrative proceedings under the abuse of discretion standard. *See Goodluck India Limited v. U.S.*, 11 F.4th 1335, 1342 (Fed. Cir. 2021); *see also Dongtai Peak Honey Industry Co., Ltd. v. U.S.*, 777 F.3d 1343, 1350 (Fed. Cir. 2015). This is the same default standard set by the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (the court must "set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see also Oman Fasteners, LLC v. U.S.,* 2023 WL 2233642, at *4 (Ct. Int'l Trade 2023) (*citing SolarWorld Americas, Inc. v. U.S.*, 962 F.3d 1351, 1359 fn. 2 (Fed. Cir. 2020)).

Commerce's discretion is not absolute. *See Dongbu Steel Co., Ltd. v. U.S.*, 635 F.3d 1363, 1372 (Fed. Cir. 2011); *see also Grupo Acerero S.A. de C.V. v. U.S.*, 698 F. Supp. 3d 1320, 1332 (Ct. Int'l Trade 2024). Commerce abuses its discretion if its exercise rests on a clear error of judgment in the consideration of the relevant factors. *See Oman Fasteners, LLC v. U.S.*, 125 F.4th 1068, 1084 (Fed. Cir. 2025). Commerce also abuses its discretion if it departs from a consistent practice without reasonable explanation. *See Consol. Bearings Co. v. U.S.*, 348 F.3d 997, 1007

(Fed. Cir. 2003).   Additionally, Commerce's actions are arbitrary when the agency offers insufficient reasons for treating similar situations differently.  *See SKF USA Inc. v. U.S.*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("*SKF USA*").

> **B.     Commerce Prematurely Granted Antiqa's Reporting Exemptions of Marbonite And Segam And Its Failure To Collapse These Affiliated Companies With The Antiqa Entity Is Unsupported By Substantial Evidence**

As we demonstrate below, Commerce erred from the start of the investigation when it excused Antiqa's reporting of affiliated entities involved in the production and sale of subject merchandise.  Not only did Commerce prejudge the issue of collapsing early in the proceeding, but it also failed to consider substantial evidence that weighed in favor of collapsing Marbonite and Segam with the remaining Antiqa entity.  Thus, Commerce failed to conduct this investigation in a way that would have allowed it to abide by the basic purpose of the statute – to determine dumping margins as accurately as possible for the entire Antiqa entity.  *See Rhone Poulenc, Inc. v. U.S.*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

Commerce's dumping calculations are, in large part, based on cost and sales data provided by mandatory respondents that are subject to the investigation.  When the facts warrant it, Commerce will collapse related entities, meaning that it will treat affiliated entities as a single entity for purposes of its dumping calculations.  *See Carpenter Technology Corp. v. U.S.*, 510 F.3d 1370, 1373 (Fed. Cir. 2007).  The collapsing practice is meant to ensure that Commerce reviews the entire producer, not merely a part of it, and prevents affiliated entities from circumventing antidumping duties by channeling production of subject merchandise through the affiliate with the lowest potential dumping margin.  *See Prosperity Tieh Enterprise Co., Ltd. v. U.S.*, 965 F.3d 1320, 1323 (Fed. Cir. 2020) ("*Prosperity Tieh*").  As such, Commerce's collapsing practice arises out of its "responsibility to prevent circumvention of the antidumping law."  *Id.*

Commerce's collapsing practice is governed by 19 C.F.R. § 351.401(f).  This regulation explains that Commerce "will treat two or more affiliated producers as a single entity where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities and the Secretary concludes that there is a significant potential for the manipulation of price or production."  *See* 19 C.F.R. § 351.401(f)(1).  To identify "a significant potential for manipulation" Commerce may consider the following: (i) the level of common ownership; (ii) the extent to which managerial employees or board members of one company sit on the board of directors for an affiliated company; and (iii) whether operations are intertwined, such as sharing of sales of information, involvement in production and pricing decisions, sharing of facilities or employees, or significant transactions between affiliates.  *See* 19 C.F.R. § 351.401(f)(2).  Courts have recognized that Commerce must consider the "totality of the circumstances," and it need not find all of the factors in the regulation present to find a significant potential for manipulation of price or production."  *See Prosperity Tieh*, 965 F.3d at 1323.  Additionally, Commerce's practice is to consider future manipulation as well as actual manipulation in the past.  *See Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,346 (Dep't of Commerce May 19, 1997) ("*1997 Preamble*").

### 1.    Commerce prematurely granted Antiqa's reporting exemptions as an abuse of discretion

In antidumping investigations, the "question of affiliation is relevant to a number of price and cost issues."  *See Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 103–316, vol. 1, p. 838 (1994) ("SAA").  This is why Commerce has long required respondents to report costs and sales by affiliated companies to ensure that they have adequately investigated all applicable sales of subject merchandise.  *See Less-Than-Fair-*

*Value Investigation of Ceramic Tile from India: Request for Information*, at G-10 (July 26, 2024) ("report the sales and cost information of these affiliates") ("Initial Questionnaire") (P.R. 159); *see also Ta Chen Stainless Pipe Co. Ltd. v. U.S.*, 31 C.I.T. 794, n.26 (Ct. Int'l Trade 2007). Accordingly, Commerce's practice is to first collect initial responses from respondents and their affiliates and wait to make determinations regarding affiliation and collapsing in its preliminary and final decision memorandums. *See* PDM at 4; IDM at Comments 3 and 5. In fact, Commerce itself acknowledged that granting exemption requests for affiliated entities early in the proceeding is improper because "final affiliation and collapsing determinations will not be made until {it} more thoroughly reviewed {Antiqa's} affiliation information." *See* Second Reporting Exclusion Denial. Yet, Commerce exempted Antiqa from reporting relevant cost and sales information from Marbonite and Segam, affiliated entities involved in the production and sale of subject merchandise, before it more thoroughly reviewed their affiliation information. Commerce's decision to do so was arbitrary and an abuse of discretion.

