**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

|  |  |  |
|---|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE, | ) ) ) | |
| Plaintiff, | ) ) ) | **PUBLIC VERSION** |
| | ) ) | **BPI Omitted at:** |
| v. | ) ) | **4-9, 11, 14-15, 30-32, 35, 38-39, 45** |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | Court No. 25-00095 |
| and | ) ) | |
| WIN-TEL CERAMICS PRIVATE LTD., ANTIQA MINERALS, and M.S. INTERNATIONAL, INC., | ) ) ) ) | |
| Defendant-Intervenors. | ) ) ) | |

**DEFENDANT'S PUBLIC RESPONSE TO PLAINTIFF'S  RULE
56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR
Assistant Director

OF COUNSEL:
SAMUEL E. CHILDERSON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

TATE NATHAN WALKER
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 307-0163

Email: Tate.Walker@usdoj.gov

March 4, 2026                                    *Attorneys for Defendant*

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

|  |  |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES,<br><br>　　　　　Defendant,<br><br>　　and<br><br>WIN-TEL CERAMICS PRIVATE LTD.,<br>ANTIQA MINERALS, and<br>M.S. INTERNATIONAL, INC.,<br><br>　　　　　Defendant-Intervenors. | Court No. 25-00095 |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the administrative record,

response thereto, reply, and all other papers, it is hereby

ORDERED that the motion is denied, and it is further

ORDERED that judgment shall enter in favor of the United States.

_____
　　　　　　　　　　　　　　　　JUDGE

Dated:

## **TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 .................................................................2

    I.     The Administrative Determination under Review ......................................2

    II.    Issues Presented for Review .....................................................................2

STATEMENT OF FACTS .......................................................................................3

    I.     Initiation of Investigation...........................................................................3

    II.    Antiqa's Exclusion Request And Responses To Commerce's Questionnaires .........3

    III.   Preliminary Collapsing Analysis................................................................8

    IV.   Preliminary Determination........................................................................11

    V.    Verification.................................................................................................12

    VI.   Final Determination and Case Briefing ..................................................13

SUMMARY OF THE ARGUMENT ........................................................................16

ARGUMENT...........................................................................................................17

    I.     Standard of Review....................................................................................17

    II.    Commerce's Granting of Antiqa's Reporting Exemptions of Marbonite And Segam Was A Lawful Use of Its Discretion...............................................18

        A.  Legal Standard for Collapsing .............................................................18

        B.  The Coalition Waived Its Arguments Regarding Antiqa's Reporting Exemption ...........................................................................................20

        C.  The Coalitions Argument Relating to The Reporting Exemptions to Marbonite And Segam Are Without Merit; Commerce Did Not Abuse Its Discretion.............................................................................................23

    III.   Commerce's Decision To Not Collapse Marbonite And Segam with Antiqa Is Supported by Substantial Evidence .........................................................24

        A.  Substantial Evidence Support's Commerce Refusal To Collapse Marbonite into Antiqa..........................................................................26

i

B.  Commerce's Decision to Not Collapse Segam into Antiqa Is Supported by The Totality of The Circumstances ....................................................30

IV.   Commerce's Decision That Win-Tel And Neelson Are Not Affiliated Is Supported by Substantial Evidence ........................................................33

A.  Debt Financing Does Not Conclusively Demonstrate Win-Tel's Control over Neelson ...............................................................................34

B.  A Close Supplier Relationship Does Not Exist Between Win-Tel And Neelson.....................................................................................37

V.   Commerce Did Not Abuse Its Discretion and Lawfully Accepted Minor Corrections Presented by Antiqa and Win-Tel.........................................40

A.  Antiqa's Minor Corrections Did Not Constitute New Information ..................41

B.  Win-Tel's Revised Database Was A Minor Correction ....................................43

VI.   Commerce's Determination To Grant Win-Tel's Scrap Offset Followed Past Practice And Depended on Verified Information.......................................43

CONCLUSION..................................................................................................46

**TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page(s)**

*Atl. Sugar, Ltd. v. United States*,
    744 F.2d 1556 (Fed. Cir. 1984) ............................................................................ 17

*Carpenter Tech. Corp. v. United States*,
    510 F.3d 1370 (Fed. Cir. 2007) ............................................................................ 19

*Catfish Farmers of Am. v. United States*,
    641 F. Supp. 2d 1362 (Ct. Int'l Trade 2009) ................................................... 20, 37

*Ceramark Technology, Inc. v. United States*,
    61 F. Supp. 3d 1371 (Ct. Int'l Trade 2015) ........................................................ 22

*Cleo Inc. v. United States*,
    501 F.3d 1291 (Fed. Cir. 2007) ............................................................................ 18

*Consol. Bearings Co. v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) .............................................................................. 22

*Consolo v. Fed. Mar. Comm'n*,
    383 U.S. 607 (1966) .............................................................................................. 17

*Consolo. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) .............................................................................................. 17

*Corus Staal BV v. United States Steel Corporation*,
    502 F.3d 1370 (Fed. Cir. 2007) ....................................................................... 21, 22

*Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,* 357 F. Supp. 3d 1325 (Ct. Int'l Trade
    2018) ................................................................................................................ 41, 42

*Goldlink Indus. Co. v. United States*,
    431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ....................................................... 18

*Goodluck lndia Ltd. v. United States,*
    11 F.4th 1335, 1343 (Fed. Cir. 2021) .............................................................. 41, 42

*INS v. Elias-Zacarias*,
    502 U.S. 478 (1992) .............................................................................................. 17

*Koenig & Bauer-Albert AG v. United States*,
    90 F. Supp. 2d 1284 (Ct. Int'l Trade 2000) ......................................................... 19

*Koyo Seiko Co. v. United States*,
516 F. Supp. 2d 1323 (Ct. Int'l Trade 2007) ................................................................... 25

*Maui Pineapple Co.  v. United States,*
264 F. Supp. 2d 1244 (Ct. Intl. Trade 2003) .................................................................. 43

*Mittal Steel Point Lisas Ltd. v. United States*,
548 F.3d 1375 (Fed. Cir. 2008) ..................................................................................... 21

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) ..................................................................................... 17

*Queen's Flowers de Colom. v. United States*,
981 F. Supp. 617 (Ct. Int'l Trade 1997) ........................................................................ 19

*Rebar Trade Action Coalition v. United States*,
398 F. Supp. 3d 1359 (Ct. Int'l Trade 2019) ................................................................. 28

*Samsung Elecs. Co. v. United States*,
70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ................................................................... 37

*Shandong Rongxin Imp. & Exp. Co. v. United States*,
203 F. Supp. 3d 1327 (Ct. Int'l Trade 2017) .......................................................... 17, 18

*Ta Chen Stainless Steel Pipe v. United States*,
23 CIT 804 (Ct. Int'l Trade 1999) .......................................................................... 36, 37

*Tatung Co. v. United States,*
18 CIT 1137 (Ct. Intl. Trade 1994) ............................................................................... 43

*TIJID, Inc. v. United States*,
366 F. Supp. 2d 1286 (Ct. Int'l Trade 2005) ................................................................. 37

*U.S. Steel Corp. v. United States,*
179 F. Supp. 3d 1114 (Ct. Intl. Trade 2016)........................................................... *passim*

*U.S. Steel Corp. v. United States*,
637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) ................................................................. 26

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009)....................................................................................................... 17

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952).......................................................................................................... 21

*Viraj Group v. United States*,
    476 F.3d 1349 (Fed. Cir. 2007) ................................................................... 19

*Wheatland Tube Co. v. United States*,
    161 F.3d 1365 (Fed. Cir. 1998) ................................................................... 17

*Zhaoqing New Zhongya Aluminum Co. v. United States*,
    70 F. Supp. 3d 1298 (Ct. Int'l Trade 2015) ................................................ 20

**Statutes**

5 U.S.C. § 706(2) .......................................................................................... 17

19 U.S.C. § 1516a(b) ..................................................................................... 17

19 U.S.C. §1677f-1(c) .................................................................................... 39

19 U.S.C. § 1673 ............................................................................................ 18

19 U.S.C. § 1673e(a) ...................................................................................... 42

19 U.S.C. § 1677(33) ............................................................................... *passim*

19 U.S.C. § 1677(33)(A)-(G) .......................................................................... 19

19 U.S.C. § 1677(33)(G) ................................................................................. 37

19 U.S.C. § 1677(35) ...................................................................................... 18

19 U.S.C. § 1677(m) ....................................................................................... 46

19 U.S.C. § 1677e(a) ...................................................................................... 18

28 U.S.C. § 2637(d) ....................................................................................... 21

**Rules**

USCIT R. 56.2 ................................................................................................... 1

**Regulations**

19 C.F.R. § 102 ................................................................................................. 6

v

19 C.F.R. § 351.102(b).............................................................................................*passim*

19 C.F.R. § 351.401(f) ..............................................................................................*passim*

19 C.F.R. § 351.404(f) .......................................................................................................... 9

19 C.F.R. § 351.525(b)........................................................................................................ 10

**Administrative Determinations**

*Antidumping Duties; Countervailing Duties*,
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997) .......................................... 19, 20, 26

*Ceramic Tile from India: Final Negative Determination of Sales at Less Than Fair Value and
    Final Negative Determination of Critical Circumstances,*
    90 Fed. Reg. 17,030 (Dep't of Commerce April 23, 2025)................................................*passim*

*Ceramic Tile from India: Initiation of Less-Than-Fair-Value Investigation*,
    89 Fed. Reg. 42,836-02 (Dep't of Commerce May 16, 2024)...................................................... 3

*Ceramic Tile From India: Preliminary Negative Determination of Sales at Less Than Fair Value
    and Postponement of Final Determination,*
    89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024) ....................................................... 11

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:
    Final Determination of Sales at Less Than Fair Value,*
    82 Fed. Reg. 16,360 (April 4, 2017)..................................................................................... 44

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from
    the People's Republic of China: Final Determination of Sales at Less Than Fair Value*,
    75 Fed. Reg. 59,217 (September 27, 2010) ........................................................................... 41

*Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty
    Determination and Final Affirmative Determination of Critical Circumstances*,
    85 Fed. Reg. 25,398 (May 1, 2020) ........................................................................... 10, 26, 29

*Certain Quartz Surface Products from India: Preliminary Affirmative Countervailing Duty
    Determination, Preliminary Affirmative Critical Circumstances Determination, In Part, and
    Alignment of Final Determination with Final Antidumping Duty Determination*,
    84 Fed. Reg. 54,838 (Oct. 11, 2019)..................................................................................... 10

*Certain Quartz Surface Products From India: Preliminary Affirmative Determination of Sales at
    Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances,*

*Postponement of Final Determination, and Extension of Provisional Measures,*
  84 Fed. Reg. 68,123 (Dep't of Commerce Dec. 13, 2019) .................................................. 26, 27

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of
  Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–
  2020,*
  87 Fed. Reg. 20,817 (Apr. 8, 2022) ...................................................................................... 38

*Certain Welded Stainless Steel Pipe from Taiwan*,
  62 Fed. Reg. 1,436 (Dep't of Commerce Jan. 10, 1997) ......................................................... 36

*Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*,
  89 Fed. Reg, 85,506 (Oct. 28, 2024)....................................................................................... 42

*Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea:
  Final Results of Antidumping Duty Administrative Review; 2018-2019*,
  86 Fed. Reg. 35,060 (July 1, 2021)......................................................................................... 44

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
  H.R. Doc. 103-316, 103rd Congress, 2d Session ,Vol. 1 (1994) at 838 (SAA)........................ 37

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| | )<br>) |
| v. | ) |
| | ) |
| UNITED STATES, | )<br>) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| WIN-TEL CERAMICS PRIVATE LTD.,<br>ANTIQA MINERALS, and<br>M.S. INTERNATIONAL, INC., | )<br>)<br>) |
| | ) |
| Defendant-Intervenors. | ) |
| | ) |

**BPI Omitted at:**
**4-9, 11, 14-15, 30-32, 35, 38-39, 45**

Court No. 25-00095

**DEFENDANT'S RESPONSE TO PLAINTIFF'S**
**RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade (USCIT R.), defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiff, Coalition for Fair Trade in Ceramic Tile (Coalition or petitioner). Plaintiff's Brief (Pl. Br.), Nov. 17, 2025, ECF No. 25. The Coalition challenges the Department of Commerce's final results of the 2023-2024 antidumping duty investigation of ceramic tiles from India. As demonstrated below, Commerce's determination is supported by substantial evidence and is in accordance with law. Accordingly, we respectfully request that the Court sustain Commerce's final results and deny the Coalition's motion for judgment on the agency record.