On August 16, 2024, Antiqa requested that Commerce grant it exclusions "from reporting detailed costs and sales data for two companies which are affiliated with Antiqa," Marbonite and Segam. *See* Antiqa First Exclusion Request. In its request, Antiqa acknowledges that both affiliated companies are producers and/or sellers of subject merchandise. *Id.* at 2 ("Antiqa should not be required to report detailed price and cost data for merchandise under consideration … sold and/or produced by these companies during the period of investigation"). In doing so, Antiqa performed its own collapsing analysis for each company filled with inconsistent claims and claims lacking evidentiary support. *Id.* at 3-12; *see infra* Section V.B.2. Commerce, rather than waiting to perform its own collapsing analysis after receiving and evaluating initial questionnaire responses, simply accepted Antiqa's faulty analysis as gospel and granted the reporting exclusions

for Marbonite and Segam without performing any substantive analysis of the claims regarding the two companies. *See* First Exclusion Request Grant ("For the reasons detailed in your request, we are granting your reporting exclusion at this time.")

The Coalition rightfully opposed this decision as "premature and informed by insufficient and misleading information submitted by Antiqa." *See* Petitioner's Opposition to Exclusions at 2. The Coalition further urged Commerce to reconsider and reverse its decision to narrow the scope of Antiqa's reporting because the facts necessary for a collapsing determination, Section A questionnaire responses, were not present on the record at the time the exclusion was granted. *See id.* at 3-5. More importantly, relying on Antiqa's own analysis was contrary to Commerce's established practice and is evidence that Commerce prejudged the collapsing issues.

In a return to its normal practice, a few weeks later, Commerce denied Antiqa's second request for a reporting exclusion for an additional affiliate. There, Commerce stated that because it was "still reviewing Antiqa's Section A questionnaire response and…final affiliation and collapsing determinations will not be made until we have more thoroughly reviewed Antiqa's affiliation information" it decided not to grant Antiqa's exemption request for Affiliate A. *See* Second Reporting Exclusion Denial. Such disparate treatment of reporting requirements for similarly situated Antiqa affiliates is arbitrary and counter to Commerce's established practice of requiring sales and cost information for all affiliated entities involved in the sale and production of subject merchandise. *See SKF USA*, 263 F.3d at 1382 ("it is well-established that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently").

Additionally, as we elaborate below, this arbitrary decision by Commerce is made worse by the fact that substantial evidence on the record supports collapsing Marbonite and Segam with

the rest of the Antiqa entity and therefore relevant cost and sales information is missing from the record of this investigation that is needed to calculate an accurate dumping margin for the entire Antiqa entity.

### 2. Commerce's determination to not collapse Marbonite or Segam with the Antiqa entity is unsupported by substantial evidence

Commerce's determination that Marbonite and Segam should not be collapsed with the Antiqa entity was unsupported by substantial evidence and not in accordance with law.  In its request for reporting exclusions, Antiqa claimed Marbonite and Segam "cannot possibly be collapsed."  *See* Antiqa's First Reporting Exclusion at 3.  Commerce, without waiting to evaluate the evidence submitted in Antiqa's Section A response, accepted Antiqa's claims and granted the exclusions.  *See* First Exclusion Request Grant.  This alone was an abuse of discretion by Commerce to abdicate its duty to conduct its own analysis of the evidence.  But worse still, when it did make its own collapsing analysis, Commerce continued to rely on the inconsistent claims made in Antiqa's first exclusion request when it determined that Marbonite and Segam should not be collapsed with the Antiqa entity.  *See IDM* at 19-22.  As such, Commerce's collapsing determinations with respect to Marbonite and Segam are unsupported by substantial evidence.

*Marbonite*

Substantial evidence supports a determination that there is significant potential for the manipulation of prices and production between Marbonite and the Antiqa entity.  There is no dispute between the parties that Marbonite meets the first two of the three factors necessary for collapsing: (1) Marbonite and Antiqa are affiliated, and (2) they have production facilities for similar or identical products that would not require substantial retooling of production facilities.  *See* IDM at 18; *see also* Antiqa's First Reporting Exclusion at 2-9.  Therefore, the Court need only determine that Commerce's determination that there is no significant potential for the manipulation

of prices or production between Marbonite and the Antiqa entity is unsupported by substantial evidence to warrant a remand.

Regarding Marbonite, Antiqa claimed that "notwithstanding an equal shareholding structure, Prism Johnson exercises actual control over Marbonite's operations through an exclusive supply agreement that governs both the quartz and ceramic tile segments." *See* Antiqa's First Reporting Exclusion at 5. Nonetheless, Antiqa acknowledged that Marbonite is a joint venture between Prism Johnson and the Kundariya family that controls the Antiqa entity, with both owning 50% of Marbonite. *Id.* at 4 and Exhibit 2. Additionally, Antiqa acknowledged that both Prism Johnson and the Kundariya family each appoint three directors, with the Kundariya family appointing the Managing director, and the existence of two overlapping directors/partners in Antiqa entity companies. *Id.* at 4. Antiqa also conceded that, even with the exclusive supply agreement with Prism Johnson, there were transactions between Antiqa entity companies and Marbonite. *Id.* at 5.