**PUBLIC VERSION**

**STATEMENT PURSUANT TO RULE 56.2**

**I.     The Administrative Determination under Review**

The administrative determination under review is the less than fair value (LTFV) determination in *Ceramic Tile from India: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 90 Fed. Reg. 17,030 (Dep't of Commerce April 23, 2025) (final determination), (P.R. 439),[1] and accompanying Issues and Decision Memorandum (IDM), (P.R. 434).  The investigation covered producers and exporters Win-Tel Ceramics Private Ltd. (Win-Tel) and Antiqa Minerals (Antiqa) (collectively respondents).  The period of investigation is April 1, 2023, through March 31, 2024.

**II.     Issues Presented for Review**

1.     Whether Commerce's granting a reporting exclusion to Antiqa's affiliated entities, Marbonite Pvt. Ltd. (Marbonite) and Segam Tiles Pvt. Ltd. (Segam or STPL), was arbitrary, capricious, or an abuse of discretion.

2.     Whether Commerce's collapsing analysis of certain affiliates of Antiqa, Marbonite, and Segam, is supported by substantial evidence.

3.     Whether Commerce's affiliation determination regarding Win-Tel and its supplier, Neelson Porselano LLP ("Neelson"), is supported by substantial evidence and otherwise in accordance with law.

4.     Whether Commerce properly acted within its discretion in accepting minor corrections in the revised sales databases from the respondents.

---

[1]  Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying administrative review.

**PUBLIC VERSION**

5.    Whether Commerce's finding that Win-Tel was due a scrap offset was supported by substantial evidence and in accordance with the law.

## STATEMENT OF FACTS

### I.    Initiation of Investigation

On April 19, 2024, Commerce received an antidumping duty (AD) petition concerning imports of ceramic tile from India filed on behalf of the Coalition. *See* Petition for Antidumping and Countervailing Duties on Imports of Ceramic Tile from India, (P.R. 1-35, C.R. 1-67). On May 9, 2024, Commerce initiated the LTFV investigation on ceramic tile from India. *See Ceramic Tile from India: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 42,836-02 (Dep't of Commerce May 16, 2024) (Initiation Notice) (P.R. 98).

On May 21, 2024, Commerce received comments from Antiqa, Niro Ceramic India Private Limited, MS International, Inc. (MSI), and the Coalition. *See* Antiqa's Comments on United States Customs and Border Patrol Data (CBP) (May 21, 2024) (P.R. 109-11, C.R. 77); Petitioner's Comments on CBP Data (May 21, 2024) (P.R. 110, C.R. 78); MSI's Comments on CBP Data (May 21, 2024) (P.R. 111, C.R. 79). On July 15, 2024, Commerce selected Antiqa and Win-Tel as mandatory respondents because both are the two exporters or producers that account for the largest volume of entries of subject merchandise. *See* Respondent Selection Memo (P.R. 155, C.R. 81). On July 26, 2024, Commerce issued the initial questionnaires to both Antiqa and Win-Tel. Initial Questionnaires (P.R. 159, P.R. 161).

### II.    Antiqa's Exclusion Request And Responses To Commerce's Questionnaires

On August 16, 2024, Antiqa requested an exclusion from reporting detailed costs and sales data for two reported affiliates, Marbonite and Segam. Antiqa's Request for Reporting Exclusion (Aug. 16, 2024) (P.R. 173-175, C.R. 82-84). Antiqa requested this exception not

3

because the affiliates were not under a common ownership interest, but because collapsing was not required by Commerce's regulations in that reporting the affiliates sales data would have no "impact on Antiqa's antidumping ('ADD') margin." *Id.* at 2. Antiqa explained that although the Kundariya family, the controlling members of both Antiqa and Win-Tel, are controlling shareholders of Antiqa, the family holds only a 50% stake in Marbonite. Antiqua also represented that,

> Marbonite *did not export any MUC* {merchandise under consideration} to the United States during the POI or at any time prior. All sales of MUC made by Marbonite in the domestic market were to Prism Johnson who did not export this MUC purchased from Marbonite to the United States. These sales made by Marbonite to Prism Johnson were made via an *exclusive supply agreement* through which Prism Johnson controls Marbonite's production and sales.

*Id.* at 4 (emphasis added). Antiqa explained that Marbonite and Antiqa did not share employees or sales information, nor did Antiqa have any involvement in production or procurement decisions made by Marbonite. *Id.* at 4-5. Antiqa attached a copy of the exclusive supply agreement between Marbonite and Prism Johnson that provided that "[

]" Antiqa's Request for Reporting Exclusion at Ex. 3 at 13 (C.R. 84). "['

]" *Id.* at 5. Antiqa concluded that the "{i}nclusion of Marbonite's data in this investigation will not contribute to the accurate calculation of Antiqa's ADD margin because neither its sales nor its production affects the pricing or alleged dumping behavior of Antiqa Group Respondents." Antiqa's Request for Reporting Exclusion at 9.

As to Segam, Antiqa reported that:

4

PUBLIC VERSION

> Kundariya family does not have a controlling interest in STPL, and merely has a relatively small ownership interest in STPL.  Thus, there is no common control between the Antiqa Group and STPL.  There are no managerial employees or board members of STPL that sit on the board of directors of Antiqa Group Respondents except one director who holds a small share in [        ] as stated above.  There are minimal transactions between Antiqa Group Respondents and STPL that have no implication on the ADD margin calculations.  There is no intertwining of operations between the two entities.  STPL did not export subject merchandise to the United States.

Antiqa's Request for Reporting Exclusion at 11; Antiqa's Request for Reporting Exclusion at Ex. 4 (C.R. 84) (demonstrating that less than [   ] percent of Segam's shareholders or partners belong to the Kundariya family).  Antiqa also explained that total transactions between Antiqa and Segam only represented some [        ] of Antiqa's total sales volume.  Antiqa's Request for Reporting Exclusion at 11.

On August 22, 2024, Commerce granted this reporting exclusion for the reasons outlined in the request.  Memorandum Granting Reporting Exclusion Request (P.R. 184).  Commerce noted that although Marbonite and Segam were both affiliated with Antiqa and its fellow companies, neither Marbonite or Segam were involved in the production and sales of goods under consideration.  *Id.*  Commerce noted that "should we later determine that sales and cost data from Marbonite and STPL are necessary for purposes of calculating an accurate antidumping margin for the Antiqa Group Companies, we will revisit this decision and may request the sales and cost data" *Id.*

On August 29, 2024, Antiqa and Win-Tel responded to Section A of their respective initial questionnaires.  *See* Antiqa Section A Response (Aug. 29, 2024) (P.R. 193-206, C.R. 85-129);

5

**PUBLIC VERSION**

Win-Tel Section A Response (Aug. 29, 2024) (P.R. 207-212, C.R. 130-154).  In its response, Antiqa also requested an additional exclusion for "Affiliate A."[2] *Id.*

On August 30, 2024, the Coalition responded to the reporting exemption for both Marbonite and Segam and Anitqa's request for a reporting exclusion for Affiliate A.  The Coalition's Comments on Antiqa's Reporting Exclusion Request (C.R. 155-159).  The Coalition argued that Commerce's decision was premature and "informed by insufficient and misleading statements submitted by Antiqa." *Id.* at 2 (C.R. 155).  The Coalition argued that it was impossible for Commerce to conduct its regulatory collapsing analysis, per 19 C.F.R. § 102, without Antiqa's questionnaire responses to Section A of Commerce's questionnaire.  *Id.* at 3.  The Coalition argued that because the companies are affiliated, they should be included in the questionnaire response.  *Id.* at 5.

On September 6, 2024, Antiqa submitted rebuttal comments.  Premature Collapsing Rebuttal Comments (C.R. 160-225).  In these comments, Antiqa argued it had complied with Commerce's requests for information, and it had not withheld necessary information.  Premature Collapsing Comments at 3 (C.R. 160).  On the merits, Antiqa argued that only Prism Johnson had actual control over Marbonite during the investigation period because of the exclusive supply agreement, despite some "50% of the company being controlled by Antique Granito Shareholders Trust ('AGST'), which consists of 25 members of Kundariya family." *Id.*  Antiqa also contended that "Prism Johnson appoints senior management, including the Chairman of the Board, CFO, and Company Secretary." *Id.*  Antiqa also reported that any transaction with Marbonite included only a small amount of non-subject merchandise and that

---

[2] Affiliate A is [                                        ].

PUBLIC VERSION

there was "**no sharing of employees, facilities, or sales information**." *Id.* at 3-4 (emphasis in original).

Regarding Segam, Antiqa also reiterated that the Kundariya family only "hold a **minority stake of [      ]** in STPL," "there are **no common directors or managerial employees** except for one common director with a minor shareholding in a trading entity" who does not "confer control or influence over STPL's operations." *Id.* at 4 (emphasis in original). The total sales between the two companies also "represented an insignificant portion of each company's total sales" and that Segam "**did not export any subject merchandise to the United States**." *Id.* at 4-5.

On September 19, 2024, Antiqa and Win-Tel responded to Sections B-D of Commerce's questionnaire. *See* Antiqa Sections B-D Responses (Sept. 19, 2024) (C.R. 233-389, P.R. 263-273); *see* Win-Tel Sections B-D Responses (September 19, 2024) (P.R. 274-77, C.R. 390-450). In their Section D response, Win-Tel provided information related to its scrap offset. *See* Win-Tel Section D Questionnaire Response (P.R. 276, C.R. 390). On Oct. 11, 2024, Commerce sent a supplemental questionnaire to Antiqa, asking it to "{p}lease confirm that all third-party suppliers of MUI are properly considered to be 'unaffiliated' with Antiqa, ACPL, Shivam, AVL, ANPL, { }, Antique, Marbonite, or Segam Tiles under the definition of 'affiliate'" Antiqa First Supplemental Questionnaire Regarding Affiliates (P.R. 288, C.R. 474) at 7. On October 11, 2024, Commerce also sent a supplemental questionnaire to Win-Tel. Wintel First Supplemental Questionnaire Section A (P.R. 289, C.R. 475).