Commerce echoed many of the same points made by Antiqa in its first reporting exclusion request. *See* IDM at 18-21, fns. 98-105. First, Commerce disagreed with the Coalition's argument that Commerce consider its past practice in a separate proceeding where it collapsed Marbonite and Shivam, which is also part of the Antiqa entity. IDM at 19. Commerce also gave weight to the notion that Marbonite did not export ceramic tile to any entity independent of Prism Johnson. *Id.* Oddly, Commerce provided unrelated and conflicting reasoning for not collapsing Marbonite with the remaining Antiqa entity, including:

> …Antiqa provided Prism Johnson's shareholding information which demonstrates that no Kundariya family members are shareholders either directly or indirectly in Prism Johnson and that there are no common managers or directors between Prism Johnson and any of the companies controlled by the Kundariya family. Antiqa Group also provided Prism Johnson's and Marbonite's consolidated

> financial statements which demonstrates further the intertwined nature of Marbonite and Prism Johnson's relationship. Antiqa Group conceded that Marbonite is a producer of ceramic tile, as well as quartz surface products but explained that Marbonite never exported ceramic tile to the United States, including during the POI and that all of Marbonite's sales of ceramic tile were domestic sales made to Prism Johnson and were not exported to the United States. They have provided documentation of Marbonite and Prism Johnson's exclusive supply agreement through which Prism Johnson controls Marbonite's production and sales. The agreement obligates Marbonite to sell its production to Prism Johnson, amongst other obligations.…
>
> …Marbonite also did not share pricing or production information, managerial or administrative functions with any member of the Antiqa Group. While Marbonite does share board members with Antiqa and Shivam, Prism Johnson appoints the controlling share of board members in Marbonite. Therefore, based on record evidence, we conclude that, while Marbonite is a producer of MUC, it is not an exporter of ceramic tile and does not possess the potential for price manipulation.

IDM at 20-21 (internal citations omitted).

Commerce's collapsing analysis of Marbonite is internally inconsistent, fails to consider evidence that detracts from its determination, and is unsupported by the evidence on the record. First, Commerce's refusal to consider past agency determinations that Marbonite and another company within the Antiqa entity, *i.e.*, Shivam, demonstrated significant potential for manipulation raises concerns of inconsistent determinations regarding the same companies. *See Certain Quartz Surface Products from India: Preliminary Affirmative Determination of Sales at Less Than Fair Value*, 84 Fed. Reg. 68,123 (Dep't of Commerce December 13, 2019) ("*QSP from India Prelim*") and accompanying Preliminary Decision Memo at 7-8 ("we preliminarily determine that Antique Marbonite, Prism Johnson, and Shivam should be treated as a single entity for AD purposes pursuant to 19 C.F.R. § 351.401(f).…we also find that the criterion in 19 C.F.R. § 351.401(f)(2), significant potential for manipulation, is met due to…overlapping board members, partners, and/or management (in the case of Shivam), and intertwined sales operations

and/or employees (in the case of both Shivam and Prism Johnson)") (unchanged in final determination); *see also Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("consistency with earlier and later pronouncements…give it power to persuade").  Moreover, past determinations that Marbonite and Antiqa entity companies demonstrated a significant potential for manipulation is relevant to whether there is a potential for manipulation in this instance.  *See 1997 Preamble*, 62 Fed. Reg. at 27,346 (explaining that Commerce's practice is to consider future manipulation as well as manipulation in the past).

Both Antiqa and Commerce also rely on the claim that during the "POI Marbonite has not exported ceramic tile to any entity independent of Prism Johnson."  *See* IDM at 19; *see also* Antiqa's First Reporting Exclusion at 8.  But it is not clear why such a claim would carry any weight under Commerce's collapsing analysis given the regulations do not require that a company be an exporter of subject merchandise to be collapsed.  Rather the language of the regulations explicitly consider whether Commerce "will treat two or more affiliated *producers* as a single entity."  *See* 19 CFR § 351.401(f) (emphasis added).  Not only are exports to the United States not required under Commerce's collapsing analysis pursuant to 19 CFR § 351.401(f), but such an analysis disregards the fact that sales to the domestic market, *i.e.*, India, are relevant to this investigation as they form the basis for normal value in Commerce's antidumping calculations. *See* PDM at 10.  Therefore, *in arguendo*, even if ceramic tile produced by Marbonite is only sold in the domestic market, such sales would be relevant in determining normal value.

Also, in determining that Marbonite should not be collapsed with the Antiqa entity, Commerce relied on shareholding information which demonstrated that no Kundariya family members are shareholders, either directly or indirectly, in Prism Johnson, and that there were no common managers or directors between Prism Johnson and any of the companies controlled by

the Kundariya family. *See* IDM at 20 (citing Antiqa's First Reporting Exclusion at 3 and Exhibit 1). This argument, however, is a red herring because the Coalition did not argue for Commerce to collapse Prism Johnson into the Antiqa-entity. Rather, the focus should have been on whether the Kundariya family are shareholders, either directly or indirectly, in Marbonite, which they are, and if there are common managers or directors between Marbonite and the Antiqa entity respondents, which there are. *See* Antiqa's First Reporting Exclusion at 4. Additionally, Commerce incorrectly stated that "Prism Johnson appoints the controlling share of board members in Marbonite," while Antiqa acknowledged that Prism Johnson and the Kundariya family each appoint three directors. *Id.* Therefore, the Kundariya family and Prism Johnson each appoint an equal share of board members in Marbonite.

Additionally, although Commerce discounted sales by Marbonite to the Antiqa Group's affiliates during the POI as "insignificant," such sales are strong evidence that Marbonite's supposed "long-standing exclusive supplier agreement" is not actually exclusive. *See* IDM at 20. Rather such sales are consistent with long-term behavior by Marbonite of having sales with entities outside of Prism Johnson. *See QSP from India* PDM at 7 ("Antique Marbonite reports that the subject merchandise manufactured by Antique Marbonite is sold to affiliates Shivam and Prism Johnson in the home market and is exported to the U.S. market by Antique Marbonite, Shivam, and Prism Johnson (*i.e.*, all three entities export to the U.S. market)").