On October 28, 2024, Win-Tel and Antiqa responded to the Supplemental Section A questionnaire. Supplemental Questionnaire Section A Responses (SAQR) (P.R. 311 – 315, C.R. 478-504). On November 13, 2024, the Coalition responded to Win-Tel's Section A Supplemental

7

**PUBLIC VERSION**

Questionnaire.  Petitioner's Comments to Section A Supplemental Questionnaire Responses (C.R. 558).  Regarding the affiliation allegations involving Win-Tel and Neelson, the Coalition argued that Win-Tel controls Neelson because of "debt financing, a close supplier relationship, and if true, a corporate grouping."  *Id.* at 8-9.  The Coalition argued that it was significant that one director of Win-Tel served as an equivalent of a director of Neelson prior to the POI.  *Id.* at 9.  The Coalition also argued that the former director of Neelson, a member of the Kundariya family, provided personal guarantees on a loan and collateral for a loan obtained by Neelson.  *Id.* at 10.  The Coalition additionally contended that the forms of collateral were still in place post the resignation of the Kundariya director.  *Id.*

On November 26, 2024, Win-Tel responded to the Coalition's arguments regarding Neelson.  Win-Tel's Rebuttal to Petitioner's Comments on Section A of the Questionnaire (Win-Tel's Rebuttal Comments on SAQR) (C.R. 641).  Win-Tel argued that the Coalition's general allegations of Win-Tel's lingering control of Neelson during the POI was unsupported, that any financial link was too tangential to demonstrate any "control or influence of the Kundariya family over Neelson."  *Id.* at 8.  Win-Tel also argued that "Neelson's sales to Win-Tel only represented merely [     ] percent of Neelson's total sales" and that such sales cannot result in a conclusion that they shared a "close supplier relationship."  *Id.*; Win-Tel's Rebuttal Comments on SAQR at Exhibit 5 (C.R. 643).

### III.    Preliminary Collapsing Analysis

On November 22, 2024, Commerce issued a preliminary collapsing memorandum in which it determined that various entities were affiliated with Antiqa.  Antiqa Preliminary Collapsing Memorandum (C.R. 645, P.R. 358).  Relevant here, however, Commerce determined that both Segam and Marbonite should *not* be collapsed into Antiqa.  Commerce determined that

8

**PUBLIC VERSION**

for Marbonite and Segam, "record evidence substantiates there is no significant potential for the manipulation of price and production." *Id.* at 13.  This was because "Marbonite is controlled by Prism Johnson." *Id.*  Additionally, "only one member of the Kundariya family served on {Segam's} board." *Id.*  The transactions between Segam and Antiqa and its affiliates were small "and did not create the potential for manipulation." *Id.*  To conclude such, Commerce thoroughly analyzed the 19 C.F.R. § 351.404(f)(1) factors, determining that all the entities were affiliated. *Id.* at 7.  The second collapsing criteria, at 19 C.F.R. § 351.404(f)(1), regarding production facilities that could be retooled, is not used in Commerce's practice when determining to collapse a non-producing exporter with an affiliated producer, so Commerce focused on whether there is a "significant potential for manipulation of price or production." *Id.* at 8 (citing *U.S. Steel Corp. v. United States,* 179 F. Supp. 3d 1114, 1136-42 (Ct. Intl. Trade 2016)).

However, as to the "significant potential for manipulation of price or production, Commerce found this factor lacking after examining common ownership, managerial overlap, and intertwined operations. *Id.* at 7-11.  Commerce found that the Kundariya family did not control Marbonite nor Segam by number of shareholders. *Id.* at 9.  As to common management, Commerce noted that [                                                    ] of Marbonite and Segam and that [     ] members of the Kundariya family are directors of Marbonite. *Id.*  Thus, Commerce determined that "there is significant overlap of directors/partners between Antiqa . . , and Marbonite," however, no "significant overlap of directors/partners between {Antiqa} and Segam." *Id.* at 10.  As to intertwined operations, Commerce noted that Antiqa reported that

> there is no shared sales information {with Marbonite}, no shared employees or facilities no common involvement in production and pricing decisions, and no transactions of MUC during the POI. Antiqa noted, however, that Marbonite did make small purchases of non-subject merchandise from Shivam and ANPL, and sold a small volume of non-subject merchandise to Shivam.

9

**PUBLIC VERSION**

*Id.* Commerce also noted that Marbonite was bound to sell its manufactured goods to Prism Johnson, and Prism Johnson's reports and financials demonstrated that Marbonite was subsidiary of Prism Johnson. *Id.* at 11.

Commerce also noted that Segam and Antiqa had no

> shared sales information, no shared employees or facilities, and no common involvement in production and pricing decisions. It also stated that Segam sold a small quantity of MUC to Antiqa during the POI, and also purchased a small quantity of MUC from AVL during the POI. Otherwise, there were no transactions between Segam and {} Antiqa

*Id.* Commerce thus refused to collapse Segam or Marbonite into Antiqa. *Id.* at 11-13.

In reviewing the comments in the record, Commerce found the Coalition's reliance on *Certain Quartz Surface Products from India: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, In Part, and Alignment of Final Determination with Final Antidumping Duty Determination*, 84 Fed. Reg. 54,838 (Oct. 11, 2019) and accompanying Decision Memorandum at 10; unchanged in *Certain Quartz Surface Products from India: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 85 Fed. Reg. 25,398 (May 1, 2020) (*QSP from India*), was misplaced because that investigation was for countervailing duties under 19 C.F.R. § 351.525(b)(6)(vi). *Id.* at 12.

Also on November 22, 2024, Commerce conducted its preliminary analysis affiliation with regard to Win-Tel. Preliminary Analysis Affiliation Memorandum Win-Tel (C.R. 646, P.R. 360). With regard to this analysis, Commerce collapsed some of the affiliated entities under review, but refused to collapse Neelson into Win-Tel.

**PUBLIC VERSION**

This was because Commerce first found that "the Kundariya family has a [    ] percent ownership in Neelson." *Id.* at 4.  Commerce also noted that "{n}o members of the Kundariya family are partners or directors of Neelson." *Id.* at 8.  Therefore, Commerce did not find them affiliated under the statutory criteria.  Commerce also analyzed the other statutory factors for collapsing like intertwined operations and found that "Win-Tel has confirmed that there is no shared sales information, no shared employees or facilities, and no common involvement in production and pricing decisions during the POI between Win-Tel and Neelson." *Id.* at 9.

Win-Tel did make some small purchases of subject merchandise from Neelson, with some subject merchandise being sold subsequent to the United States, but these sales were only [    ] percent of overall total export sales.  *Id.*  Commerce thus concluded that there was "no significant potential for manipulation of price of production".  *Id.*  Commerce addressed the Coalition's concerns regarding one member of the Kundariya's family being a former director of Neelson, and Commerce explained that this concern was not significant since this period fell outside the POI.  *Id.* at 10.  Commerce noted that the resignation letter occurred well before the POI.  *Id.* (citing Win-Tel's Supplemental Section A Response at Ex. S1-1 (c) (Oct. 28, 2024) (C.R. 489).  Thus, Commerce refused to collapse Neelson with Win-Tel.

## IV.    Preliminary Determination

On November 26, 2024, Commerce issued the Preliminary Determination.  *See Ceramic Tile From India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't of Commerce Dec. 2, 2024) (P.R. 363) (*Preliminary Determination*), and accompanying preliminary decision memorandum (P.R. 350) (PDM).  In the Preliminary Determination, Commerce found that Ceramic Tile from India is not being or is not likely to be, sold in the United States at less than fair value.  *Id*. at 5.

**PUBLIC VERSION**

With respect to the issue of affiliation, Commerce determined that Antiqa Ceramic Pvt. Ltd. (ACPL), Shivam Enterprises (Shivam), Antiek Vitrified LLP (AVL), Antiqu Non Woven Pvt. Ltd. (ANPL), Marbonite, Segam, and Affiliate A are affiliated under 19 U.S.C. § 1677(33); PDM at 5. Commerce also collapsed ACPL, Shivam, AVL, and ANPL into a single Antiqa entity pursuant to 19 C.F.R. § 351.401(f) after determining there is a significant potential for manipulation of prices, production, or other export decisions between the companies. Antiqa Preliminary Collapsing Memorandum.

Additionally, Commerce determined that Win-Tel is affiliated with Theos Tiles LLP ("Theos") pursuant to 19 U.S.C. § 1677(33) based on common ownership. *See* PDM at 5; Win-Tel Collapsing Analysis. Commerce subsequently collapsed the companies into a single entity based on their level of common ownership, extent of managerial overlap, and intertwined operations. *See* PDM at 5; Win-Tel Collapsing Analysis at 4-11 (P.R. 360, C.R. 646). Through the same analysis, Commerce determined that Neelson and Win-Tel are not affiliated. *See* PDM at 5; Win-Tel Collapsing Analysis at 1.

## V. Verification

Prior to verification, Commerce stated "{n}ew information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes *minor corrections to information* already on the record; or (3) the information corroborates, supports, or clarifies information already on the record." Verification Outline, at 2 (Feb. 4, 2025) (C.R. 744, P.R. 389) (emphasis added. Both Win-Tel and Antiqa presented minor corrections to Commerce before verification. *See* IDM at 5, 9.

Specifically, Antiqa presented a correction to correct an underreporting of a particular United States selling expense. IDM at 5; *see also* Antiqa Sales Verification Report at 2-3 (March

**PUBLIC VERSION**

17, 2025) (P.R. 402, C.R. 897); Verification Exhibits, at VE-1 (February 19, 2025) (C.R. 746, P.R. 391). This underreporting was due to a clerical oversight, representing a small percentage of the gross unit price variable, which impacted the United States sales database. *Id.* Commerce then examined and verified the minor correction, and found that accepting this correction had no impact on the calculated margin. *Id.* Commerce memorialized this verification in its sales and cost reports. *See* Antiqa Cost Verification Report (March 18, 2025) (P.R. 403, C.R. 898).

Win-Tel also presented three corrections. Win-Tel's Opening Day Minor Corrections (Feb. 26, 2025) (P.R. 395, C.R. 757-62); Win-Tel's Verification Report at VE 1 (March 31, 2025) (C.R. 899). These included misreporting the brokerage and handing expenses for a sale in the United States sales database, ZIP codes for some of its sales in the United States sales database, and a formula error regarding allocation of packing costs. *See* Win-Tel's Verification Report (March 17, 2025) (P.R. 401, C.R. 896) at 1-3.[3] Commerce accepted corrections as minor and verified this information. IDM at 10; Win-Tel Sales Verification Report (March 17, 2025) (P.R. 401, C.R. 896). Commerce also verified Win-Tel's scrap offset during verification. *See* Win-Tel Cost Verification Report (Feb. 21, 2025) (P.R. 392, C.R. 756) at 13; *see also* Win-Tel Cost Verification Exhibit 11 (C.R. 735).