Lastly, although Commerce stated that "Marbonite also did not share pricing or production information, managerial or administrative functions with any member of the Antiqa Group," the record indicates otherwise. IDM at 21. Instead, the record demonstrates that Marbonite's production information is clearly available to the Antiqa-entity, and Marbonite certainly has a managerial overlap with the Antiqa-entity, including by the Kundariya family's appointment of

Marbonite's managing director.  *See* Antiqa's First Reporting Exclusion at 4 and 8 (discussing Marbonite's production information).  Moreover, the overlap in shared management with Antiqa entity companies is evidence that "sales information is implicitly shared between these entities as part of operational activities."  *Compare with Antiqa Minerals Response to First Supplemental Questionnaire*, at S1-4 (Oct. 28, 2024) ("Antiqa's Supp A QR") (P.R. 311; C.R. 478) (explaining that "Antiqa, ACPL, Shivam, AVL, and ANPL do share sales information to a certain extent due to the shared management within the Kundariya family").

Thus, the record, as a whole, overwhelmingly demonstrates that there is significant potential for manipulation of prices and production of subject merchandise between the Antiqa entity and Marbonite.

*Segam*

Similar to Marbonite, there is no dispute between the parties that Segam meets the first two of the three factors necessary for collapsing: (1) Segam and Antiqa respondents are affiliated, and (2) they have production facilities for similar or identical products that would not require substantial retooling of production facilities.  *See* IDM at 21; *see also* Antiqa Prelim Collapsing Memo, at 7-8.  Thus, again, the Court need only hold that Commerce's determination of no significant potential for manipulation between Segam and the Antiqa entity is unsupported by substantial evidence to warrant a remand on this issue.

Regarding Segam, Commerce determined that "the non-controlling ownership percentage, the lack of significant overlap of directors/partners between Antiqa and Segam, and the lack of intertwined operations does not support finding a significant potential for manipulation."  *See* IDM at 22.  Commerce agreed with the Antiqa entity's argument that its common ownership share of Segam was too insignificant to meet Commerce's collapsing requirement.  *Id.* at 21.  Additionally, although Commerce acknowledged "that there is a managerial overlap between Antiqa, ANPL,

Marbonite, and Segam, as the Kundariya family maintains directorship in all of these companies," Commerce determined that this overlap is not significant. *Id.* Commerce also discounted that evidence on the record does not demonstrate that Segam and the Antiqa entity affiliates communicate on pricing and sales, and that the existence of transactions between Antiqa entity companies and Segam "by itself does not meet the criteria for finding the entities have intertwined operation." *Id.* at 22. We address why Commerce's final determination with respect to each factor in 351.401(f)(2) is unsupported by substantial evidence and not in accordance with law.

First, regarding the level of common ownership – although it acknowledged that the Kundariya family's ownership in Segam is not controlling, Commerce preliminarily determined that "there is a significant common ownership among Antiqa, ACPL, ANPL, AVL, Marbonite, Shivam, Segam, and {Affiliate A}." *See Antiqa's Prelim Collapsing Memo* at 9. In fact, the Kundariya family, collectively, is the [                    ] in Segam. *See* Antiqa's First Reporting Exclusion at Exhibit 4. Moreover, Segam's reported list of shareholders raises questions about the true extent of Kundariya family ownership in Segam because [      ] shareholders [

                    ] – account for an [                    ] of total ownership. *See id.* Commerce never explained why it changed its determination from the preliminary determination when it found that there was significant common ownership among Antiqa entity affiliates and Segam, nor did it consider the potential that the true extent of Kundariya family ownership in Segam is greater, despite the record evidence. *See* IDM at 21. Nonetheless, substantial evidence on the record supports, as Commerce found in its preliminary determination, that there is a significant level common ownership among Antiqa-entity companies and Segam.

Moreover, substantial evidence demonstrates that there is overlap in managerial employees or board members between Segam and the Kundariya family which controls the Antiqa-entity.  In fact, Antiqa acknowledged that there are common directors between Segam and several other Antiqa entity companies.  *See* Antiqa's First Reporting Exclusion at 10; *see also Antiqa's Section A Questionnaire Response*, at Exhibit A-8 (Aug. 29, 2024) ("Antiqa's Section A QR") (C.R. 118). Antiqa also obscured the extent of Kundariya family involvement Segam, as it reported that Segam "is promoted by Mr. Kamlesh Rajkotiya and Mr. Mahesh Rugnath" but in comparing the name of Mr. Mahesh Rugnath to the list of shareholders for Segam it becomes evident that Mr. Mahesh's [                                    ] because the only individual with a similar name in the shareholder list is [                                    ].  *Compare Antiqa's First Exclusion Request* at 10 *with* Exhibit 4.  Also, the Managing Director and Chairman of Segam is [                                    ].  *See Petitioner's Response to Antiqa's Exclusion Request,* at Attachment 5 (August 30, 2024) (C.R. 155-159).

Lastly, substantial evidence also contradicts Commerce's determination that there is a lack of intertwined operations between the Antiqa entity and Segam.  As explained above, there is a clear overlap in directors and management between Segam and Antiqa entity affiliates.  Because of this overlap in directors, it is implicit that these entities share production, sales, and pricing information.  *See supra* at 18 (comparing to Antiqa's Supp A QR) (explaining that "Antiqa, ACPL, Shivam, AVL, and ANPL do share sales information to a certain extent due to the shared management within the Kundariya family").  Also, Segam's production, pricing, and sales information is clearly available to the Antiqa entity.  *See* Antiqa's First Exclusion Request at 11 (discussing Segam's production and sales information).  Moreover, the existence of sales and

purchases of subject merchandise between the Antiqa entity and Segam further support a determination that Segam's operations are intertwined with the Antiqa entity.  *See id*.