## VI.    Final Determination and Case Briefing

Ahead of Commerce's final results, the Coalition filed its case brief on March 26, 2025. Coalition Case Brief (C.R. 987). The Coalition argued that Commerce should "determine Win-Tel, Theos, and Neeson are affiliated pursuant to the Debt financing and 'close supplier relationship' factors under 19 C.F.R. § 351.102(b)(3). *Id.* at 2. The Coalition also argued that

---

[3] The formula error regarding allocation of packing cost only affected the packing cost allocation and not total reported packing costs.

PUBLIC VERSION

"Win-Tel's failure to provide verifiable costs and sales information to Commerce, thereby warranting the application of total AFA {adverse facts available} in the final determination." *Id.* at 3.  The Coalition further argued that Commerce should revise its affiliation and collapsing analysis with respect to Antiqa and certain of its affiliated companies." *Id.* at 4.  Last, the Coalition argued that Antiqa failed to provide verifiable sales information" to Commerce thus "warrantying at least a partial AFA." *Id*. at 6.

In support of its first argument, the Coalition pointed to a 2020 loan to Neelson where a member of the Kundariya family provided collateral. *Id.* at 10.  The Coalition contends that but for this collateral, Nelson would not have secured the loan. *Id.*  The Coalition points out that this makes Win-Tel essentially an investor and not just in a typical supplier/customer relationship. *Id.* at 11.  Additionally, the Coalition argued that the closer supplier relationship existed between Win-Tel and Neelson because Neelson is by far Win-Tel's second largest supplier, and Neelson's supplied goods make up [    ] of Win-Tel's export sales. *Id.* at 13.

As to the Coalition's second point, urging the application of total AFA for Win-Tel, the Coalition pointed to that, in its view, that there were levels of inconsistencies in the reporting costs and profits to manufacturing the subject merchandise. *Id.* at 18-25.  This included allegations of inconsistent and unreliable record keeping. *Id.* at 23-25.  In conjunction with this argument, the Coalition argued that the Commerce should have rejected "new factual information" in the form of corrected sales data based which corrected some [   ] United States sales zip codes and a formula error regarding packing costs. *Id.* at 24.  The Coalition argued that these were significant changes that required Commerce to reject them at such a later stage of the proceedings. *Id.* at 24-25.

14

**PUBLIC VERSION**

Third, the Coalition also posited that Marbonite should be collapsed into Antiqa and argued that Marbonite and Segam produce identical or similar products to Antiqa, demonstrate significant potential manipulation, have intertwined operations, and have a common level of ownership with overlap in boards and managerial employees. *Id.* at 25-33. Fourth, the Coalition argued that Antiqa mispresented its affiliates throughout the proceedings and that this justifies an application of partial AFA. *Id.* at 33-42.

In response, on April 1, 2024, Win-Tel and Antiqa provided their rebuttal case brief. Rebuttal Case Brief (C.R. 997). In their brief, the respondents provided that Commerce should continue to not collapse Marbonite with Antiqa because, in part, the Kudariya family holds only a "non-controlling interest{} in Marbonite," as well as a lack of controlling directors being family members. *Id.* at 6. Similarly, respondents provided that the ownership stake of the Kudariya family was also very small in Segam. *Id.* The respondents also generally rebutted the Coalition's claims that any error in zip codes and a packing error were not minor. *Id.* at 38-39. The respondents also argued that the Coalition "failed to demonstrate how property of the Kundariya family provided as a collateral security prior to the POI, when [                    ] was a Partner in Neelson, could result in Win-Tel impacting Neelson's decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id.* at 33-34.

On April 16, 2025, Commerce published its final determination, maintaining the finding from the preliminary determination that ceramic tile from India was not being, or was not likely to be, sold at less than fair value, and assigned a 0.00 percent dumping margin for both mandatory respondents. *See* Final Determination, 90 Fed. Reg. at 17,030-31; IDM at 1. At the final determination Commerce continued to find that Marbonite and Segam should not be collapsed with the Antiqa entity. *See* IDM at 17-22. Commerce also found that Win-Tel and

15

PUBLIC VERSION

Neelson were not affiliated.  *See* IDM at 11-14.  At the final determination, Commerce continued to rely on Win-Tel's reported scrap offset.  *See* IDM at 25-27.

## SUMMARY OF THE ARGUMENT

The Coalition challenges Commerce's final determination on the grounds that: (1) Commerce's granting of a reporting exclusion for Antiqa's affiliated entities, Marbonite and Segam, was arbitrary and an abuse of discretion; (2) Commerce's collapsing analysis of the Antiqa entity is not supported by substantial evidence and otherwise not in accordance with law; (3) Commerce's non-affiliation determination regarding Win-Tel and Neelson is not supported by substantial evidence and otherwise not in accordance with law; (4) Commerce abused its discretion when accepting minor corrections at verification; and (5) Commerce's determination to grant a scrap offset was not in accordance with law.

Contrary to the Coalition's contentions, Commerce's *Final Determination* is supported by substantial evidence, in accordance with law, and was not an abuse of discretion.  In addition, the Coalition has failed to exhaust administrative remedies prior to bringing its challenge to the granting of a reporting exclusion for Antiqa affiliated entities Marbonite and Segam.  Further, Commerce did not abuse its discretion by granting a reporting exclusion for Antiqa. Commerce's decision to not collapse Antiqa with Marbonite and Segam was supported by substantial evidence and otherwise in accordance with law.  Commerce's decision that Win-Tel and Neelson are not affiliated is supported by substantial evidence and otherwise in accordance with law.  Commerce also did not abuse its discretion when accepting minor corrections at verification.  Last, Commerce's determination to grant a scrap offset was in accordance with law.

16

**PUBLIC VERSION**

## ARGUMENT

### I.    Standard of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  Courts "hold unlawful and set aside agency action, findings, and conclusions found to be {} arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law{.}"  5 U.S.C. § 706(2).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consolo. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).  Thus, a party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions.  *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984).  Moreover, it is not necessary for Commerce to provide an explicit explanation so long as its decisional path is reasonably discernible.  *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998) (*Wheatland*).

Additionally, when Congress entrusts an agency to administer a statute that demands inherently fact-intensive inquiries, agency conclusions may be set aside only if the record is "so compelling that no reasonable factfinder" could reach the same conclusion.  *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see also Shandong Rongxin Imp. & Exp. Co. v. United*

17

*States*, 203 F. Supp. 3d 1327, 1338 (Ct. Int'l Trade 2017) (recognizing a deference to Commerce's factual findings). It is thus improper to overturn a determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citations omitted), and the Court will not substitute its judgement in choosing between two fairly conflicting views, even if it could "justifiably have made a different choice had the matter been before it de novo." *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (citation modified).

## II.   Commerce's Granting of Antiqa's Reporting Exemptions of Marbonite And Segam Was A Lawful Use of Its Discretion

### A.   Legal Standard for Collapsing

The antidumping duty statute requires that, if Commerce determines that foreign merchandise is being, or likely to be, sold in the United States at less than fair value, then "there shall be imposed upon such merchandise an antidumping duty . . . in an amount equal to the amount by which the normal value {generally the home market price in the exporting country} exceeds the export price (or constructed export price) {the United States price} . . . for the merchandise." 19 U.S.C. § 1673. The amount by which the normal value (home market price) exceeds the export price or constructed export price (United States price) of the subject merchandise is the "dumping margin." 19 U.S.C. § 1677(35). At the conclusion of an antidumping duty investigation, if Commerce and the United States International Trade Commission (ITC) have made the requisite affirmative findings, Commerce publishes an order that will result in the eventual assessment of duties on imports of goods covered by the investigation. 19 U.S.C. § 1673e(a).

At issue is the treatment of affiliated companies for purposes of calculating dumping margins. "{C}ollapsing entities means that Commerce will treat the collapsed entities as a single

18

entity for the purpose of calculating anti-dumping margins." *Carpenter Tech. Corp. v. United States*, 510 F.3d 1370, 1373 (Fed. Cir. 2007); *see also Koenig & Bauer-Albert AG v. United States*, 90 F. Supp. 2d 1284, 1286 (Ct. Int'l Trade 2000) (citations omitted) (describing collapsing). The purpose behind a collapsing determination is "'to ensure that {Commerce} reviews the entire producer or reseller, not merely a part of it.'" *Queen's Flowers de Colom. v. United States*, 981 F. Supp. 617, 622 (Ct. Int'l Trade 1997) (citation omitted) (brackets in original).

The "principal authority governing collapsing is 19 C.F.R. § 351.401(f)." *Carpenter Tech.*, 510 F.3d at 1373. Pursuant to this regulation, three conditions must be satisfied for Commerce to collapse two or more affiliated producers into a single entity. *Id.* The companies must be "affiliated," as defined by 19 U.S.C. § 1677(33)(A)-(G). The regulations clarify that affiliated persons and affiliated parties have the same meaning as in 19 U.S.C. § 1677(33). *See* 19 C.F.R. § 351.102(b)(3). Collapsing, however, "requires a finding of more than mere affiliation." *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,345 (Dep't of Commerce May 19, 1997) (*Preamble*).

The affiliated producers must also have "production facilities for similar or identical products" that "would {not} require substantial retooling" "in order to restructure manufacturing priorities." 19 C.F.R. § 351.401(f)(3). This factor "requires similarity in the products produced, not in the facilities that produce them." *Viraj Group v. United States*, 476 F.3d 1349, 1356 (Fed. Cir. 2007).

Finally, there must be "a significant potential for the manipulation of prices {or} production." 19 C.F.R. § 351.401(f)(1). Commerce "may consider" the following factors in making this determination: (1) "{t}he level of common ownership;" (2) "{t}he extent to

19

which managerial employees or board members of one firm sit on the board of directors of an affiliated firm;" and (3) "{w}hether operations are intertwined," for example, "through the sharing of sales and export information; involvement in production, pricing, and other commercial decisions; the sharing of facilities or employees; or significant transactions between the affiliated producers." 19 C.F.R. § 351.401(f)(2). This list is "non-exhaustive." *Preamble*, 62 Fed. Reg. at 27,346.

"Commerce need not find all of the factors in the regulation present to find a significant potential for manipulation of price or production." *United States Steel Corp. v. United States*, 179 F. Supp. 3d 1114, 1139 (Ct. Int'l Trade 2016); *see also Preamble*, 62 Fed. Reg. at 27,346. Instead, "'{t}hese factors are considered by Commerce in light of the totality of the circumstances,'" meaning that "'no one factor is dispositive in determining whether to collapse the producers.'" *Zhaoqing New Zhongya Aluminum Co. v. United States*, 70 F. Supp. 3d 1298, 1304 (Ct. Int'l Trade 2015) (citation omitted); *see also Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362, 1373 (Ct. Int'l Trade 2009) (explaining that a collapsing determination is "dependent upon the totality of the facts and circumstances"). Thus, collapsing determinations "are very much fact-specific in nature, requiring a case-by-case analysis, as reflected in {Commerce's} determinations in actual cases." *Preamble*, 62 Fed. Reg. 27,346.

### B.    The Coalition Waived Its Arguments Regarding Antiqa's Reporting Exemption

Commerce's determination to grant Antiqa a reporting exemption was a lawful use of its discretion. The Court, however, can and should hold that the Coalition waived its argument by failing to raise its claim in its case brief before Commerce. For that reason alone, the Court should reject the Coalition's argument here.