In sum, substantial evidence on the record of the investigation demonstrates that there is a significant potential for manipulation between the Antiqa entity and Segam.  Thus, Commerce's determination to not collapse the two and to not require cost and sales reporting from Segam was unsupported by substantial evidence and unlawful.

### C.    Commerce's Determination That Win-Tel And Neelson Are Not Affiliated Is Unsupported By Substantial Evidence

Commerce erred when it determined that Win-Tel is not affiliated with Neelson.  IDM at 12-14.  As we demonstrate below, substantial evidence shows that Neelson and Win-Tel are affiliated when considering all the relevant factors in 19 C.F.R. § 351.102(b)(3) including close supplier relationship, and debt financing.  As we explained above, in antidumping investigations, the "question of affiliation is relevant to a number of price and cost issues."  *See* SAA at 838.  As such, Commerce's unsupported determination that Neelson is not affiliated with Win-Tel impacted its dumping margin calculations and warrants a remand for reconsideration.

The statute defines "affiliated persons" to include:

> (A) members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants;
> (B) any officer or director of an organization and such organization;
> (C) partners;
> (D) employer and employee;
> (E) any person directly or indirectly owning controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;
> (F) two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and
> (G) any person who controls any other person and such other person.

*See* 19 U.S.C. §1677(33).  The statute further clarifies that "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction

over the other person." *Id.* Commerce's regulations adopt the statute's definition of "affiliated persons" and adds that it will also consider other factors such as corporate and family groupings, franchise or joint venture agreements, debt financing, and close supplier relationships. *See* 19 C.F.R. § 351.102(b)(3). The regulation further explains that Commerce also will consider the temporal aspect of a relationship in determining whether control exists, and that normally, temporary circumstances will not suffice as evidence of control. *Id.*

The Coalition argued that Win-Tel and Neelson are affiliated based on debt financing because members of the Kundariya family that control Win-Tel and Theos provided Neelson with collateral used to secure a loan, and a close supplier relationship as Neelson is Win-Tel's [

] supplier of subject merchandise behind Theos, another affiliated supplier. Instead, Commerce relied on explanations from Win-Tel company officials at verification that the Kundariya family member who secured collateral for Neelson took steps to have his collateral released from the bank which secured the original loan. *See* IDM at 14. Additionally, Commerce determined that the record makes evident that Win-Tel is not reliant upon Neelson because Neelson is "only" Win-Tel's third largest supplier of ceramic tile for export, and the percentage of Win-Tel's exports produced by Neelson is "miniscule." *Id.* at 13. Commerce's determination fails to properly consider whether affiliation existed between Win-Tel and Neelson and is further unsupported by substantial evidence.

### 1. Debt financing demonstrates Win-Tel's control over Neelson

Just prior to the POI, up to [                    ], [                              ], a family member of the Kundariya family that owns Win-Tel, was a partner in Neelson with [    ] percent ownership. *See* IDM at 13; *see also* Win-Tel's Supplemental Section A Questionnaire Response, at S-3, (Oct. 28, 2024) ("Win-Tel's Supp A QR") (P.R. 314-315; C.R. 488-504). During the years that [                        ] was a partner in Neelson, members of the Kundariya

22

family provided Neelson with collateral used to secure a loan.  *Id.*  In fact, evidence on the record demonstrates that out of the [      ] pieces of collateral used to secure Neelson's loan, [      ] of those belong to the Kundariya family.

Instead, Commerce relied on documentation indicating that two individuals who acquired the ownership interest in Neelson from the Kundariya family provided collateral to replace the collateral previously provided by the Win-Tel partner.  *See* IDM at 13-14.  Commerce also added that "during verification, Win-Tel company officials explained that the Kundariya family member upon retiring from Neelson took steps to have his collateral released from the bank which secured the original loan."  *See* IDM at 14.  However, this is contradicted by Win-Tel's reporting and Commerce's own sales verification report of Win-Tel in which it states that "{t}hough [      ] withdrew from his partnership in Neelson in [            ], the divestment process has not concluded because the bank has not yet relinquished the guarantee to the Kundariya family….the process is not officially complete."  *See* Commerce Memo, *Verification of the Sales Response of Win-Tel Ceramics Private Limited*, at 3 (Mar. 14, 2025) ("Win-Tel Sales Verification Report") (P.R. 401; C.R. 896); *see also* Win-Tel's Supp A QR at S-3 ("…when [      ] resigned as a Partner from Neelson in [            ], the security was not released.  This is because an existing security cannot be abruptly terminated.")

This kind of debt financing arrangement between Win-Tel and Neelson extends much further than a typical customer/supplier relationship.  Instead Win-Tel's directors and shareholders are investors in Neelson through collateral for securing a loan.  This relationship continues to exist even after Win-Tel's shareholders resigned from partnership in Neelson because the collateral interest provided by members of the Kundariya family remains active.

This Court has previously upheld Commerce's conclusion that debt financing between two purported unaffiliated companies indicated a control relationship and supported a finding of affiliation. *See Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804, at *9-10 (Ct. Int'l Trade 1999). There Commerce explained, and the Court agreed, that if a customer "unilaterally, and without consideration, assigned its {assets} to facilitate a loan for {the supplier} …. that the {customer} would accept this risk without any consideration…. does not comport with the commercial realities of dealings between unaffiliated companies." *Id.* at *10. Similarly, the debt financing and close financial history between Win-Tel and Neelson do not comport with the commercial realities of dealings between unaffiliated companies and instead warrant a remand for Commerce to reconsider its affiliation determination.