20

**PUBLIC VERSION**

In 28 U.S.C. § 2637(d), Congress expressly mandated that the Court of International Trade "{s}hall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping duty determinations.  The statute reflects "a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States Steel Corporation*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  Exhaustion is "a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Id.* at 1379.  This Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.* at 1379.  Parties must raise issues with specificity and "at the time appropriate under {an agency's} practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952).

Parties may only avoid the requirement to exhaust their administrative remedies if their argument falls into an exception: specifically, the "pure question of law" exception, or the futility exception.  *Corus Staal,* 502 F.3d at 1378 n. 4; *see also Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384-85 (Fed. Cir. 2008).  To fall under the futility exception, a party must show that they "would be required to go through obviously useless motions in order to preserve their rights." *Corus Staal*, 502 F.3d at 1379 (internal quotation omitted).  The futility exception "is a narrow one{,}" and "{t}he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust its administrative remedies." *Id.*  To fall under the "pure question of law" exception, a party must show that the issue presents a pure legal issue that requires only an examination of the relevant statute and does not require the application of any special expertise from the agency or the development of a

21

factual record either before or after the Court's consideration of the issue.  *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1003 (Fed. Cir. 2003).

Here, Antiqa requested its reporting exemption for Marbonite and Segam on August 16, 2024.  Antiqa's Request for Reporting Exclusions.  On August 22, 2024, Commerce preliminarily granted this request.  Memo Granting Reporting Exclusion Request.  On August 30, 2024, the Coalition responded to Antiqa's request and argued that the Department should reconsider its granting of the request.  The Coalition's Comments Regarding Antiqa's Request for Reporting Exclusions.  In its preliminary collapsing analysis, Commerce made no changes to its decision to grant a reporting exclusion for both Marbonite and Segam.  Antiqa Preliminary Collapsing Memorandum at 13.  Later, in its case brief before Commerce, the Coalition did not preserve or raise its dispute Commerce's granting of the reporting exclusion.  *See generally* Coalition Case Br. at 9.  Thus, the Coalition now improperly raises before this Court an argument, *see* Pl. Br. 10-13, that it failed to raise before Commerce for its consideration in the final determination.

The Coalition's argument does not involve a pure question of law, as it requires Commerce to analyze the relationship Antiqa and affiliated entities – a fact intensive analysis.  Nor has the Coalition shown that raising the argument in its case brief before Commerce would have been futile.  Arguments made about why Commerce should not grant the reporting exclusion could have influenced Commerce's decision-making in the final results.[4]  In fact, other

---

[4] Whether or not Commerce would actually have done so is not relevant to the futility exception analysis.  *See, e.g., Ceramark Technology, Inc. v. United States*, 61 F. Supp. 3d 1371, 1375-76 (Ct. Int'l Trade 2015) (finding in a circumvention remand proceeding "{w}hile Commerce still might not have agreed with Ceramark's arguments on remand, the 'mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies.' *Corus Staal*, 502 F.3d at 1379. ").

22

arguments regarding these entities were made by the Coalition and analyzed by Commerce. IDM at 17.  Because the Coalition failed to exhaust its administrative remedies, the Court should decline to consider its argument that Commerce's granting of the reporting exclusion was premature.

### C. The Coalitions Argument Relating to The Reporting Exemptions to Marbonite And Segam Are Without Merit; Commerce Did Not Abuse Its Discretion

As established above, the Coalition waived its arguments regarding the reporting exemptions for failure to raise them in its case brief to Commerce.  Even if it were considered by the Court, the Coalition's waived argument is without merit and should be rejected by the Court. Commerce's decision to grant Antiqa's exclusions request at the beginning of this investigation was not premature and was informed by substantial record evidence.

The Coalition argues that Commerce granted Antiqa's request prematurely.  Pl. Br. at 12. Not so.  This is because the exclusion request included the annual report of Prism Johnson, the supply agreement between Prism Johnson and Marbonite, and STPL shareholding details, among other materials.  Antiqa's Request for Reporting Exclusion at 3-11; Reporting Exclusions Exhibits 2-4 (C.R. 83-84).  In short, Commerce had all information necessary with regard to this request to make an analysis as to whether to grant this exclusion.  This was further proven in Commerce's preliminary collapsing analysis, where Commerce was able to complete an analysis of whether to collapse these entities.  *See* Antiqa Preliminary Collapsing Analysis at 13.  The Coalition claims, Commerce "prejudged the collapsing issues", but the Collapsing Analysis clearly shows Commerce was able to fully judge the issue nonetheless, just as Commerce noted when it initially granted the exclusion saying that it would revisit the issue.  Pl. Br. at 12;

**PUBLIC VERSION**

Commerce Granting Antiqa Exclusion; *see generally* Antiqa Preliminary Collapsing Analysis Memorandum.

In addition, Commerce's decision to deny Antiqa's second request, for an exclusion request for Affiliate A, does not undermine the reasonableness of granting of Antiqa's prior exclusion request. The Coalition points to Commerce words that it was "still reviewing Antiqa's Section A questionnaire response and is in the process of drafting additional questions regarding Antiqa's affiliations." Commerce's Letter Regarding Second Request for Reporting Exclusion (Sept. 11, 2024) (C.R. 226, P.R. 247); Pl. Br. at 12. The Coalition opines that Commerce needed to wait and evaluate those same section A questionnaire responses for the Antiqa's first exclusion request. Pl. Br. at 12. This is not correct.

Instead, this evidence shows the separation between Commerce's first and second exclusion decision. The reporting exclusion for Marbonite and Segam was requested in a standalone document with affiliation and collapsing information included, while the second request came within Antiqa's Section A response which Commerce required supplemental information to fully evaluate. Commerce's Letter Regarding Second Request for Reporting Exclusion; *see* Antiqa First Supplemental Questionnaire Regarding Affiliates at 7. Commerce would have to complete reviewing the Section A questionnaire response to analyze the affiliation information, and the exclusion request contained in that response.

Therefore, notwithstanding the Coalition's failure to exhaust, Commerce did not abuse its discretion when deciding to accept Antiqa's and reporting exemption.

## III. Commerce's Decision To Not Collapse Marbonite And Segam with Antiqa Is Supported by Substantial Evidence

In the underlying investigation, Commerce determined that two affiliates of Antiqa, Marbonite and Segam, should not be collapsed into the Antiqa entity. *See* IDM at 18-22. The

PUBLIC VERSION

Coalition claims that Commerce's decision to not collapse Marbonite and Segam with Antiqa is not supported by substantial evidence. Pl. Br. at 13. As detailed below, the Coalition is wrong. Commerce did not abuse its discretion, and it considered all relevant information in its determination to not collapse Marbonite and Segam into the Antiqa entity.

The criteria for treating affiliated producers as a single entity for purposes of antidumping proceedings are provided in 19 C.F.R. § 351.401(f). Commerce considers three factors on whether it should collapse two or more affiliated producers into a single entity. *Id.* The first two factors under the collapsing regulation are not in dispute. *See* Pl. Br. at 13 ("There is no dispute between the parties that Marbonite meets the first two of the three factors necessary for collapsing:").

What is at issue is the third regulatory factor. Pl. Br. at 13-14. Per its regulations, Commerce must find there is "a significant potential for the manipulation of price {or} production." 19 C.F.R. § 351.401(f)(1). Commerce's regulations expand on this, laying out factors which Commerce "may consider" in finding significant potential for manipulation:

> **(2)** ***Significant potential for manipulation.*** In identifying a significant potential for the manipulation of price, production or other export decisions, the factors the Secretary may consider for all affiliated parties include:
> (i) The level of common ownership;
> (ii) The extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm; and
> (iii) Whether operations are intertwined, such as through the sharing of sales and export information; involvement in production, pricing, and other commercial decisions; the sharing of facilities or employees; or significant transactions between the affiliated parties.

19 C.F.R. § 351.401(f)(2). Commerce considers these factors in light of the totality of the circumstances and no one factor is dispositive in the collapsing analysis. *See, e.g., Koyo Seiko Co. v. United States*, 516 F. Supp. 2d 1323, 1346 (Ct. Int'l Trade 2007).

25

**PUBLIC VERSION**

A.     **Substantial Evidence Support's Commerce Refusal To Collapse Marbonite into Antiqa**

Substantial evidence supports Commerce's determination that Marbonite should not be collapsed with the Antiqa entity.  Commerce properly determined that there is no significant potential for the manipulation of prices or production between Marbonite and the Antiqa entity.

The Coalition claims that Commerce's collapsing analysis with regard to Marbonite is internally inconsistent, fails to consider evidence that detracts from its determination, and is unsupported by the evidence on the record.  Pl. Br. at 15.  To support this claim, the Coalition cites to *QSP from India* claiming that "past determinations that Marbonite and Antiqa entity companies demonstrated a significant potential for manipulation is relevant to whether there is a potential for manipulation in this instance."  Pl. Br. at 16 (citing *Preamble*, 62 Fed. Reg. at 27,346).  However, this statement that past findings regarding potential for manipulation must be controlling is not availing.  *See* IDM at 19*; see, e.g., U.S. Steel Corp. v. United States*, 637 F. Supp. 2d 1199, 1218 (Ct. Int'l Trade 2009).

Further, the Coalition disputes the importance of the fact that "Marbonite has not exported ceramic tile to any entity independent of Prism Johnson."  IDM at 19.  Although the Coalition claims that this fact does not carry weight, it misunderstands the reason Commerce points to this facet of the Marbonite's relationship with Prism Johnson.  Although Commerce need not rely on *QSP from India*, the fact that Marbonite only sold ceramic tile to Prism Johnson is an important distinguishing factor from *QSP from India*.  In *QSP from India*, Marbonite exported QSP through Prism Johnson and Shivam and this was a factor in collapsing these entities.  IDM at 19; *see Certain Quartz Surface Products From India: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,*

26

84 Fed. Reg. 68,123 (Dep't of Commerce Dec. 13, 2019), and accompanying preliminary decision memorandum at comment VI.  However, here Marbonite *does not* export ceramic tile through Antiqa, therefore this weighs against collapsing.  IDM at 19; *see* Antiqa's Request for Reporting Exception at 5.

In addition, the Coalition claims that Commerce's analysis was not properly focused on "whether the Kundariya family are shareholders, either directly or indirectly, in Marbonite … and if there are common managers or directors between Marbonite and Antiqa entities{.}"  Pl. Br. at 17.  However, Commerce properly analyzed and considered evidence of shared managers or directors; the Coalition's arguments amount to a contention that it would have weighed the factors under 19 C.F.R. § 351.401(f)(2) differently than Commerce, which is not a basis for remand.