### 2. Close supplier relationship of Neelson and Win-Tel evidenced on the record undermines Commerce's lack of affiliation finding

Commerce's determination that there is not a close supplier relationship between Win-Tel and Neelson is unsupported by substantial evidence on the record and suffers from an incomplete analysis. Commerce not only neglected to properly consider the extent to which Win-Tel is reliant on Neelson as a supplier of subject merchandise but also failed to consider altogether the extent to which Neelson is reliant on Win-Tel as its exporter of subject merchandise. As such, Commerce's affiliation determination regarding Win-Tel and Neelson warrants a remand for reconsideration.

A "close supplier relationship" is defined in the SAA as a relationship where "the supplier or buyer become reliant upon the other." *See* SAA at 838. Commerce has previously explained "that a 'close supplier relationship' is established when a party demonstrates that the relationship is significant and could not be easily replaced." *See TIJID, Inc. v. U.S.*, 366 F. Supp. 2d 1286, 1299 (Ct. Int'l Trade 2005) (internal citation omitted).

The record supports a finding that Win-Tel and Neelson are reliant upon each other. First, as explained above, members of the Kundariya Family provide collateral to secure a loan for Neelson. Such financial dependency evidences the "reliance" contemplated under the "close supplier relationship" affiliation factor. *See supra* at 22-24.

Moreover, Neelson is by far Win-Tel's [                ] supplier of subject merchandise, behind only Theos, another affiliated supplier. *See* Win-Tel's Section A QR, at Exhibit A-19(a) Part-1 (C.R. 154). It is unclear how Commerce came to the determination that "Neelson is only Win-Tel's *third* largest supplier of ceramic tile for export" because the exhibit that Commerce cites as support for that statement does not support such a conclusion. *See* IDM at 13 (emphasis added) (also citing to Win-Tel's A QR, at Exhibit A-19 Part 1). Rather, Neelson's importance in Win-Tel's supply chain is evidenced by the fact that Win-Tel reported sourcing [        ] square meters of subject merchandise from [   ] "unaffiliated" suppliers during the POI, and out of those [   ] suppliers and [         ] square meters of subject merchandise, Neelson is by far the largest supplier, accounting for [                    ] percent of merchandise sourced by Win-Tel from third-party suppliers. *See* Win-Tel's Section A QR, at Exhibit A-19(a) Part-1. Win-Tel could not replace the amount of subject merchandise supplied by Neelson even if it combined the subject merchandise it reported sourcing from the remaining [   ] other suppliers.

Evidence on the record demonstrates that Neelson accounts for [        ] percent of Win-Tel's exports to the United States – a significant portion of such sales. *Id.* Yet, Commerce concluded that Win-Tel's exports produced by Neelson is "miniscule." *See* IDM at 13. For comparison, Win-Tel and Antiqa, the two exporters and producers that accounted for the largest volume of entries of subject merchandise such that they were selected as mandatory respondents accounted for [        ] percent and [        ] percent, respectively. *See* RSM at Attachment (P.R. 155;

C.R. 81). Thus, Commerce's description of Win-Tel's exports produced by Neelson as "miniscule" is inconsistent and not supported by the record.

Additionally, although Commerce provided some analysis as to why it determined that Win-Tel is not reliant upon Neelson, it lacked similar analysis on whether Neelson had become reliant on Win-Tel for its exports of subject merchandise. *See generally* IDM at Comment 3. This Court has explained that "Commerce's practice, consistent with the SAA's definition of such a relationship, is to evaluate whether a buyer company has become reliant on the seller, *or vice versa*." *See United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1132 (Ct. Int'l Trade 2016) (emphasis added). Instead, throughout this investigation, Commerce failed to evaluate the extent to which Neelson may be reliant on Win-Tel as a supplier of subject merchandise.

Thus, in considering the record as a whole and all the factors presented together, Commerce's determination that Win-Tel and Neelson are not affiliated is unsupported by substantial evidence.

### D. Commerce's Determination To Accept New Factual Information Which Was Methodological In Nature During And After Verification Was Contrary To Practice And Unlawful

Commerce's determination to accept new information which was methodological in nature during and after verification was contrary to Commerce's established practice as affirmed by the Federal Circuit. More importantly, Commerce further acted unlawfully when it allowed parties to place information on the record of the proceeding on which it relied in making its final determination but was not subject to verification. As such, this Court should remand Commerce's acceptance of new sales databases as "minor corrections" during and after verification and reconsider its failure to apply adverse facts available to errors discovered during verification.

Commerce's verification is mandated by the statute which requires that Commerce "shall verify all information relied upon in making – (1) a final determination in an investigation." *See*

19 U.S.C. § 1677m(i).  The courts have explained that "verification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness."  *See e.g., Bomont Industries v. U.S.*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990).  As such, verification marks "a point of no return," and Commerce has a practice of rejecting methodological changes, including revisions to databases, as untimely new factual information and not minor corrections.  *See e.g., Goodluck India Limited v. United States*, 11 F.4th 1335, 1343-44 (Fed. Cir. 2021) ("*Goodluck India*") (sustaining Commerce's decision to not accept revised submissions on the day of verification because "Goodluck's revisions were a systemic change to the entire reported database"); *see also Deacero S.A.P.I. de C.V. v. U.S.*, 996 F.3d 1283, 1296-98 (Fed. Cir. 2021) (Commerce explained that revised database changes were not "'minor,' but rather 'significant'" and warranted application of adverse facts available); *Eregli Demir ve Celik Fabrikalari v. United States*, 357 F.Supp.3d 1325, 1336 (Ct. Int'l Trade 2018) ("*Erdemir*") (Commerce rejected respondent's revised ocean freight expenses as a minor correction "because there were a large number of sales entries to which the {revisions}…would apply"); *Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 85,506 (October 28, 2024) ("*Shrimp from Ecuador CVD Inv.*") and accompanying Issues and Decision Memorandum at Comment 15 (providing Commerce's explanation for rejecting minor corrections as not "minor" because of the numerous transactions and assets on which the revised data is based).  Accordingly, Commerce has long instructed that "verification is not intended to be an opportunity for submission of new factual information."  *See* Verification Agendas for Win-Tel and Antiqa, at 2 (Feb. 3, 2025) (P.R. 388-389).