First, Commerce examined if Kundariya family members are shareholders in Marbonite. IDM at 19.[5]  Second, whether Kundariya family members are shareholders (or put another way, whether there is a "level of common ownership") is not necessarily itself dispositive for affiliation, as there are multiple factors Commerce may analyze under the regulation.  *See* 19 C.F.R. § 351.401(f)(2).  In addition to the level of common ownership, Commerce also may analyze "{w}hether operations are intertwined, such as through the sharing of sales and export information; involvement in production, pricing, and other commercial decisions; the sharing of facilities or employees; or significant transactions between the affiliated parties."  *Id.*  Therefore, Commerce found that although the "Antique Trust" owns 50% of Marbonite, Prism Johnson owns the other 50%.  IDM at 19; *see* Antiqa Preliminary Collapsing Memorandum at 9-11.  The

---

[5] In fact, Commerce recognized that Kundariya family members are invested in Marbonite, through the "Antique Trust."  IDM at 19; Premature Collapsing Analysis Rebuttal Comments at 3.

PUBLIC VERSION

record also demonstrates that Marbonite and Prism Johnson had significantly intertwined operations, that there exists an exclusive supply agreement between Marbonite and Prism Johnson, and that Marbonite's production was subject to this long-standing supplier agreement. IDM at 20; *see* Antiqa Preliminary Collapsing Memorandum 9-11. Thus, these facts together showed that Marbonite and Antiqa lacked intertwined operations, weighing against a finding of significant potential for manipulation. IDM at 20; *see also Rebar Trade Action Coalition v. United States*, 398 F. Supp. 3d 1359, 1369-70 (Ct. Int'l Trade 2019) (affirming Commerce's collapsing determination despite some contrary evidence because it was reasonable). To state that Commerce did not focus on whether Kundariya family members are shareholders misunderstands both Commerce's decision, which took such a fact into account, and the regulations governing Commerce's analysis.[6]

Additionally, the Coalition argues that Marbonite's insignificant number of non-ceramic tile sales to an affiliate of Antiqa Group suggests the long-standing exclusive supplier agreement between Marbonite and Prism Johnson is not exclusive, supporting intertwined operations between Marbonite and Antiqa. Pl. Br. at 17. However, Commerce found "strong evidence" for the fact that Prism Johnson and Marbonite's agreement is exclusive regarding ceramic tiles. Antiqa's Request for Reporting Exclusion at Ex. 3 at 5, 13. Any non-ceramic tile sales were

---

[6] The Coalition posits that Commerce was wrong about Prism Johnson's ability to appoint controlling members of the board of directors. Pl. Br. at 17 (citing IDM at 21). Although Commerce's analysis of such is unclear, it is clear this factor was not determinative since Commerce reached the same result in the preliminary collapsing memorandum without this analysis. *See* Antiqa Collapsing Memorandum at 9-10 ("we preliminarily determine that there is significant overlap of directors/partners between Antiqa, ACPL, ANPL, AVL, Shivam, and Marbonite."); *see also* Premature Collapsing Rebuttal Comments at 3 ( Antiqa explains that that "Prism Johnson appoints senior management, including the Chairman of the Board, CFO, and Company Secretary.").

28

PUBLIC VERSION

insignificant in relation to Antiqa Group's purchases, to sales to the United States, and to Marbonite's total sales in the fiscal year. *See* IDM at 20. The Coalition once again points to *QSP from India*, this time to try to explain that Marbonite has long-term relationships with entities other than Prism Johnson. Pl. Br. at 17. Once again, Commerce is not bound by the decision in *QSP from India* here and pointing to insignificant sales of products other than ceramic tiles does little to display significant potential for manipulation of the product under investigation.

Finally, the Coalition claims that "the record demonstrates that Marbonite's production information is clearly available to the Antiqa entity." Pl. Br. at 17-18. However, in making this claim, the Coalition cites to Antiqa's first reporting exclusion request at pages 4 and 8. *Id.; see* Antiqa's Request for Reporting Exclusion. However, this premise appears unsupported. Rather this document states that "{t}here are no other common officers, directors, or managerial employees between Marbonite, Prism Johnson, and Antiqa Group Respondents except the three directors nominated by AGST"; "Marbonite operates independently from Antiqa Group Respondents, with no significant operational overlap"; and "Marbonite's operations are entirely under the control of Prism Johnson, not the Antiqa Group." Antiqa Exclusion Request at 3-4, 8. Thus, Marbonite appears to operate completely out of the view of Antiqa, and that supports Commerce's ultimate conclusion. *See also* Premature Collapsing Rebuttal Comments at 3 ("**There is no sharing of . . . sales information**").

This is in contrast to the relationship amongst the companies comprising the collapsed single entity as detailed by the Coalition *See* Pl. Br. at 18 (citing to Antiqa's Supp A QR) (explaining that "Antiqa, ACPL, Shivam, AVL, and ANPL do share sales information to a certain extent due to the shared management within the Kundariya family.")

**PUBLIC VERSION**

Therefore, for the reasons outlined above, Commerce's determination not to collapse Marbonite is supported by substantial evidence and in accordance with law.

### B.    Commerce's Decision to Not Collapse Segam into Antiqa Is Supported by The Totality of The Circumstances

Similarly to its determination with respect to Marbonite, Commerce's determination that Segam and Antiqa should not be collapsed is supported by substantial evidence because there is no significant potential for manipulation between Segam and the Antiqa collapsed entity.

The Coalition claims that Commerce's determination as to each factor in 19 C.F.R. § 351.401(f)(2) is unsupported by substantial evidence. Pl. Br. at 18-19. The Coalition is wrong. Commerce properly determined that each of these factors weighs in favor of not finding significant potential for manipulation. *See* IDM at 21-22.

First, the Coalition points to the level of ownership by the Kundariya family in Marbonite, however, this level of ownership in Segam is not controlling. Pl. Br. at 19. The Coalition gives too much weight to a preliminary analysis by Commerce that "there is significant common ownership among Antiqa, . . . Marbonite, {and} Segam." (citing Antiqa Preliminary Collapsing Memorandum at 9).[7] However, Commerce still found that the small amount of ownership interest was not significant enough to support finding potential of manipulation. *See* IDM at 21; Antiqa Preliminary Collapsing Analysis at 9 (P.R. 358, C.R. 645). Thus, substantial evidence supports Commerce refusal to collapse Antiqa and Segam. IDM at 21.

---

[7] The Coalition's argument that the "Kundariya family, collectively, is the [          ] in Segam" simply shows a [                              ]. *See* Pl. Br. at 19. The record establishes that all together, members of the Kundariya only make up [      ] of total shareholding. *See* Antiqa's Request for Reporting Exclusion at Exhibit 4 (P.R. 175, C.R. 84).

**PUBLIC VERSION**

Further, under common ownership, the Coalition once again turns to its statements regarding the names of Segam's owners.[8]  Commerce analyzed this information submitted under Exhibit 4 of Antiqa's First Exclusion Request.  Commerce also analyzed and verified Antiqa Corporate Ownership and family tree information, and in the final determination did not find any reason to change its collapsing decision. Antiqa Sales Verification Report at 4; *see* Exhibits VE-2c-d  (Feb. 28, 2025) (C.R. 778-80).

With regard to managerial overlap, the Coalition points to overlap in managerial employees or board members between Segam and the Kundariya family, as well as promoters and common directors, and argues that there is sufficient managerial overlap among the companies.  Pl. Br. at 20.  Both arguments were addressed and rebutted in Commerce's Final Determination.  *See* IDM at 21-22.  First, Commerce did acknowledge that there is overlap of directors or partners between Segam and the Kundariya family but found this insignificant because of the relative number of family members serving on Segam's board.  *See* IDM at 21; *see also* Antiqa's Request for Reporting Exclusion at 11; Antiqa's Request for Reporting Exclusion at Ex. 4 (C.R. 84) (demonstrating that less than [    ] percent of Segam's shareholders or partners belong to the Kundariya family).

Second, on the Coalition's point with regard to a previously indicated promoter of Segam being the managing director and chairman of Segam and otherwise related to the Kundariya family, Commerce properly reviewed record evidence and determined that these are two different individuals with two different names through verification.  *See* IDM at 22 (citing Antiqa's

---

[8] Specifically, the Coalition points to [      ] shareholders [                                    ], stating that this establishes that the true extent of Kundariya family ownership in Segam is potentially greater." Pl. Br. at 19.  In their argument, the Coalition is asking the Court to find collapsing purely due to a [                  ].

PUBLIC VERSION

Response to Section B Questionnaire at Revised (BQR) Exhibit A-7 (Sept. 19, 2024) (C.R. 265)).[9]

Finally, the Coalition argues that substantial evidence contradicts Commerce's determination that Segam and Antiqa lack intertwined operations.  In support of this, the Coalition points to its analysis of managerial overlap to show an "implicit" intertwining of operations.  *See* Pl. Br. at 20.  Putting the Coalition's reliance on implication aside, as shown above, because Commerce properly determined that the Coalition's contention of managerial overlap fails, so too does its speculation about an "implicit" intertwining of operations.

Further, although the Coalition claims that "Segam's production, pricing, and sales information is clearly available to the Antiqa entity," its citation does not substantiate this claim.  *See* Pl. Br. at 20; *cf.* Antiqa's Exclusion Request at 11.  Rather the document *explicitly* states, "There is no shared sales information between STPL and Antiqa Group Respondents."  Antiqa's Exclusion Request at 10.  Although it appears that the data for the direct sales *between* the two companies was available, nothing the Coalition points to refute the statement made by Antiqa about its lack of access to Segam's sales information.  *Id.* at 10-11.

Further still, the Coalition points to an "existence of sales and purchases of subject merchandise between the Antiqa and Segam" in its support of intertwining of operations.  Pl. Br. at 21.  This precise issue has already been addressed by Commerce in its IDM.  *See* IDM at 22.[10]

---

[9] Antiqa showed in its rebuttal brief that "[                                        ] is **not** a partner in [                    ]."  Respondent's Rebuttal Brief at 7( "{[                              ]} is not a shareholder in any of the Antiqa Group entities."); *see also* BQR Ex. A-7.

[10] Commerce stated "{w}hile Commerce does consider the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, and/or significant transactions between the affiliated producers in its determination of whether entities have intertwined operations, the existence of transactions between entities by itself does not meet the criteria for finding the entities have intertwined operations."  IDM at 22.

**PUBLIC VERSION**

Commerce already acknowledged that Segam sold a negligible quantity of ceramic tile to Antiqa during the POI and purchased a negligible quantity of ceramic tile from AVL.  IDM at 22. Therefore, Commerce's determination that there were no intertwined operations is supported by substantial evidence having considered and weighed the evidence in the totality of the circumstances.

**IV.    Commerce's Decision That Win-Tel And Neelson Are Not Affiliated Is Supported by Substantial Evidence**

Commerce's determination that Win-Tel is not affiliated with Neelson is supported by substantial evidence.  The Coalition claims that Commerce erred when it determined that Win-Tel is not affiliated with Neelson.  Specifically, the Coalition claims that affiliation exists due to both the debt financing and a close supplier relationship under 19 C.F.R. § 351.102(b)(3).  Pl. Br. at 21-22.  However, Commerce properly determined that the evidence in the underlying investigation shows that neither a debt financing argument nor a close supplier relationship argument are sufficient to establish control necessary for an affiliation determination.  IDM at 11-14.

19 U.S.C. § 1677(33) provides that affiliated persons include:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> (B) Any officer or director of an organization and such organization.
> (C) Partners.
> (D) Employer and employee.
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> (G) Any person who controls any other person and such other person.