Yet, for the reasons we explain below, Commerce, in this investigation, fell short of its duty to verify information relied upon in making its final determination and abused its discretion

when it accepted methodological information, including revised sales databases, during and after verification.  As such, Commerce's final determination should be remanded.

### 1.     Commerce's request and acceptance of Antiqa's revised sales databases after verification was an abuse of discretion and unlawful

At verification, Antiqa presented, for the first time, five "minor corrections" to its sales reporting.  *See* Commerce Memorandum, "Sales Verification Report for Antiqa Minerals," at 2-3, (March 14, 2025) ("Antiqa Sales Verification Report") (P.R. 402; C.R. 897).  However, at least one of those corrections was methodological in nature and had an extensive impact on the sales reporting.  Accordingly, Commerce should have rejected it as untimely filed new factual information and applied adverse facts available.  Instead, on March 28, 2025, weeks after the verification, Commerce requested that Antiqa submit revised sales databases by March 31, 2025, just *16 days* before Commerce issued its final determination in this investigation and nearly a month and a half after Commerce verified Antiqa's sales reporting.  Such a departure from Commerce's judicially affirmed practice is not only an abuse of discretion but also does not meet the statutory requirement that Commerce verify all information relied upon in making its final determination.  *See Goodluck India*, 11 F.4th at 1343; 19 U.S.C. § 1677m(i).  Instead, this Court should interpret the plain language of the statute that mandates Commerce to "verify all information relied upon in making – a final determination in an investigation" to mean that databases provided after verification could not have been verified.  19 U.S.C. § 1677m(i).

As explained above, Commerce has a practice of rejecting methodological changes to reporting at verification.  *See Erdemir*, 357 F. Supp. 3d at 1336; *see also Goodluck India*, 11 F.4th at 1343.  Commerce has also explained that minor corrections are not "minor" when they have an impact on numerous transactions.  *See Shrimp from Ecuador CVD Inv.* IDM at Comment 15.  In this case, Antiqa failed to report U.S. sales database expenses that were discovered for the first

time at verification and impacted [    ] U.S. sales.  *See* Antiqa Sales Verification Report at 3. Commerce should have rejected these "minor correction" due to their widespread impact on the U.S. sales database.  Instead, Commerce unlawfully granted Antiqa another bite at the apple and requested that it submit revised U.S. sales databases well after verification occurred.

Under the statute, when "necessary information is not available on the record," because information provided "cannot be verified," Commerce "shall" use "facts otherwise available in reaching the applicable determination."  19 U.S.C. § 1977e(a).  Here, Antiqa failed to provide the omitted U.S. sales database expenses until verification and did not submit the revised sales databases until more than a month after verification concluded.  Commerce's determination to allow for revised sales databases at such a late stage after verification had passed contradicts the notion that verification "represents a point of no return" where information *already submitted* is tested for "accuracy and completeness."  *See Wilmar Trading Pte Ltd. v. U.S.*, 675 F. Supp. 3d 1215, 1248 (Ct. Int'l Trade 2023) ("*Wilmar Trading*") (citing *Ghigi 1870 S.p.A. v. U.S.*, 547 F. Supp. 3d 1332, 1334 (Ct. Int'l Trade 2021)).  Because Antiqa's revised databases had not already been submitted to Commerce at the start of verification, they could not have been tested for accuracy and completeness during verification.

Because this error impacted [    ] sales in the U.S. sales databases the errors were not minor, and due to the fundamental role of U.S. sales databases in Commerce's dumping calculations, the revised U.S. sales databases are certainly methodological information and not "minor corrections". Accordingly, Commerce's determination to accept such errors at verification was an abuse of discretion, and its subsequent decision to request revise sales databases after verification is unlawful in light of the statutory requirement that it verify all information relied upon in making its final determination.  19 U.S.C. § 1677m(i).

### 2. Commerce's acceptance of Win-Tel's revised sales databases during verification was an abuse of discretion

At verification, Win-Tel disclosed multiple errors to its sales reporting which Commerce should have declined to accept. *See* Commerce Memorandum, *Verification of Sales Response of Win-Tel Ceramics Private Limited*, at 2, (March 14, 2025) ("Win-Tel Sales Verification Report") (P.R. 401; C.R. 896). Despite several opportunities to provide accurate sales data throughout this proceeding, Win-Tel waited until the start of verification to disclose numerous errors in its sales data that justified a new sales database submission. Accordingly, Commerce should have rejected those corrections due to their pervasive and methodological nature and instead applied adverse facts available in calculating Win-Tel's dumping margin.

Here, Win-Tel's sales reconciliations also contained adjustments impacting [

] sales that Win-Tel did not previously disclose. Win-Tel's Sales Verification Report at 2. These adjustments constitute the very kind of methodological adjustments that in past cases Commerce would have rejected. *See Goodluck India*, 11 F.4th at 1343; s*ee also Erdemir*, 357 F. Supp. 3d at 1336. Specifically, Commerce verified that Win-Tel misreported brokerage and handling expenses incurred, several zip codes impacting [   ] U.S. sales, and most critically, a formula error to packing costs which affected [    ] sales. Win-Tel's Sales Verification Report at 2. It is also concerning that Win-Tel only provided documentation for [                ] to corroborate this adjustment, when the error impacted [    ] sales. *Id.*

These errors are so significant that they required Win-Tel to file entirely new revised U.S. and home market sales databases, in contravention of Commerce's judicially affirmed practice to not accept new factual information at or after verification. *See Win-Tel's Opening Day Minor Corrections*, at VE-1 (Feb. 26, 2025) (P.R. 395; C.R. 757-762) ; *but see Goodluck India*, 11 F.4th at 1343; *Erdemir*, 357 F. Supp. 3d at 1336. Sales databases form part of the foundation of

Commerce's dumping calculations, and as such, one can hardly argue that revised home and U.S. sales databases are not methodological in nature. Moreover, because Win-Tel's corrections have an impact on [        ] of transactions Commerce should have declined to accept these as minor corrections.