In addition, the statute provides, "a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other

**PUBLIC VERSION**

person." *Id.* Commerce's regulations provide that in determining whether control over another person exists Commerce will consider, among other factors "debt financing; and close supplier relationships." 19 C.F.R. § 351.102(b)(3). However, Commerce will not find that control exists on the basis of these factors "unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id.*

In both the preliminary determination and the final determination, Commerce considered whether affiliation existed between Win-Tel and Neelson. *See* IDM at 12-13; PDM at 5; Preliminary Analysis Affiliation Memorandum Win-Tel at 9. In the final determination, Commerce properly determined that affiliation did not exist between the companies under 19 U.S.C. § 1677(33).

### A. Debt Financing Does Not Conclusively Demonstrate Win-Tel's Control over Neelson

Commerce properly found that Win-Tel and Neelson are not affiliated despite the presence of a debt-financing relationship. IDM at 13-14. The Coalition claims that because members of the family that control Win-Tel "provided Neelson with collateral used to secure a loan," this shows control based on debt financing. Pl. Br. at 22. However, as Commerce found in the IDM, this does not establish that Win-Tel and Neelson are affiliated. IDM at 13-14. The Court should reject the Coalition's invitation that the Court reweigh the record evidence as substantial evidence review requires that Commerce's reasonable factual determinations be sustained.

As stated above, debt financing is one of the factors Commerce considers to determine whether control exists under section 1677(33). *See* 19 C.F.R. § 351.102(b)(3). However, Commerce's regulations clarify that Commerce "will not find control exists on the basis of these

34

**PUBLIC VERSION**

factors unless the relationship has potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product." *Id.* Commerce also considers the temporal aspect of a relationship as "*temporary circumstances* will not suffice as evidence of control." *Id.* (emphasis added).

The record here demonstrates that Commerce correctly weighed that this debt-financing agreement does not mandate collapsing. As Commerce explains, Neelson's, Win-Tel's, and Theo's partnership agreements, annual returns, and ownership shares all demonstrate that there are no common owners, board members, directors or overlapping personnel between Neelson and Win-Tel Group. IDM at 13.

Prior to the period of investigation, a Win-Tel shareholder ([

]) was a minor partner in Neelson and, along with other partners in Neelson, provided collateral to secure a bank loan which Neelson obtained. IDM at 13. However, the record establishes, that prior to the POI in 2022, the Kundariya family partner of Neelson retired and took steps to divest ownership. IDM at 13; Win-Tel's Supplemental Section A Response at Exs. S1-1 (c) and (d) showing the resignation in late 2022; Ex. S1-1 (a) and (b) showing non-Kundariya ownership.

At verification, officials of Win-Tel explained that upon retiring from Neelson, this partner took steps to have his collateral released from the bank which secured the original loan. IDM at 14. Further, two individuals acquired ownership interest in Neelson in 2022. IDM at 13. In 2022, these two individuals, with no record connection to Win-Tel, provided collateral to replace the collateral provided by the Win-Tel shareholder. *Id.* at 13-14; *see* Win-Tel's Supplemental Section A Response at Exs. S1-1 (a). Although it might be true that the process of divestment has not concluded, as Commerce recognized in verification, the divestment process

35

was substantially complete, and the bank was asked to release the collateral at the time of verification in March of 2025. Win-Tel's Verification Report at 3.

Just because the divestment process is not complete, this is not evidence that the former Kundariya family partner of Neelson has not taken steps to remove his ownership interest nor is there evidence of present control or influence. Commerce already examined record evidence to determine whether debt financing may have the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product. Commerce looked at Neelson's annual return, its partnership agreement, its ownership shares, Neelson's and Win-Tel's board members, and the resignation documentation. IDM at 14; Preliminary Analysis Affiliation Memo Win-Tel. These together sufficiently refute that one of Win-Tel's former board members is still obligated by their collateral such that this relationship would have the potential to impact decisions concerning the production, pricing, or cost of ceramic tile during the POI. *See* IDM at 14.

Further, the Coalition cites to *Ta Chen Stainless Steel Pipe v. United States*, 23 CIT 804, 815 (Ct. Int'l Trade 1999), to support its claim that the debt financing here creates a relationship rising to the level of affiliation. However, the Coalition's reliance on *Ta Chen* is misplaced. In the underlying administrative decision in that case, Commerce had found that through a debt financing arrangement of a respondent party "placed its continued ability to operate in the hands of a putatively unaffiliated party." *Ta Chen,* 23 CIT at 815 (quoting *Certain Welded Stainless Steel Pipe from Taiwan*, 62 Fed. Reg. at 1,436 (Dep't of Commerce Jan. 10, 1997)(preliminary results)). This stands in contrast to this case. Here, any debt financing arrangement between Win-Tel owners and Neelson occurred prior to the POI, the Win-Tel owner retired from Neelson prior to the POI, and replacement partners have provided new collateral in the process of

36

unwinding any former collateral interest.  IDM at 14.  These facts do not show Neelson has

"placed its continued ability to operate" in the hands of Win-Tel.  *Ta Chen,* 23 CIT at 815.  Thus,

Commerce's determination is supported by substantial evidence.

**B.      A Close Supplier Relationship Does Not Exist Between Win-Tel And Neelson**

Commerce properly determined that Win-Tel and Neelson are not affiliated through a

close supplier relationship.  IDM at 12-13.  The Coalition claims that this determination was not

supported by substantial evidence and referred to Commerce's analysis as "incomplete."  Pl. Br.

at 24.  The Coalition's claim is again reliant on reweighing record evidence, and does not

undermine Commerce's reasonable determination.

When determining whether affiliation exists under 19 U.S.C. § 1677(33)(G), Commerce

will ascertain if there is a "close supplier relationship{.}" 19 C.F.R. § 351.102(b)(3).

Determining whether a close supplier relationship exists requires considering whether the

relationship is significant and could not be easily replaced, and whether the supplier has become

reliant on the seller.  *See* Statement of Administrative Action Accompanying the Uruguay Round

Agreements Act, H.R. Doc. 103-316, 103rd Congress, 2d Session ,Vol. 1 (1994) at 838 (SAA);

*TIJID, Inc. v. United States*, 366 F. Supp. 2d 1286, 1298-99 (Ct. Int'l Trade 2005).  Upon

determining that reliance exists Commerce then determines whether one of the parties is in a

position to exercise restraint or direction over the other.  *See Catfish Farmers of Am. v. United

States*, 641 F. Supp. 2d 1362, 1373-74 (Ct. Int'l Trade 2009); *Samsung Elecs. Co. v. United

States*, 70 F. Supp. 3d 1350, 1357 (Ct. Int'l Trade 2015) (internal citations omitted) ("Not all

close supplier relationships are control relationships, however"; a supplier and buyer are

affiliates only when one "'becomes reliant upon the other.'").  Commerce's analysis of whether a

party is reliant goes beyond a mere evaluation of the extent of the transactions between the

**PUBLIC VERSION**

companies. Commerce does not find reliance solely based on the proportion of purchases or sales between the parties, even where that proportion is one hundred percent. *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 20,817 (Apr. 8, 2022), and accompanying IDM at Comment 1.

The record does not support finding that Win-Tel and Neelson are reliant upon each other. First, as explained above, p. 36, though owners of Win-Tel have provided collateral to secure a loan in the past, this alone does not "evidence the reliance contemplated under the close supplier affiliation factor" as claimed by the Coalition. *See* Pl. Br. at 25 (internal citations omitted).

Moreover, contrary to what is claimed, Neelson is not an indispensable supplier of goods to Win-Tel. IDM at 13; *see also* Pl. Br. at 25.[11] The Coalition fails to understand that Win-Tel itself produced a vast majority of the ceramic tile it sold. IDM at 13. In addition, the Coalition continues to overstate the importance Neelson plays in Win-Tel's supply chain. *See* Pl. Br. at 25. The Coalition provides several statistics to attempt to demonstrate Neelson's importance, however each one of these is out of context and does not detract from Commerce's finding.

First, the Coalition points to the record to show that Neelson accounts for [      ] of supply sourced from unaffiliated suppliers. Pl. Br. at 25. However, this statistic is taken out of context. Unaffiliated suppliers only make up [      ] of Win-Tel's sales to the United States. *See* Win-Tel's section Win-Tel's section A QR at Exhibit A-19(a) Part-1 (Aug 29, 2024) (C.R. 154). Therefore, when attempting to demonstrate Neelson's importance in Win-Tel's supply

---

[11] The Coalition's claim that Neelson is the [              ] supplier to Win-Tel misunderstands the record. As the record shows, "Win-Tel/ Theos first uses its own capacity and if the capacity is insufficient then for any excess order quantity, Win-Tel approaches Neelson for supply{.}" *See* Win-Tel's SAQR at S-7 (P.R. 314, C.R. 488).

38

chain, the Coalition actually shines a light on [

]. Although Neelson is an unaffiliated supplier to Win-Tel, the record clearly indicates

that Neelson's supply pales in comparison to that supplied by Win-Tel and Theos. *See* Win-Tel's

A QR at Exhibit A-19(a) Part-1.

Further, the Coalition continues to err in relying on percentages of exports for purposes of

Commerce's respondent selection process and whether a supplier relationship reaches a level to

show reliance. Pl. Br. at 25-26.[12] These are two processes which are completely unrelated, and

their comparison is not appropriate. The selection of Win-Tel as being "significant" to merit

selection as a mandatory respondent is a well-established practice to select the two largest

exporters of subject merchandise to the United States during the POI. *See* Respondent Selection

Memorandum. Further, the term "significant" concerns Commerce's workload and resources to

examine all known exporters, not to describe the amount of Win-Tel's or Antiqa's entries. *Id.* at

3. In addition, 19 U.S.C. §1677f-1(c), which mandates Commerce's respondent selection

practice, makes no reference to the term "significant" and instead focuses on the "largest

volume" or just a "statistically valid" sample. This is a false equivalency between two practices

which are unrelated.

Finally, the Coalition, relies on *U.S. Steel Corp v. United States*, 179 F. Supp. 3d 1114,

1132 (Ct. Int'l Trade 2016), as the legal premise for finding that Commerce failed to evaluate the

extent to which Neelson was reliant on Win-Tel. Pl. Br. at 26. In that case, this Court remanded

---

[12] Taking issue with Commerce's determination that Win-Tel's exports produced by
Neelson are "miniscule," the Coalition alleges that because Win-Tel and Antiqa accounted for
[     ] percent and [     ] percent of entries of subject merchandise and were selected as
mandatory respondents, then Neelson's [     ] percent of Win-Tel's exports to the United States
should be considered significant. Pl. Br. at 25. This false equivalency between Commerce's
respondent selection requirements and the characterization of Neelson's percentage of Win-Tel's
imports is unpersuasive.