In sum, Commerce should have rejected these revised U.S. and home market databases at such a late stage in the proceeding. *See Wilmar Trading*, 675 F. Supp. 3d at n.44 (warning that "verification occurs so late in the administrative process that courts should be particularly wary of intervening in a way that would direct the introduction of new information"). Instead, by accepting the significant changes at verification, Commerce failed to abide by its practice of only accepting "minor" corrections during verification. Thus, Commerce's determinations with respect to its acceptance of Win-Tel and Antiqa's revised sales databases should be remanded for reconsideration consistent with its practice and the statute.

### E.    Commerce's Determination To Grant Win-Tel's Scrap Offset Was Unlawful

Although not mandated by statute, Commerce has a practice of granting an offset to normal value for sales of by-products generated during the production of subject merchandise, if the respondent can demonstrate that the by-product is either resold or has commercial value and has re-entered the respondent's production process. *See Arch Chemicals, Inc. v. U.S.*, 33 C.I.T. 954, 956 (Ct. Int'l Trade 2009) ("*Arch Chemicals*"). Respondents must provide evidence linking the scrap sold with the scrap generated from the production of subject merchandise during the relevant period. *See American Tubular Products, LLC v. United States*, 847 F.3d 1354, 1360-61 (Fed. Cir. 2017) (sustaining Commerce's decision to deny a scrap offset when Chengde failed to show that the scrap sold was generated during the period of review). Commerce is not required to grant an offset, and the burden to substantiate an offset with sufficient information rests with the respondents. *Arch Chemicals*, 33 C.I.T. at 956. Commerce did not disagree with this description

of its practice. *See* IDM at 26 ("Commerce's practice is to allow for a scrap offset based on the quantity of scrap generated during the cost reporting period"). However, Commerce unlawfully disregarded its own finding during verification and instead opted to rely on respondent's unverified submissions.

At verification, Commerce discovered that Win-Tel does not track the *production* of scrap in the course of business, and instead it calculated the scrap offset based on scrap *sales* revenue recorded during the POI. *See* Commerce Memorandum, *Verification of the Cost Response of Win-Tel Ceramics Private Limited in the Less-Than-Fair-Value Investigation of Ceramic Tiles from India*, at 13, (February 21, 2025) ("Win-Tel Cost Verification Report") (P.R. 392; C.R. 756). Commerce acknowledged this finding in its final determination. *See* IDM at 26. As such, according to Commerce's own practice as stated in the IDM, Commerce should have rejected Win-Tel's scrap offset because it did track the production of scrap produced in the course of business.

However, Commerce unlawfully chose to instead rely on record submissions that were inconsistent with its own findings as stated in the verification report. *See id.* ("While it is stated in Win-Tel's cost verification report that Win-Tel does not track generation of scrap in the normal course of business and valued scrap based on actual sales values, the record otherwise shows that Win-Tel does maintain records of the quantity of scrap generated.") Not only is this determination internally inconsistent with Commerce's own report, but it also violates Commerce's mandate to verify all information relied upon in making a final determination. *See* 19 U.S.C. § 1677m(i). Because Commerce relied on information that was contradicted at verification, its decision to grant Win-Tel a scrap offset was unlawful.

## VI.    <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court grant the motion for judgment on the agency record, hold that Commerce's final determination is unsupported by substantial

evidence and otherwise not in accordance with law, remand this matter to Commerce for disposition consistent with the opinion and order of the Court, and order any additional relief the Court may deem just and proper.

Respectfully submitted,

David M. Spooner, Esq.
Christine J. Sohar Henter, Esq.
Hendricks Valenzuela, Esq.

BARNES & THORNBURG LLP
555 12th St. NW, Suite 1200
Washington, D.C. 20004
(202) 371-6377

*Counsel to Plaintiff*
*The Coalition for Fair Trade in Ceramic Tile*

Date: <u>November 17, 2025</u>

### CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contain 9,788 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Scheduling Order.  In preparing this certificate of compliance, I have relied on the word count function of the word processing system used to prepare the brief.


Date: <u>November 17, 2025</u>                    <u>/s/ David M Spooner</u>
                                                David M. Spooner

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE,<br><br>     Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>and<br><br>WIN-TEL CERAMICS PRIVATE LTD., ANTIQA MINERALS,<br>and<br>M.S. INTERNATIONAL, INC.,<br><br>     Defendant-Intervenors. | Court No. 25-00095 |

<u>**ORDER**</u>

Upon consideration of the motion for judgment on the agency record filed by plaintiff, the Coalition for Fair Trade in Ceramic Tile (the "plaintiff"), the responses thereto filed by defendant and the defendant-intervenors, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the plaintiff's motion for summary judgment on the agency record is **GRANTED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the antidumping duty investigation of ceramic tile from India is remanded for disposition consistent with this Court's opinion and order; and it is further

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of this date; and it is further

**ORDERED** that Commerce shall file the administrative record for the remand proceeding within fourteen (14) days of the date of the filing of its remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within fourteen (14) days after the deadline to file replies to the comments on the remand redetermination.

**SO ORDERED**.


Date: _____          _____
New York, New York                Honorable Joseph A. Laroski, Jr., Judge
                                  U.S. Court of International Trade