39

Commerce's determination that a mandatory respondent was not affiliated with certain input suppliers, holding that Commerce failed to take into account evidence in addition to evidence such as an exclusive sales contract that indicated the percentage of steel billets the respondent purchased from the supplier in determining the close supplier relationship. *U.S. Steel*, 179 F. Supp. 3d at 1131-32. Here, as the above facts indicate, Commerce analyzed precisely these factors in finding that no close supplier relationship existed. Win-Tel submitted materials showing that no exclusive supplier relationship existed. *See* Win-Tel Section A Questionnaire Response at 36 (P.R. 206, C.R. 130) and Exhibit A-19 (C.R. 154). Win-Tel submitted information showing what percentage of its supply came from Neelson. *See* Ex. A-19. Win-Tel submitted information showing what percentage of Neelson's sales were due to Win-Tel. Preliminary Analysis Affiliation Memo Win-Tel at 10-11 (P.R. 360, C.R. 646). Unlike in *U.S. Steel*, Commerce analyzed all this information and properly found that Neelson and Win-Tel should not be found affiliated. *Id*.; *see also* IDM at 14; Preliminary Analysis Affiliation Memo Win-Tel at 9.

Commerce fully analyzed record evidence of debt financing and a close-supplier relationship, and properly concluded that neither were sufficient to establish the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product and accordingly there was not sufficient evidence to find control within the meaning of 19 U.S.C. § 1677(33).

## V.    Commerce Did Not Abuse Its Discretion and Lawfully Accepted Minor Corrections Presented by Antiqa and Win-Tel

Commerce lawfully accepted minor corrections presented by Antiqa and Win-Tel. For the reasons outlined below, the corrections presented by Antiqa and Win-Tel prior to verification were minor and did not constitute new information which Commerce should reject.

40

**PUBLIC VERSION**

## A.    Antiqa's Minor Corrections Did Not Constitute New Information

The Court should sustain Commerce's decision to accept from Antiqa, prior to verification, factual information consisting of corrections of certain isolated clerical errors (including underreporting of a particular U.S. selling expense) that Commerce determined to be minor corrections. Commerce considers several factors when determining whether to accept minor corrections at verification. These include:

> "(1) whether the correction is clerical or methodological; (2) whether we are able to verify the error and are satisfied with the documentary support for the reported correction; (3) whether the error calls into question the overall integrity of the respondent's submissions; and (4) whether it amounts to a "substantial revision of previously reported data.""

IDM at 6-7; *see also Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 59,217 (September 27, 2010), and accompanying IDM at Comment 10. Each of these factors pointed to accepting the revisions as a minor correction. IDM at 7.

In arguing that Commerce unlawfully accepted Antiqa's pre-verification correction, the Coalition relies upon cases that addressed Commerce's practice of rejecting methodological changes to reporting at verification. Pl. Br. at 28 (citing *Eregli Demir ve Celik Fabrikalari T.A.S. v. United States,* 357 F. Supp. 3d 1325 (Ct. Int'l Trade 2018); *Goodluck India Ltd. v. United States,* 11 F.4th 1335, 1343 (Fed. Cir. 2021)). Antiqa's corrections did not constitute methodological changes. For that reason, the cases raised by the Coalition actually support Commerce's determination. IDM at 5-6. For example, in *Eregli*, the Court stated that, "{m}aking the corrections would have required Commerce to match each affected transaction to particular invoices and their respective discounts. The number of affected sales and *variations in*

41

**PUBLIC VERSION**

*the discounts* affecting those sales provide substantial evidentiary support for Commerce's decision that the corrections were not minor." *Eregli Demir*, 357 F. Supp. 3d at 1336 (emphasis added) (citation modified). Additionally, in *Goodluck India*, when defining a minor correction, the Federal Circuit stated, "{t}his practice, as applied at verification, strikes an appropriate balance between finality and accuracy. Moreover, importantly, it is within *Commerce's discretion* to decide which *interest outweighs* the other on a case-by-case basis." *Goodluck India* at 1343 (emphasis added). Therefore, each of these cases stand for Commerce's ability to exercise discretion in accepting minor corrections, as it did here.

The Coalition cites to *Shrimp from Ecuador* for the premise that "minor corrections are not 'minor' when they have an impact on numerous transactions." *Id.* (*Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg, 85,506 (Oct. 28, 2024)*,* and accompanying IDM at Comment 15). However, the present case is factually distinct. In *Shrimp from Ecuador,* Commerce stated the respondent's "{r}evised data is based on numerous transactions and assets which would have been unduly burdensome to verify on the spot." *Id.* This decision demonstrates Commerce's ability to reject minor corrections if they represent new information and cannot be verified on the spot. That is not the case here. IDM at 8. Here, Commerce determined that this information was not new factual information and was not unduly burdensome to verify. IDM at 8; Antiqa Sales Verification (P.R. 402, C.R. 897) at 3-4. This minor correction was a singular small expense which was related to selling expenses which were already on the record. IDM at 8. Commerce verified these expenses in their entirety. *Id.* Commerce's determination here is supported by substantial evidence.[13]

---

[13] Therefore, Commerce had no authority to apply facts available. 19 U.S.C. § 1677e(a) allows Commerce to apply facts otherwise available when necessary information is not available on the record or because that information cannot be verified. Here, all necessary information is

PUBLIC VERSION

### B.    Win-Tel's Revised Database Was A Minor Correction

For the similar reasons as found above with regard to Antiqa, Commerce found that Win-Tel's minor corrections were not new factual information or unduly burdensome to verify as they were small value, isolated in nature, and had minimal impact on the variables in question. *See* IDM at 10; Win-Tel's Verification Report at 2.

In addition, Commerce's request for, and subsequent acceptance of Win-Tel's revised database is not an acceptance of new factual information as alleged by the Coalition. *See* Pl. Br. at 30. Rather, this Court has found that requesting a revised database incorporating corrections presented and examined at verification is not an acceptance of new factual information. *See Maui Pineapple Co. v. United States,* 264 F. Supp. 2d 1244, 1258 (Ct. Intl. Trade 2003)*; Tatung Co. v. United States,* 18 CIT 1137, 1141 (Ct. Intl. Trade 1994) (Despite the Coalition's insistence to the contrary, "the issue is not the value of the errors as a percentage of total United States sales, or the number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission.").

Thus, since these corrections to United States and home market databases were minor and able to be verified in a timely and efficient manner that did not disrupt the proceedings, Commerce did not abuse its discretion in accepting them.

## VI.    Commerce's Determination To Grant Win-Tel's Scrap Offset Followed Past Practice And Depended on Verified Information

---

on the record, and Commerce was able to verify this information. *See* Antiqa Sales Verification (March 17, 2025) (P.R. 402, C.R. 897) at 2 ("{w}e tied each of the corrections to supporting documentation and/or addressed it in the relevant section of the report below, as appropriate"). Therefore, Commerce determined that there was no basis for relying on facts available here. IDM at 5, 9.

**PUBLIC VERSION**

Commerce followed its established practice in granting Win-Tel's claimed scrap offset. The Coalition claims that Commerce went against its practice and relied on unverified information in its decision to grant Win-Tel a scrap offset. Pl. Brief at 32. However, the Coalition mischaracterizes Commerce's practice and is misinformed on whether Commerce verified the information relied upon for determining the scrap offset.

It is Commerce's practice to allow for a scrap offset generally based on quantity of scrap generated during the cost reporting period. *See* IDM at 26; *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16,360 (April 4, 2017), and accompanying IDM at Comment 18. Further, to value the generated scrap quantity, it is Commerce's practice to grant a scrap offset which is reflective of the actual sales value of the scrap generated. IDM at 26*; see also Heavy Walled Rectangular Welded Carbon Steel Pipes and Tubes from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2018-2019*, 86 Fed. Reg. 35,060 (July 1, 2021), and accompanying IDM at Comment 5. In this proceeding, this is precisely what Win-Tel submitted in its response and what Commerce verified at the cost verification.

The Coalition argues that Commerce violated its own practice by granting a scrap offset where Win-Tel did not track its *production* of scrap in the course of business, but Commerce explained in the IDM that Win-Tel does track the quantity but not the value of the scrap generated. Pl. Br. at 32; IDM at 27. In its Section D questionnaire, Commerce requested Win-Tel to "{d}escribe the method used under your company's cost accounting system to account for scrap generated at each stage of the production process." *See* Win-Tel Request for Information (Sept. 6, 2024) (P.R. 161) at D-8. On September 19, 2024, in response to this question, Win-Tel

**PUBLIC VERSION**

stated that it did not have a cost accounting system in which it tracks the value of scrap generated. *See* Win-Tel Section D Questionnaire Response (P.R 276, C.R. 390) at D-19, D-20. Instead, at the time of sale of scrap, Win-Tel credits the associated general ledger account using the sales value. *Id.* at D-20. When submitting the Section D response, Win-Tel shared, as an attachment, data showing scrap sale quantity and scrap generation quantity. *See* Antiqa Cost Verification Report, Exhibit D-7A (C.R. 403).[14] Commerce verified this information. Specifically, Commerce traced the total quantity generated in the amount of kilograms (kg) [        ] from the monthly movement schedule to the product ledger of broken tiles in Win-Tel's financial accounting system to its Kuber Secretary ("Kuber") software production system. *See* Win-Tel Cost Verification Report (Feb. 24, 2025) (C.R. 756, P.R. 392) at 13; *see also* Win-Tel Cost Verification Exhibit 11 (C.R. 735).[15]

As discussed in the Cost Verification Report, Win-Tel uses Kuber software to record information for sales, purchases, and expenses incurred. *See* Win-Tel Cost Verification Report at 4. Additionally, Win-Tel's maintains its production system in Kuber.[16] In the verification report, Commerce explained that it reviewed samples of the production report generated from Kuber software throughout the verification. *See* Win-Tel Cost Verification Report at 5. With regard to the scrap offset calculation, Commerce specifically traced the POI sales and generated quantities from the worksheet showing the sales and the generated quantities to the sales and generated

---

[14] The data in Exhibit D-7A tracks sale scrap, scrap generation and stock of scrap at the opening and closing of each month for the relevant period.

[15] Specifically, pages 5 and 6 of the Win-Tel Cost Verification Exhibit 11 show invoices for scrap sold from the month of August, which, when added together,

.

[16] *See* Letter "Win-Tel's Supplemental Section D Questionnaire Response" dated November 19, 2024, at D1-6.

**PUBLIC VERSION**

quantities in the inventory movement schedule extracted from Kuber software with no exception. Antiqa Cost Verification Report Exhibit D-7A (Sept. 19, 2024) (C.R. 403).

Therefore, the record supports that Commerce followed its past practice by relying on information submitted by respondents in granting Win-Tel's scrap offset in this proceeding. As discussed above, Commerce affirmatively traced the scrap generation quantities to the production system and the scrap values to supporting invoices. Therefore, Commerce reaffirms that it verified the exact information relied upon in granting this scrap offset, in compliance with 19 U.S.C. § 1677(m)(i) and therefore no correction the scrap offset is necessary.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the Coalition's motion, sustain Commerce's Final Determination, and enter judgement for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

FRANKLIN E. WHITE, JR.
Assistant Director

OF COUNSEL:

TATE WALKER
Commercial Litigation Branch

SAMUEL E. CHILDERSON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, DC 20230

U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Tel: (202) 307-0163
Email: tate.walker@usdoj.gov

March 4, 2025

*Attorneys for Defendant*

46

PUBLIC VERSION

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the word limitations set forth in the Court's Chambers Procedures. Specifically, excluding those exempted portions as set forth in paragraph 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains 13,529 words. This word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Tate N. Walker
TATE N. WALKER

47

**PUBLIC VERSION**