IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE,<br><br>       Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>       Defendant,<br><br>    and<br><br>WIN-TEL CERAMICS PRIVATE LTD.,<br>ANTIQA MINERALS, and<br>M S INTERNATIONAL, INC.,<br><br>       Defendant-Intervenors | Court No. 25-00095<br><br>**<u>PUBLIC VERSION</u>** |

**DEFENDANT-INTERVENORS' CONSOLIDATED RESPONSE TO PLAINTIFF'S MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone:  (202) 783-6881

*Counsel to Defendant-Intervenors Win-Tel
Ceramics Private Ltd and Antiqa Minerals*

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone:  (202) 637-5600

*Counsel to Defendant-Intervenor
M S International, Inc.*

April 29, 2026

# TABLE OF CONTENTS

Page

STATEMENT PURSUANT TO RULE 56.2 ................................................................................... 2

I.      Administrative Determination Under Review ................................................................. 2

II.     Statement of Issues ......................................................................................................... 2

STATEMENT OF FACTS ............................................................................................................. 3

SUMMARY OF THE ARGUMENT ............................................................................................. 5

ARGUMENT .................................................................................................................................. 7

I.      Standard of Review ........................................................................................................ 7

II.     The Court Should Disregard Plaintiff's Unexhausted Arguments and Reliance on
        Materials Outside the Administrative Record in Connection with the Collapsing Issue ... 8

        A.  Plaintiff Failed to Exhaust Its Administrative Remedies with Respect to Its
            Reporting Exclusion Argument ................................................................................. 9

        B.  Plaintiff Improperly Relies on Evidence Outside the Administrative Record ............ 12

III.    Commerce Lawfully Declined to Collapse Antiqa with Marbonite and Segam .............. 13

        A.  Commerce Properly Granted Antiqa's Reporting Exclusion Request ........................ 14

        B.  Commerce Properly Declined to Collapse Antiqa with Marbonite and Segam ......... 17

            1.  Commerce Properly Declined to Collapse Antiqa with Marbonite ...................... 18

            2.  Commerce Properly Declined to Collapse Antiqa with Segam ........................... 22

IV.     Commerce's Determination That Win-Tel and Neelson Are Not Affiliated Is
        Supported by Substantial Evidence and Otherwise Lawful ............................................. 25

V.      Commerce Did Not Abuse Its Discretion in Accepting Minor Corrections from
        Antiqa and Win-Tel at the Outset of Verification ........................................................... 31

        A.  Commerce Properly Accepted Antiqa's Minor Corrections ..................................... 33

        B.  Commerce Properly Accepted Win-Tel's Minor Corrections ................................... 34

VI.     Commerce Lawfully Granted Win-Tel's Scrap Offset .................................................... 36

CONCLUSION .............................................................................................................................. 37

**TABLE OF AUTHORITIES**

Page

CASES

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) ............................................................. 11

*Atl. Sugar, Ltd. v. United States*,
744 F.2d 1556 (Fed. Cir. 1984) ................................................................................. 8

*Axiom Resource Mgmt., Inc. v. United States*,
564 F.3d 1374 (Fed. Cir. 2009) ............................................................................... 12

*Camau Frozen Seafood Processing Imp. Exp. Corp v. United States*,
880 F. Supp. 2d 1348 (Ct. Int'l Trade 2012) ............................................................ 11

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................................................ 12

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ............................................................................................ 7, 25

*Consolo v. Fed. Mar. Comm'n*,
383 U.S. 607 (1966) .................................................................................................. 8

*Corus Staal BV v. United States*,
502 F.3d 1370 (Fed. Cir. 2007) ............................................................................. 9, 10

*Dorbest Ltd. v. United States*,
604 F.3d 1363 (Fed. Cir. 2010) ....................................................................... 9, 10, 11

*Downhole Pipe & Equip. L.P. v. United States*,
776 F.3d 1369 (Fed. Cir. 2015) ...................................................................... 8, 16, 25

*Essar Steel Ltd. v. United States*,
678 F.3d 1268 (Fed. Cir. 2012) ............................................................................... 12

*Fischer S.A. Comercio, Industria and Agricultura v. United States*,
Ct. No. 12-00340, 2014 WL 2853909 (Ct. Int'l Trade May 27, 2014) .............................. 10, 11

*Gerber Food (Yunnan) Co. v. United States*,
601 F. Supp. 2d 1370 (Ct. Int'l Trade 2009) .............................................................. 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)..................................................................................... 24

*Maui Pineapple Co. v. United States*,
  264 F. Supp. 2d 1244 (Ct. Int'l Trade 2003) .............................................................. 31

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...................................................................................... 8

*Paul Muller Industrie GmbH & Co. v. United States*,
  502 F. Supp. 2d 1271 (Ct. Int'l Trade 2007) .............................................................. 10

*Prime Time Com. LLC v. United States*,
  495 F. Supp. 3d 1308 (Ct. Int'l Trade 2021)............................................................... 11

*Qingdao Sea-Line Trading Co. v. United States*,
  766 F.3d 1378 (Fed. Cir. 2014)...................................................................................... 8

*QVD Food Co. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011)...................................................................................... 8

*QVD Food Co. v. United States*,
  721 F. Supp. 2d 1311 (Ct. Int'l Trade 2010) .............................................................. 11

*Rhone Poulenc, Inc. v. United States*,
  899 F.2d 1185 (Fed. Cir. 1990)..................................................................................... 10

*Samsung Electronics Co. v. United States*,
  70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015) ............................................................... 28

*Sandvik Steel Co. v. United States*, 164 F.3d 596 (Fed. Cir. 1998) ................................... 9

*Siemens Energy, Inc. v. United States*,
  992 F. Supp. 2d 1315 (2014) .................................................................................. 8, 31

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)..................................................................................... 17

*Sunpreme Inc. v. United States*,
  946 F.3d 1300 (Fed. Cir. 2020)...................................................................................... 8

*Ta Chen Stainless Steel Pipe v. United States*,
  23 C.I.T. 804 (1999) .................................................................................................... 27

*U.S. Steel Corp v. United States*,
   179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016) ........................................................ 30

*U.S. Steel Corp. v. United States*,
   637 F. Supp. 2d 1199 (Ct. Int'l Trade 2009) ........................................................ 13

*Unemployment Comp. Comm'n of Alaska v. Aragon*,
   329 U.S. 143 (1946)................................................................................................ 9

*Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*,
   256 F. Supp. 3d 1346 (Ct. Int'l Trade 2017) ........................................................ 10

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
   716 F.3d 1370 (Fed. Cir. 2013)............................................................................... 9

## STATUTES

19 U.S.C. § 1677m(c) ............................................................................................... 14

19 U.S.C. §1516a(b) ................................................................................................... 7

28 U.S.C. § 2637(d) .................................................................................................... 9

## REGULATIONS

19 C.F.R. § 351.102(b)(3)............................................................................25, 26, 27, 28

19 C.F.R. § 351.309(b)(1)......................................................................................... 10

19 C.F.R. § 351.401(f) ................................................................................. 13, 18, 19, 21

## ADMINISTRATIVE DETERMINATIONS

*Carbon and Alloy Steel Wire Rod from Italy: Final Determination of Sales at Less Than Fair Value*,
   83 Fed. Reg. 13,230 (Mar. 28, 2018)..................................................................... 31

*Ceramic Tile From India: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*,
   90 Fed. Reg. 17,030 (Dep't Commerce Apr. 23, 2025)....................................*passim*

*Ceramic Tile From India: Initiation of Less-Than-Fair-Value Investigation*,
   89 Fed. Reg. 42,836 (Dep't Commerce May 16, 2024) ........................................... 3

*Ceramic Tile From India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*,
89 Fed. Reg. 95,182 (Dep't Commerce Dec. 2, 2024) ................................................................ 4

*Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*,
87 Fed. Reg. 20,817 (Apr. 8, 2022) ......................................................................................... 29

*Emulsion Styrene-Butadiene Rubber from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*,
82 Fed. Reg. 33,062 (Dep't Commerce July 19, 2017) ............................................................. 31

*Structural Steel Beams from Germany: Notice of Final Determination of Sales at Less Than Fair Value*,
67 Fed. Reg. 35,497 (May 20, 2002) ....................................................................................... 32

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| COALITION FOR FAIR TRADE IN CERAMIC TILE, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> WIN-TEL CERAMICS PRIVATE LTD., ANTIQA MINERALS, and M S INTERNATIONAL, INC., <br><br> Defendant-Intervenors | Court No. 25-00095 <br><br> **PUBLIC VERSION** |

**DEFENDANT-INTERVENORS' CONSOLIDATED RESPONSE TO PLAINTIFF'S MOTION FOR JUDGEMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Win-Tel Ceramics Private Limited ("Win-Tel"), Antiqa Minerals ("Antiqa"), and M S International, Inc. ("MSI") (collectively, "Defendant-Intervenors"), respectfully submit this consolidated response to the motion for judgment on the agency record filed by Plaintiff, the Coalition for Fair Trade in Ceramic Tile ("Plaintiff" or "Petitioner") on November 17, 2025 ("Pl. Br."). *See* ECF No. 25. Defendant-Intervenors support the legal positions and arguments advanced by Defendant, the United States (the "Government"), in its response brief filed on March 4, 2026 ("Gov't Br."), *see* ECF Nos. 32-33, and respectfully request that the Court deny Plaintiff's motion for judgment on the agency record because Commerce's negative determination in this investigation reflects a reasonable evaluation of a fully developed and verified administrative record.

PUBLIC VERSION

## STATEMENT PURSUANT TO RULE 56.2

**I.     Administrative Determination Under Review**

The administrative determination under review is the negative final determination by the U.S. Department of Commerce ("Commerce" or the "Department") in its less-than-fair-value ("LTFV") investigation of ceramic tile from India.  *See Ceramic Tile From India: Final Negative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 17,030 (Dep't Commerce Apr. 23, 2025) ("*Final Determination*") (P.R. 439), accompanying Issues and Decision Memorandum ("*Final IDM*") (P.R. 434).[1]  The period of investigation is April 1, 2023, through March 31, 2024.  *Id.*

**II.     Statement of Issues**

1.     Whether the Court should decline to consider Plaintiff's argument that Commerce prematurely granted Antiqa reporting exemptions for Marbonite Ceramics Pvt. Ltd. ("Marbonite") and Segam Tiles Pvt. Ltd. ("Segam" or "STPL"), when Plaintiff failed to exhaust its administrative remedies for that argument before Commerce during the administrative proceeding.

2.     Whether the Court, in reviewing Commerce's determination not to collapse Marbonite with Antiqa, should decline Plaintiff's request that the Court consider materials from a separate LTFV investigation that are outside the administrative record for this proceeding.

3.     Whether Commerce's decision to grant a reporting exclusion to Antiqa's affiliated entities Marbonite and Segam was arbitrary, capricious, or an abuse of discretion.

4.     Whether Commerce's determination not to collapse Antiqa with Marbonite and Segam is supported by substantial evidence and otherwise lawful.

---

[1]     Throughout this brief, citations to the public record ("P.R.") and confidential record ("C.R.") refer to the administrative record of the LTFV investigation.

5.      Whether Commerce's finding that Win-Tel and its supplier Neelson Porselano LLP ("Neelson") are not affiliated is supported by substantial evidence and otherwise lawful.

6.      Whether Commerce abused its discretion in accepting minor corrections from Antiqa and Win-Tel at verification.

7.      Whether Commerce's finding that Win-Tel was entitled to a scrap offset was supported by substantial evidence and otherwise lawful.

## STATEMENT OF FACTS[2]

On May 9, 2024, Commerce initiated a LTFV investigation of ceramic tile from India. *See Ceramic Tile From India: Initiation of Less-Than-Fair-Value Investigation*, 89 Fed. Reg. 42,836 (Dep't Commerce May 16, 2024) (P.R. 98). On July 15, 2024, Commerce selected Antiqa and Win-Tel as mandatory respondents. *See* Memorandum, *Less-Than-Fair-Value Investigation of Ceramic Tile from India: Respondent Selection* (July 15, 2024) (P.R. 155; C.R. 81).

On August 16, 2024, following issuance of Commerce's initial questionnaires, Antiqa requested that Commerce exclude two of its affiliates, Marbonite and Segam, from having to report detailed cost and sales data in response to the questionnaires. Antiqa Request for Reporting Exclusion (Aug. 16, 2024) ("Reporting Exclusion Request") (P.R. 173-175; C.R. 82-84). Antiqa explained, among other factors, that neither Marbonite nor Segam was involved in the export of subject merchandise. *Id.* at 8-9, 11; Letter to U.S. Department of Commerce from Barnes & Thornburg at 1-5 (Aug. 30, 2024) ("Opposition to Reporting Exclusion") (P.R. 214-17; C.R. 155-59). On August 22, 2024, Commerce granted the reporting exclusion as Antiqa requested. Memorandum Granting Reporting Exclusion Request (Aug. 22, 2024) (P.R. 184).

---

2      In addition to providing a general overview of the proceedings, Defendant-Intervenors adopt the statement of facts set forth in the Defendant's response brief. To the extent that additional facts not mentioned by Defendants are relevant to Defendant-Intervenors' arguments, they are discussed in the context of the arguments set forth below.

Following Win-Tel's and Antiqa's submissions of their questionnaire responses, Commerce issued a negative Preliminary Determination on December 2, 2024. *See Ceramic Tile From India: Preliminary Negative Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 89 Fed. Reg. 95,182 (Dep't Commerce Dec. 2, 2024) ("*Preliminary Determination*") (P.R. 363), accompanying Preliminary Decision Memorandum (P.R. 350). The Department preliminarily determined that ceramic tile from India was not being, and was not likely to be, sold in the United States at less than fair value, calculating a 0.00 percent dumping margin for both mandatory respondents. *See Preliminary Determination*, 89 Fed. Reg. at 95,183. Commerce also preliminarily declined to collapse Antiqa with Marbonite or Segam. Antiqa Preliminary Affiliation and Collapsing Memorandum (Nov. 22, 2024) ("Prelim. Antiqa Collapsing Memo") (P.R. 358; C.R. 645).

On March 26, 2025, Plaintiff filed its case brief. *See* Case Brief of The Coalition for Fair Trade in Ceramic Tile (Mar. 26, 2025) (P.R. 413; C.R. 987) ("Petitioner Case Brief"). Despite having initially objected to Antiqa's reporting exclusion request for Marbonite and Segam, Plaintiff *did not* raise this issue in its case brief. *Compare id.* at 1-43 *with* Opposition to Reporting Exclusion at 1-5 (P.R. 214-17; C.R. 155-59). Plaintiff did raise various other issues, such as contending that Antiqa should be collapsed with Marbonite and Segam, and that Win-Tel and Neelson should be deemed affiliated. *See* Petitioner Case Brief at 6-40 (P.R. 413; C.R. 987). On April 1, 2025, Defendant-Intervenors rebutted the arguments that Plaintiff had briefed. *See* Joint Rebuttal Brief of Win-Tel and Antiqa (Apr. 1, 2025) ("Respondents' Rebuttal Brief") (P.R. 427; C.R. 997); Letter in Lieu of Rebuttal Brief of M S International, Inc. (Apr. 1, 2025) (P.R. 426).

On April 23, 2025, Commerce published its negative *Final Determination*. *See* 90 Fed. Reg. 17,030, accompanying *Final IDM* (P.R. 434). The Department continued to find that ceramic

tile from India was not being, and was not likely to be, sold in the United States at less than fair value, while again calculating a 0.00 percent dumping margin for both mandatory respondents. *See Final Determination*, 90 Fed. Reg. at 17,031.

In the *Final IDM*, Commerce addressed and rejected Plaintiff's arguments regarding affiliation and collapsing issues. Specifically, Commerce found that the record evidence did not support collapsing Antiqa with Marbonite or Segam. *See Final IDM* at 17-22 (P.R. 434). Commerce likewise determined that the record did not support a finding that Win-Tel was affiliated with Neelson. *See id.* at 11-14. Commerce also rejected Plaintiff's arguments concerning the minor corrections and scrap offset issues. *See id.* at 4-10, 25-27.

Following the *Final Determination*, Plaintiff commenced this action challenging aspects of Commerce's decision. *See* Summons (May 23, 2025), ECF No. 1. On July 28, 2025, the Court granted Defendant-Intervenors' motions to intervene. *See* Order (July 28, 2025), ECF No. 21.

## SUMMARY OF THE ARGUMENT

None of Plaintiff's challenges to Commerce's *Final Determination* provides a basis for remand or reversal because they largely seek to relitigate fact issues that Commerce already considered and resolved based on the verified administrative record. In addition to supporting the Government's position, Defendant-Intervenors add their further arguments below.

First, Plaintiff's collapsing arguments concerning Antiqa, Marbonite, and Segam suffer from procedural flaws. Specifically, Plaintiff failed to exhaust its administrative remedies with respect to its challenge to Commerce's decision to grant Antiqa a reporting exclusion for Marbonite and Segam by failing to raise the issue in its administrative case brief. This deprived Commerce of the opportunity to address Plaintiff's argument in the first instance, and well-established precedent bars Plaintiff from raising it *de novo* before the Court. Likewise, Plaintiff's collapsing argument with respect to Marbonite improperly relies on evidence outside the

PUBLIC VERSION

administrative record, consisting of information from a separate LTFV investigation involving different merchandise and respondents. Commerce correctly rejected that approach and confined its analysis to the record of this investigation, as required by law. The Court should similarly confine its analysis to the administrative record and properly raised arguments.

Beyond procedural defects, Commerce's decisions to grant Antiqa's request for a reporting exclusion for Marbonite and Segam—and ultimately not to collapse Antiqa with those entities—should be sustained because they are reasonable. Commerce properly and provisionally granted Antiqa's reporting exclusion request early in the investigation, based on extensive evidence that neither Marbonite nor Segam could be collapsed under Commerce's regulatory criteria and that reporting data would not affect Antiqa's margins. Further, Commerce reasonably declined to collapse Antiqa with Marbonite based on record evidence showing that Marbonite was controlled by another company (Prism Johnson) that maintained control through appointment of Marbonite's Chairman and an exclusive supply agreement. Likewise, Commerce reasonably declined to collapse Antiqa with Segam given the small ownership interest and lack of common directors or officers between the companies. Plaintiff's claims to the contrary improperly ask this Court to reweigh the evidence and rely on speculation that individuals sharing a common surname must be related (which Antiqa disproved both as a general matter and for specific individuals).

Commerce's decision not to deem Win-Tel and Neelson affiliates was also reasonable. Contrary to Plaintiff's claims, the record shows that the sole individual providing an ownership connection between the two companies had retired prior to the investigation period, taken steps to divest his interest in Neelson, and been replaced by other investors. Further, the record shows that Win-Tel and Neelson engaged in significantly less business than Commerce normally requires to find affiliation based on a close supplier relationship, and in any event that the companies lacked

PUBLIC VERSION

the indicia of dependance and control to support such a finding. This issue presents another instance where Plaintiff improperly invites this Court to reweigh the record evidence.

Next, Commerce did not abuse its discretion in accepting minor corrections that Antiqa and Win-Tel presented at the outset of verification, consistent with agency practice. Contrary to Plaintiff's claims, the corrections were not methodological merely because they resulted in revised sales databases, the content of which was disclosed to Plaintiff well before briefing. Moreover, the record confirms the propriety of Commerce's findings that the corrections were in fact minor. Antiqa's corrections were clerical oversights that did not affect reporting structures or formulas, were too small to materially affect Antiqa's margins, and were verified by Commerce through source documentation. Likewise, Win-Tel's errors were quantifiably minor and did not affect reconciliation as Plaintiff alleges. There is thus no basis for Commerce to reject these minor errors.

Finally, Commerce properly granted Win-Tel's scrap offset. Although Win-Tel does not assign a value to its scrap until sold, due to the scrap's negligible value, it records the quantity of scrap generated in the normal course of business. Consequently, Commerce granted the offset in accordance with Department practice, Win-Tel's reporting, and Commerce's verified findings.

## ARGUMENT

### I.     Standard of Review

The court sustains Commerce's final determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law{.}" 19 U.S.C. §1516a(b)(1)(B)(i). "Substantial evidence" connotes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (citation omitted). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383

U.S. 607, 620 (1966); *see Sunpreme Inc. v. United States*, 946 F.3d 1300, 1308-09 (Fed. Cir. 2020).

"It is not for this court on appeal to reweigh the evidence or to reconsider questions of fact anew." *Downhole Pipe & Equip. L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) (citation omitted). Judicial review is also "limited to the record before Commerce," *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014), and "the burden of creating an adequate record lies with interested parties and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (citations and brackets omitted).

A party disputing Commerce's determination under the substantial evidence standard thus "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and this Court sustains a determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from it. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). Further, Commerce "need not address every piece of evidence presented by the parties" because "absent a showing to the contrary, the court presumes that {Commerce} has considered all of the record evidence." *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1324 (2014) (citations omitted).

## II.    The Court Should Disregard Plaintiff's Unexhausted Arguments and Reliance on Materials Outside the Administrative Record in Connection with the Collapsing Issue

Defendant-Intervenors agree with the Government that Plaintiff has forfeited its lead argument that Commerce improperly granted Antiqa a reporting exclusion for Marbonite and Segam. *See* Gov't Br. at 20-23. We write separately to provide a more thorough discussion of the exhaustion jurisprudence and to highlight Plaintiff's similarly improper reliance on non-record evidence in connection with its collapsing arguments concerning Antiqa.

PUBLIC VERSION

## A. Plaintiff Failed to Exhaust Its Administrative Remedies with Respect to Its Reporting Exclusion Argument

Congress, in 28 U.S.C. § 2637(d), mandated that this Court "shall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping duty ("ADD") determinations. The exhaustion doctrine provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998) (citation omitted). Requiring exhaustion both protects agency authority and promotes judicial efficiency. *See Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).

It is thus well-settled that "{a} reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the {agency} of an opportunity to consider the matter, make its ruling, and state the reason for its action." *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1379 (Ct. Int'l Trade 2009) (quoting *Unemployment Comp. Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946)). "{S}imple fairness," moreover, "requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1375 (Fed. Cir. 2010) (citation omitted).

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has explained that the statute demonstrates "a congressional intent that, absent a strong contrary reason, *the court should insist that parties exhaust their remedies before the pertinent administrative agencies.*" *Corus Staal*, 502 F.3d at 1379 (emphasis added). Thus, this Court generally takes a "strict view" of the exhaustion requirement in trade cases. *Id.*; *see also*, *e.g.*, *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).

PUBLIC VERSION

Moreover, Commerce's regulations directly address instances in which a party fails to raise an issue properly before Commerce in a LTFV proceeding. They specify that, in making its final determination, Commerce will only consider "written arguments in case or rebuttal briefs filed within the time limits." 19 C.F.R. § 351.309(b)(1). They also state that a party's case brief "must present *all arguments that continue in the submitter's view to be relevant* to {Commerce's} final determination or final results, *including any arguments presented before the date* of publication of the preliminary determination{.}" 19 C.F.R. § 351.309(c)(2) (emphasis added); *see also Dorbest*, 604 F.3d at 1375 ("Commerce regulations require the presentation of all issues and arguments in a party's administrative case brief"); *Fischer S.A. Comercio, Industria and Agricultura v. United States*, Ct. No. 12-00340, 2014 WL 2853909, at *4-5 (Ct. Int'l Trade May 27, 2014) (plaintiff failed to exhaust administrative remedies by not raising issue in its case brief).

Because Commerce's regulations expressly address the exhaustion requirement in the context of challenges to antidumping determinations in investigations, the Federal Circuit has held that "{t}he exhaustion requirement in this context is therefore not simply a creature of court decision, as is sometimes the case, but is a requirement explicitly imposed by the agency as a prerequisite to judicial review." *Corus Staal*, 502 F.3d at 1379. Equally significantly, the Federal Circuit has held that a party's obligation to exhaust its administrative remedies in proceedings before Commerce applies both to broad issues and arguments related to those issues. *See Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Xi'an Metals & Mins. Imp. & Exp. Co. v. United States*, 256 F. Supp. 3d 1346, 1356 (Ct. Int'l Trade 2017); *Paul Muller Industrie GmbH & Co. v. United States*, 502 F. Supp. 2d 1271, 1275 (Ct. Int'l Trade 2007) (holding that, when a party raises a general issue, but fails to incorporate a specific argument relating to the same issue, it fails to exhaust administrative remedies with respect to that argument).

PUBLIC VERSION

Here, Plaintiff failed to exhaust its argument that Commerce prematurely granted Antiqa's reporting exemptions for Marbonite and Segam.  Pl. Br. at 9-12.  Although Plaintiff now contends that it opposed Commerce's decision as "premature" and based on "insufficient and misleading information," *see* Pl. Br. at 12, Plaintiff did not raise this argument in its administrative case brief.  *See generally* Petitioner Case Brief (P.R. 413; C.R. 987).  As a result, Commerce was deprived of the opportunity to address this claim in the first instance and to make findings or conclusions regarding it in the *Final Determination* that is before this Court.  To the extent Plaintiff relies on any earlier objection, that is insufficient under the exhaustion requirement.  *See* 19 C.F.R. § 351.309(c)(2); *Dorbest*, 604 F.3d at 1375; *Fischer*, 2014 WL 2853909, at \*4.  For example, a petitioner who challenges respondent selection early on but does not include that challenge in its case brief has not exhausted its administrative remedies.  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 675 F. Supp. 2d 1287, 1299-1303 (Ct. Int'l Trade 2009).

This Court has likewise rejected attempts to raise new or reframed arguments on judicial review that were not clearly presented to Commerce.  *E.g., QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1320 (Ct. Int'l Trade 2010) (holding that the time for a party to raise its new arguments concerning surrogate data was in its administrative case brief because the surrogate data issue "was squarely in play"); *Camau Frozen Seafood Processing Imp. Exp. Corp v. United States*, 880 F. Supp. 2d 1348, 1355 (Ct. Int'l Trade 2012) (although party challenged surrogate country selection, it "never argued that one country was more economically comparable to Vietnam than the other"); *Prime Time Com. LLC v. United States*, 495 F. Supp. 3d 1308, 1314 (Ct. Int'l Trade 2021) (party's "prior attempts" to raise issue did not excuse failure to exhaust administrative remedies), *aff'd*, No. 2021-1783, 2022 WL 2313968 (Fed. Cir. June 28, 2022).

Nor, as the Government rightly explains, do any of the limited exceptions to the exhaustion doctrine apply in this case. *See* Gov't Br. at 21-23. Accordingly, Plaintiff may not raise its unexhausted argument *de novo* before the Court, and the Court should decline to consider it.

## B. Plaintiff Improperly Relies on Evidence Outside the Administrative Record

Similarly, Plaintiff's collapsing argument with respect to Marbonite is flawed because it relies on evidence outside the administrative record. Judicial review is confined to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). "The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the "arbitrary and capricious" standard into effectively de novo review.'" *Axiom,* 564 F.3d at 1380 (citation omitted). Limiting review to the agency record also furthers important efficiency and finality considerations. *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1277 (Fed. Cir. 2012) ("To allow constant reopening and supplementation of the record would lead to inefficiency and delay in finality.").

Here, Plaintiff's collapsing argument with respect to Marbonite rests on precisely the type of extra-record evidence that judicial review forbids. Plaintiff urges the Court to overturn Commerce's determination by relying on information from the separate *Quartz Surface Products from India* LTFV investigation—an entirely different proceeding involving different merchandise, respondents, and record evidence—to argue that Marbonite should be collapsed with Antiqa in this LTFV investigation. *See* Pl. Br. at 15-17. In the *Final Determination*, Commerce expressly rejected that approach, explaining that each proceeding stands on its own record and that it is statutorily required to base its determinations solely on the record evidence in the relevant segment of the proceeding. *See Final IDM* at 18-19 (P.R. 434). It is axiomatic that "each agency determination is *sui generis*, involving a unique combination and interaction of many variables,

and therefore a prior administrative determination is not legally binding on other reviews before this court." *U.S. Steel Corp. v. United States*, 637 F. Supp. 2d 1199, 1218 (Ct. Int'l Trade 2009).

Consistent with that principle, Commerce declined to consider information regarding Marbonite's role as a mandatory respondent and exporter in the *Quartz Surface Products from India* investigation because that information was not part of the agency record in the ceramic tile investigation. *Final IDM* at 19 (P.R. 434). Commerce further explained that the factual posture of the two proceedings was materially different: in the quartz investigation, Marbonite produced and exported the subject merchandise, whereas in this investigation Marbonite did not export ceramic tile to the United States during the period of investigation. *Id.* at 19-21.

As we demonstrate below, after confining its analysis to the record evidence properly before it, Commerce reasonably determined that collapsing Marbonite with Antiqa was not warranted under 19 C.F.R. § 351.401(f). *Id.* Plaintiff's attempt to circumvent Commerce's record-based findings by importing evidence from another investigation invites precisely the type of *de novo* fact-finding that this Court and the Federal Circuit have repeatedly rejected. Because Commerce properly confined its analysis to the administrative record of this investigation in reasonably concluding that the regulatory criteria for collapsing were not met, the Court should reject Plaintiff's attempt to rely on non-record evidence.

**III.    Commerce Lawfully Declined to Collapse Antiqa with Marbonite and Segam**

Defendant-Intervenors fully support the Government's defense of Commerce's actions with respect to Antiqa, Marbonite, and STPL. Gov't Br. at 23-33. Defendant-Intervenors below provide additional support and context to establish that Commerce acted properly in (A) provisionally granting Antiqa's requested reporting exclusion early in the investigation and (B) declining to collapse Antiqa with either Marbonite or STPL.

PUBLIC VERSION

### A. Commerce Properly Granted Antiqa's Reporting Exclusion Request

By way of background, Commerce routinely grants reporting exclusions to respondents in ADD proceedings—a practice grounded in statute.  *See, e.g., Aluminum Extrusions from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 89 Fed. Reg. 80,506 (Dep't Commerce Oct. 3, 2024), accompanying Issues and Decision Memorandum Cmt. 5.  If a "party is unable to submit the information requested in the requested form and manner," Commerce "may modify such requirements to the extent necessary to avoid imposing an unreasonable burden."  19 U.S.C. § 1677m(c).  In accordance with this statutory discretion and Commerce's practice, Antiqa early in the investigation on August 16, 2024, requested authorization to forego "reporting detailed costs and sales data for two companies which are affiliated with Antiqa."  Reporting Exclusion Request at 1 (P.R. 173-175; C.R. 82-84).  Antiqa advised Commerce that "such data requires a significant expenditure of time and effort, *without having any impact on Antiqa's {ADD} margin*."  *Id*. at 2 (emphasis added).

Commerce did not "simply accept{} Antiqa's faulty analysis as gospel."  Pl. Br. at 11.  As an initial matter, Antiqa provided a robust analysis under each regulatory collapsing criterion while appending hundreds of pages of evidentiary support that included:

- the exclusive supply agreement through which Marbonite, since 2005, has been required to sell its entire production exclusively to the company Prism Johnson Ltd., as well as to meet Prism Johsnon's inventory and packing requirements—proving that Marbonite is economically dependent on Prism Johnson because Marbonite's revenue is predominantly derived from those sales; and

- STPL shareholding information proving that only a minor [    ] percent stake is held by the Kundariya family, which wholly owns Antiqa.

*See* Reporting Exclusion Request at 5-6, 10, Exs. 3-4 (P.R. 173-175; C.R. 82-84).

Moreover, in provisionally granting Antiqa's reporting exclusion on August 22, 2024, Commerce expressly reserved its rights to revisit that decision and require full reporting:

- 14 -

PUBLIC VERSION

> For the reasons detailed in your request, we are granting your reporting exclusion at this time. However, *should we later determine that sales and cost data from Marbonite and STPL are necessary* for purposes of calculating an accurate antidumping margin for the Antiqa Group Companies, *we will revisit this decision and may request the sales and cost data for these companies.*

Memorandum Granting Reporting Exclusion Request (P.R. 184) (emphasis added).  This expressly qualified exclusion, granted in response to an extensive evidentiary demonstration, is the antithesis of "simply accept{ing} Antiqa's faulty analysis as gospel."  Pl. Br. at 11.  Indeed, Commerce later conducted a verification of Antiqa's reported corporate structure and affiliations, and identified no discrepancies that would undermine Commerce's decision to maintain the reporting exclusion.  *See* Antiqa Sales Verification Report at 4, Ex. VE-2 (Mar. 14, 2025) (P.R. 402; C.R. 897).

Further, Antiqa on September 6, 2024, filed a prompt and thorough rebuttal to Plaintiff's opposition to the reporting exclusions, which Plaintiff had filed more than one week following Commerce's provisional grant.  Letter to Commerce from GDLSK (Sept. 6, 2024) (P.R. 222-40; C.R. 160-225) ("Reporting Exclusion Rebuttal").  Plaintiff opposed the exclusions by alleging misreporting in "the record in the {countervailing duty ("CVD")} investigation regarding Antiqa," which was also a mandatory respondent in that proceeding.  Opposition to Reporting Exclusion at 1-2 (P.R. 214-17; C.R. 155-59).  In rebuttal, Antiqa placed all of its CVD supplemental questionnaire responses on the LTFV record, consisting of more than 800 pages, and explained "that Antiqa has provided satisfactory answers and supporting documentation in all four supplemental responses to the Department in the CVD investigation, effectively refuting all claims raised by Petitioner in its comments.  These allegations are put to bed by Antiqa's CVD affiliation responses attached hereto."  Reporting Exclusion Rebuttal at 8 (P.R. 222-40; C.R. 160-225).

Plaintiff also based its affiliate misreporting allegation on the overlap of individuals with a particular surname, "Kundariya."  Opposition to Reporting Exclusion at 4-5 (P.R. 214-17; C.R.

PUBLIC VERSION

155-59).    Antiqa in rebuttal explained that: "*The surname 'Kundariya' is relatively common in the region*, akin to many other surnames in India that are widespread within specific states or communities. *In India, it is common for surnames to be shared by many families without indicating a direct familial relationship.*"    Reporting Exclusion Rebuttal at 11 (P.R. 222-40; C.R. 160-225) (emphases added).    Antiqa additionally provided family trees demonstrating that the other Kundariyas were not part of the family that owns Antiqa.    *See* Reporting Exclusion Rebuttal Attachment 5 at S4-5–6, Ex. S4-3 (P.R. 222-40; C.R. 160-225); Antiqa Sales Verification Exhibits at Ex. VE-2A at 74-78  (Feb. 28, 2025) (P.R. 397; C.R. 763-894).

Antiqa accordingly rebutted both major grounds upon which Plaintiff based its opposition to the reporting exclusions.    Antiqa's rebuttal urged Commerce not to have its "limited resources be wasted to analyze data having no impact on the ADD margin calculations (*i.e*., Marbonite and STPL data)." *Id*. at 11.    Antiqa additionally reminded Commerce that the record supported the exclusion request such that there was no need for the Marbonite and STPL data:

> Petitioner's challenges do not introduce any new, substantive information that would alter the Department's previous findings. Antiqa has satisfactorily demonstrated that the Department's exclusion decision regarding Marbonite and STPL was supported by substantial evidence and should be reaffirmed. . . . *The criteria for collapsing under 19 C.F.R. § 351.401(f) are not met, and including detailed Marbonite and STPL data on the record would not contribute to a more accurate determination of Antiqa's ADD margin.*

*Id*. at 12 (emphases added).    Thus, Commerce's determination to grant and maintain the exclusion was well-supported by the record, and this Court should decline Plaintiff's request to inappropriately reweigh the evidence. *See Downhole Pipe*, 776 F.3d at 1376-77.

Plaintiff also draws a false equivalence between Commerce granting the reporting exclusion for Marbonite and STPL *prior to Antiqa's Section A Questionnaire Response*, and Commerce's subsequent denial of an exclusion that Antiqa requested for [

- 16 -

] at the time Antiqa filed the response. *See* Antiqa Section A Questionnaire Response at AQR-1, AQR-19–21 (Aug. 29, 2024) ("Antiqa AQR") (P.R. 193-206; C.R. 85-129). According to Plaintiff, Commerce's denial represented "a return to its normal practice" and "{s}uch disparate treatment of reporting requirements for similarly situated Antiqa affiliates is arbitrary." Pl. Br. at 12 (citing *SKF USA Inc. v. United State*s, 263 F.3d 1369, 1382 (Fed. Cir. 2001)). Yet, the relevant issue is not whether the Antiqa affiliates are similar, but whether Commerce "offer{ed} insufficient reasons for *treating similar situations differently*." *SKF*, 263 F.3d at 1382 (emphasis added). Granting the reporting exclusion for Marbonite and STPL, submitted nearly two weeks before the Section A response, cannot be considered a "similar situation" to denying an exclusion for [          ] requested in the Section A response itself. *Id*. Indeed, Commerce explained at the time that it declined to grant this third exclusion because it "is still reviewing Antiqa's {AQR} and is in the process of drafting additional questions regarding Antiqa's affiliations." Letter from U.S. Department of Commerce (Sept. 11, 2024) (P.R. 247; C.R. 226).

Thus, although Commerce ultimately (and properly) declined to collapse Antiqa with any of the three companies, Commerce's approach with respect to the late-breaking request for [        ] does not undermine the reasonableness to the exclusions that Commerce granted prior to the Section A response submission. *See* Prelim. Antiqa Collapsing Memo (P.R. 358; C.R. 645); *Final IDM* Cmt. 5 (P.R. 434). Indeed, Plaintiff has not demonstrated that reporting data for Marbonite or STPL would have had any material impact on Antiqa's margin calculation, and as we detail immediately below, Plaintiff's claims that Commerce unlawfully declined to collapse Marbonite and STPL with the Antiqa Group wholly lack merit.

**B. Commerce Properly Declined to Collapse Antiqa with Marbonite and Segam**

Commerce, both preliminarily and in its *Final Determination*, collapsed Antiqa with four other affiliated companies: Antiqa Ceramic Pvt. Ltd.; Shivam Enterprises ("Shivam"); Antiek

PUBLIC VERSION

Vitrified LLP ("AVL"); and Antique Non Woven Pvt. Ltd. ("ANPL"). *See* Prelim. Antiqa Collapsing Memo at 1 (P.R. 358; C.R. 645); *Final IDM* Cmt. 5 (P.R. 434). These five entities collectively comprise the "Antiqa Group Respondents." Respondents' Rebuttal Brief at 1 (P.R. 427; C.R. 997). Throughout the LTFV investigation, however, Commerce *declined* to collapse Antiqa with three additional affiliated companies: Marbonite; STPL; and [      ]. *Id*. For these companies, Commerce was unable to make the key required finding "that there is a significant potential for the manipulation of price or production." 19 C.F.R. § 351.401(f)(1). Commerce thoroughly considered the regulatory criteria: (i) common ownership; (ii) managerial or board overlap; and (iii) whether operations are intertwined. *See id*. § 351.401(f)(2); Prelim. Antiqa Collapsing Memo at 5-13 (P.R. 358; C.R. 645); *Final IDM* Cmt. 5 (P.R. 434). Thus, contrary to Plaintiff's claims, Commerce's lawfully found collapsing inappropriate.

### 1. Commerce Properly Declined to Collapse Antiqa with Marbonite

There cannot be "a significant potential for the manipulation of price or production" between Antiqa and Marbonite because the record shows that Marbonite is controlled by another company. Plaintiff suggests that there is common ownership between Antiqa and Marbonite because the Kundariya family that owns Antiqa also owns half of Marbonite through the Antique Granito Shareholders Trust ("AGST"). *See* Pl. Br. at 14. The other half of Marbonite, however, is owned "by Prism Johnson Ltd., a large publicly traded company listed on the Bombay Stock Exchange." Reporting Exclusion Request at 3 (P.R. 173-175; C.R. 82-84).

Moreover, the record shows that Prism Johnson controls Marbonite—as documented by an "exclusive-supply agreement" that Commerce highlighted in declining to collapse Antiqa and Marbonite. *See* Prelim. Antiqa Collapsing Memo at 2, 11 (P.R. 358; C.R. 645); *Final IDM* at 20 (P.R. 434); *see also* Gov't Br. at 27-28. Clause 11 of this agreement requires Marbonite to sell its

*entire production* exclusively to Prism Johnson, which severely limits Marbonite's ability to operate independently and makes Marbonite economically dependent on Prism Johnson:

Reporting Exclusion Request at 6, Ex. 3 (P.R. 173-175; C.R. 82-84).  Other key provisions include:

- Clauses 4.3-4.4, requiring Marbonite to maintain inventory levels to meet Prism Johnson's projected needs;

- Clauses 5.1-5.4, requiring Marbonite to package its goods according to Prism Johnson's detailed instructions, including the use of Prism Johnson's logo and trademark;

- Clause 15.2, giving Prism Johnson access to all necessary information and records at Marbonite; and

- a recent amendment requiring Marbonite to obtain written permission before supplying any material to third parties.

*See id.*

The exclusive supply agreement precludes collapsing because Prism Johnson's control of Marbonite prevents finding "a significant potential for the manipulation of price or production" between Antiqa and Marbonite under 19 C.F.R. § 351.401(f). The agreement establishes Marbonite's economic dependence on Prism Johnson, given that Marbonite's revenue is predominantly derived from its sales to Prism Johnson.  Likewise, Marbonite's operations—including production and sales—are governed by this exclusive supply agreement.  Plaintiff's claim that the agreement "is not actually exclusive" lacks evidentiary support, with the only alleged support stemming from a prior ADD proceeding on a separate product that is outside the record and inapposite to this investigation.  *See* Pl. Br. at 29; Section II.B, *supra*.  Moreover, Antiqa has

always recognized that there were very small transactions of non-subject merchandise between Marbonite and its other affiliates. *See* Reporting Exclusion Request at 5 (P.R. 173-175; C.R. 82-84); Reporting Exclusion Rebuttal at 4 (P.R. 222-40; C.R. 160-225). Commerce correctly found that, "because these sales were neither of {merchandise under consideration} nor of inputs used for ceramic tile production, *these sales do not suggest intertwined operations*." *Final IDM* at 20 (P.R. 434) (emphasis added); *see also* Gov't Br. at 28-29 (observing sales were "insignificant").

Further reporting by Antiqa that supports Commerce's finding includes:

- Marbonite has not exported any merchandise under consideration to the United States during the Period of Investigation ("POI"). The ceramic tiles produced by Marbonite are sold domestically to Prism Johnson, which did not re-export this merchandise to the United States. During the POI, Marbonite sold its entire production of [          ] sqm of tiles to Prism Johnson. Antiqa requested the details from Prism Johnson, which advised that it sold [          ] sqm of tiles from Marbonite in the domestic market and sold the remaining tiles to third countries (less than [        ] sqm).

- Prism Johnson exported a small amount of merchandise under consideration to the United States, which was either self-produced or sourced from other Prism Johnson affiliates—not Marbonite. Specifically, Prism Johnson exported [        ] sqm to the United States during the POI, produced by its H&R Johnson Division. This quantity represents less than [  ] of the total quantity the Antiqa Group Respondents exported to the United States during the POI.

- None of the Kundariya family members have any shareholding or involvement in Prism Johnson or any of its affiliates.

- During the POI, Marbonite did not sell any merchandise under consideration to any Antiqa Group Respondents. The only small transactions with Antiqa Group Respondents involved non-subject merchandise. These minimal and non-subject transactions support the lack of any significant operational or financial overlap between Marbonite and the Antiqa Group Respondents.

*See* Reporting Exclusion Request at 8 (P.R. 173-175; C.R. 82-84).

Consequently—as Antiqa explained and Commerce agreed—"the AGST and the Kundariya family do not have sufficient control over Marbonite to direct or use its assets as their own. In contrast Prism Johnson controls Marbonite's operations." *Id*. at 8-9 (emphasis omitted);

PUBLIC VERSION

Memorandum Granting Reporting Exclusion Request (P.R. 184). Indeed, the Prism Johnson financial statement "*identifies Marbonite as a subsidiary {in} which it has a controlling interest and that the other 50% held by the AGST is 'non-controlling.'*" Reporting Exclusion Request at 7, Ex. 2 at 247, 309 (P.R. 173-175; C.R. 82-84) (emphasis added). In regulatory terms, the "operations are intertwined" exclusively between Marbonite and Prism Johnson, and thus cannot be so intertwined between Marbonite and Antiqa. *See* 19 C.F.R. § 351.401(f)(2)(iii).

Additionally, it would not be appropriate to collapse the companies based on "{t}he extent to which managerial employees or board members sit on the board of directors of an affiliated firm." *Id*. § 351.401(f)(2)(iii). Plaintiff alleges that Commerce "incorrectly" analyzed this factor because "the Kundariya family and Prism Johnson each appoint an equal share of board members in Marbonite." Pl. Br. at 17. Yet, Plaintiff omits that "Prism Johnson appoints the Chairman of the Board." Reporting Exclusion Request at 4 (P.R. 173-175; C.R. 82-84). Antiqa in full transparency submitted the Shareholders Agreement through which AGST and Prism Johnson make appointments to the Marbonite Board of Directors. Reporting Exclusion Rebuttal at Att. 1: CVD Affiliation Response Ex. 3d (P.R. 222-40; C.R. 160-225). The equal number of board appointments cannot compel Commerce to collapse, given Antiqa's reporting that AGST's appointees had only minimal contacts with Antiqa:

> There are no other common officers, directors, or managerial employees between Marbonite, Prism Johnson, and Antiqa Group Respondents except the three directors nominated by AGST as stated above. However, none of these directors sit on the board of Prism Johnson. Of these three directors nominated by the AGST, two are directors/partners in Antiqa Group Respondents that are trading firms. One of the directors holds a small share of [                    ] and [                    ], while the other holds a minimal [                    ].

Reporting Exclusion Request at 3 (P.R. 173-175; C.R. 82-84).

Overall, Commerce considered the totality of the evidence and concluded that "Prism Johnson appoints the controlling share of board members in Marbonite" as well as that Marbonite "is not an exporter of ceramic tile and does not possess the potential for price manipulation." *Final IDM* at 20-21 (P.R. 434) (citations omitted). These findings are well-grounded in the record. *See* Prelim. Antiqa Collapsing Memo at 5-13 (P.R. 358; C.R. 645); Antiqa AQR at Ex. A-8 (P.R. 193-206; C.R. 85-129); *Final IDM* Cmt. 5 (P.R. 434). Thus, this Court should decline to second-guess Commerce's findings and hold that Commerce's decision not to collapse Antiqa and Marbonite is supported by "such relevant evidence as a reasonable mind might accept as adequate to support {that} conclusion." *Consol. Edison*, 305 U.S. at 229.

## 2. Commerce Properly Declined to Collapse Antiqa with Segam

The Government correctly notes that, with respect to Antiqa and STPL, "the Coalition is asking the Court to find collapsing purely due to a [                    ]." Gov't Br. at 31 n.8.

The first regulatory criterion of "common ownership" does not compel collapsing because the Kundariya family that owns Antiqa merely owns a [    ] percent share in STPL. *Id*. at 31-32; Reporting Exclusion Request at 10, Ex. 4 (P.R. 173-175; C.R. 82-84); Prelim. Antiqa Collapsing Memo at 4, 9 (P.R. 358; C.R. 645).; *Final IDM* at 21 (P.R. 434). Similarly, with respect to the managerial overlap criterion, Antiqa reported that:

> There are common directors between STPL and other Antiqa Group companies, viz. Antique Marbonite Private Ltd, Antique Textile Private Ltd, and Shivam Surface India LLP – but *there are no common directors or officers between STPL and Antiqa Group Respondents*. Only one of the directors of STPL, {who is} one of the [  ] partners of [        ] holding a small share of [     ]. . . .
>
> In summary, the Kundariya family does not have a controlling interest in STPL, and merely has a relatively small ownership interest in STPL. . . . There are no managerial employees or board members of STPL that sit on the board of directors of Antiqa Group Respondents except one director who holds a small share in [        ] as stated above.

- 22 -

PUBLIC VERSION

Reporting Exclusion Request at 10-11 (P.R. 173-175; C.R. 82-84) (emphasis added).  This record evidence was subject to verification and persuasively supports Commerce's determination that there is no common control between the Antiqa Group and STPL.  *See* Respondents' Rebuttal Brief at 6 (P.R. 427; C.R. 997); *Final IDM* at 21-22 (P.R. 434).

By contrast, Plaintiff questions Commerce's findings on both of these criteria based on its speculative claims that STPL has "[      ] shareholders [                          ]" and that "the Managing Director and Chairman of Segam is . . . [                        ]." Pl. Br. at 19-20.  Antiqa debunked these claims early in the investigation:

> Petitioner appear{s} to believe that all individuals with the surname "Kundariya" are related.  This assumption appears to be the basis of its allegations that directors and employees of Segam with the surname "Kundariya" are related to the Kundariya family of Antiqa.  Petitioner's assumption is wrong.  The surname "Kundariya" is primarily found in Gujarat, India, particularly in the Morbi district and surrounding villages. It is associated with various communities and has been adopted by multiple families in this region. In Gujarat, the surname "Kundariya" reflects regional and cultural ties rather than a specific lineage. *The surname "Kundariya" is relatively common in the region,* akin to many other surnames in India that are widespread within specific states or communities. *In India, it is common for surnames to be shared by many families without indicating a direct familial relationship.*  For example, "Kundariya" is similar to surnames like "Patel" or "Sharma", or "Gupta" – which are prevalent across various communities and regions in India.  In short, this allegation is akin to claiming that all persons in the United Sates with the surname "Smith" are related.  The allegation should be summarily rejected.

Reporting Exclusion Rebuttal at 10-11 (P.R. 222-40; C.R. 160-225) (emphases added).

Moreover, in response to Plaintiff's allegations, Antiqa specifically explained that Plaintiff's allegations about certain common directors were based on erroneous information because the individuals at issue were not involved as a partner or shareholder in the Antiqa Group entities.  *See* Respondents' Rebuttal Brief at 6-7 (P.R. 427; C.R. 997) (citing Antiqa AQR at Ex. A-8 (P.R. 193-206; C.R. 85-129)); Antiqa Supplemental Section A Questionnaire Response at

Revised Ex. A-7 (Oct. 28, 2024) ("Antiqa SAQR") (P.R. 311-13; C.R. 478-87); Antiqa Sales

Verification Exhibits at Ex. VE-2C (Feb. 28, 2025) (P.R. 397; C.R. 763-894)).

Substantial record evidence likewise supports Commerce's finding that there were no

intertwined operations that would support collapsing Antiqa and STPL. Prelim. Antiqa Collapsing

Memo at 11 (P.R. 358; C.R. 645); *Final IDM* at 22 (P.R. 434). As Antiqa reported:

**No Intertwined or Shared Operations**

- No Shared Employees and Facilities: There are no shared employees or facilities between STPL and Antiqa Group Respondents.

- No Shared Sales Information: There is no shared sales information between STPL and Antiqa Group Respondents. STPL is operated independently by its founders/promoters.

- No Common Involvement in Production and Pricing Decisions: STPL operates independently with no involvement in the production and pricing decisions of Antiqa Group Respondents

Reporting Exclusion Request at 10 (P.R. 173-175; C.R. 82-84) (emphasis in original).

Plaintiff's argument on this criterion unpersuasively relies on its debunked claim that

individuals with the same name are related: "Because of this overlap in directors, it is implicit

that these entities share production, sales, and pricing information." Pl. Br. at 20. It is well

established, however, that such speculation does not constitute substantial evidence. *Lucent*

*Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1327 (Fed. Cir. 2009). Plaintiff also argues that

collapsing is warranted based on "the existence of sales and purchases of subject merchandise."

Pl. Br. at 20-21. Yet Antiqa explained why these minimal transactions do not compel collapsing:

**Transactions Between Companies**

- During the POI, STPL sold subject merchandise exclusively in the domestic market. STPL did not export any subject merchandise to the United States . . .

- STPL sold a small quantity of {merchandise under consideration} amounting {to} Rs.[          ] (qty sqm – [          ]) of subject merchandise to Antiqa, which represented [          ] of Antiqa's total value of sales. Antiqa

- 24 -

PUBLIC VERSION

subsequently sold this merchandise to unaffiliated domestic customers.

- STPL also purchased a small quantity of {merchandise under consideration} amounting {to} Rs.[          ] (qty sqm – [          ]) from AVL, which represents merely [      ] of AVL's total value of sales. . . .

There are *minimal transactions between Antiqa Group Respondents and STPL that have no implication on the ADD margin calculations*. There is no intertwining of operations between the two entities. STPL did not export subject merchandise to the United States. For sales made by STPL in the domestic market, pricing decisions are not controlled by the Antiqa Group. Therefore, STPL and Antiqa do not meet the criteria for collapsing as per 19 C.F.R. § 351.401(f)(1).

Reporting Exclusion Request at 11-12 (P.R. 173-175; C.R. 82-84) (emphases modified).

In sum, overwhelming record evidence establishes that Commerce reasonably declined to collapse Antiqa and STPL. *See* Prelim Antiqa Collapsing Memo at 5-13 (P.R. 358; C.R. 645); *Final IDM* Cmt. 5 (P.R. 434). Based on the evidence, and Defendant's and Defendant-Intervenors' arguments, this Court should find that Commerce's decision not to collapse Antiqa and STPL is supported by substantial evidence and otherwise lawful. *See Consol. Edison*, 305 U.S. at 229.

## IV. Commerce's Determination That Win-Tel and Neelson Are Not Affiliated Is Supported by Substantial Evidence and Otherwise Lawful

Defendant-Intervenors agree with the Government that Plaintiff's claim seeking to have Win-Tel and Neelson deemed affiliated should be rejected because it is a classic example of a litigant improperly asking this Court to reweigh the evidence after Commerce disagreed with its position. *See* Gov't Br. at 33-40; *Downhole Pipe*, 776 F.3d at 1376-77 (affirming court's role not to reweigh evidence or reconsider fact questions anew).

As the Government explained, in determining whether control over another person exists Commerce will consider, among other factors "debt financing; and close supplier relationships." 19 C.F.R. § 351.102(b)(3). Importantly, however, Commerce will *not* find that control exists on the basis of these factors "unless the relationship has the potential to impact decisions concerning

the production, pricing, or cost of the subject merchandise or foreign like product." *Id.* Moreover, Commerce also considers the temporal aspect of a relationship because "temporary circumstances *will not suffice* as evidence of control." *Id.* (emphasis added). The record here amply supports Commerce's conclusion that the relationship between Win-Tel and Neelson—in which they lacked common ownership and Neelson supplied a small percentage of Win-Tel's overall ceramic tile production—did not meet this standard. In the interest of judicial economy, and in light of the Government's thorough briefing on the issue, Defendant-Intervenors focus their arguments on key flaws in Plaintiff's position.

*First*, Commerce acted reasonably in concluding that the previous involvement in Neelson by a member of the Kundariya family (that differed from the Antiqa owners), who retired and divested his minority ownership in 2022 prior to the POI, did not provide a basis to find the control necessary for affiliation. *See Final IDM* at 12-14 (P.R. 434); Gov't Br. at 34-37. Commerce based its decision in evidence—explaining that Neelson's and Win-Tel's partnership agreements, annual returns, and ownership shares all demonstrate that there are no common owners, board members, directors, or overlapping personnel between the two companies, and that they are majority owned by different families. *Final IDM* at 14 (P.R. 434) (citing Win-Tel Section A Questionnaire Response at Ex. A-19 Part 1 (Aug. 29, 2024) ("Win-Tel AQR") (P.R. 207-12; C.R. 130-54); Win-Tel Supplemental Section A Questionnaire Response at Exs. Sl-1 (a), Sl-1 (b), Sl-2 (a) (Oct. 28, 2024) ("Win-Tel SAQR") (P.R. 314-15; C.R. 488-504); Win-Tel Supplemental Sections B & C Questionnaire Response at Exs. S2-2 (a-b) (Nov. 8, 2024) (P.R. 334; C.R. 507-23)).

Likewise, Commerce explained why it is not dispositive that the Kundariya family member (along with all other Neelson shareholders/partners) had previously provided collateral for a bank loan. Commerce highlighted the evidence showing, not only that this person had divested his

- 26 -

PUBLIC VERSION

ownership and sought his collateral back prior to the POI, but that the two individuals who acquired this former partner's ownership interest *also provided* replacement collateral. *See Final IDM* at 13-14 (P.R. 434) (citing Win-Tel SAQR at Exs. Sl-1 (a-d) (P.R. 314-15; C.R. 488-504)). Commerce even explained that the land the Kundariya family member provided as collateral for Neelson's loan was small compared to that provided by Neelson itself. *Id.* at 14.

Commerce further considered Plaintiff's argument that the Kundariya family member would remain liable with the bank for the collateral until 2027, but explained that "Commerce cannot solely consider an outdated loan agreement as sufficient evidence to find affiliation." *Id.*; *see also* Pl. Br. at 23  Indeed, Commerce recognized at verification that the divestment process was substantially complete, and that the bank had been asked to release the collateral prior to verification in March 2025. *See* Win-Tel Sales Verification Report at 3 (Mar. 14, 2025) (P.R. 401; C.R. 896).  Although the bank had not yet completed the return process, there was no evidence of present control or influence by Win-Tel over Neelson. *See Final IDM* at 14 (P.R. 434).

Consequently, Commerce's had ample support for its finding that the evidence, taken together, "refute{s} the notion that this individual is still obligated by the collateral for the loan such that the relationship would have the potential to impact decisions concerning the production, pricing, or cost of ceramic tile during the POI." *Id.* (citations omitted); *see also* 19 C.F.R. § 351.102(b)(3).  Additionally, as the Government cogently explained, this case is clearly different from *Ta Chen Stainless Steel Pipe v. United States*, 23 C.I.T. 804 (1999), in which a company "placed its continued ability to operate in the hands of a putatively unaffiliated party." *Id.* at 815 (citation omitted).  Plaintiff's comparison between this case and *Ta Chen* is thus inapt.

*Second*, Commerce reasonably concluded that the small portion of Win-Tel's sales for which Neelson served as supplier ([     ] percent) did not create a "close supplier" relationship

or require collapsing.  *See Final IDM* at 12-13 (P.R. 434); Gov't Br. at 37-40.  Indeed, as the Government highlights, Win-Tel self-produced the vast majority of its own ceramic tile and sourced only a "small portion of the ceramic tile it sold" from its affiliate Theos Tiles LLP and various other unaffiliated suppliers, including Neelson.  *Final IDM* at 13 (P.R. 434); Gov't Br. at 38; *see also* Win-Tel AQR at 36, Ex. A-19 Part 1 (P.R. 207-12; C.R. 130-54).  Win-Tel did not rely exclusively, or even predominantly, on Neelson to supply ceramic tile for export.  *See id.*

Likewise, the record demonstrates that Neelson's sales to Win-Tel represent a minority (merely [      ] percent) of Neelson's total sales.  *See* Win-Tel Rebuttal to Petitioner Comments on Supplemental Section A Questionnaire Response at 7-8, Ex. 5 (Nov. 26, 2024) (P.R. 353; C.R. 641-42); Respondents' Rebuttal Brief at 27 (P.R. 427; C.R. 997).  Nor is there evidence of an exclusive supply agreement or *any type* of similar agreement between Win-Tel and Neelson. *See id.*  Such small transaction volumes cannot create a "close supplier relationship"—let alone the requisite control necessary for Commerce to find affiliation under 19 C.F.R. § 351.102(b)(3). *See* Win-Tel Preliminary Affiliation and Collapsing Memorandum at 10 (Nov. 22, 2024) (P.R. 360; C.R. 646) (noting small transaction volume).

Indeed, in *Samsung Electronics Co. v. United States*, 70 F. Supp. 3d 1350 (Ct. Int'l Trade 2015), this Court explained that "{n}ot all close supplier relationships are control relationships" and that "{a} close supplier relationship is a control relationship under the statute when the supplier or buyer becomes reliant upon the other."  *Id.* at 1357 (citation and quotation marks omitted). Plaintiff relied on *Samsung* before Commerce.  Petitioner Case Brief at 12 (P.R. 413; C.R. 987). In *Samsung*, however, Commerce declined to find affiliation—and this Court affirmed—when record evidence established that there was no exclusivity arrangement between the respondent and

- 28 -

its suppliers, and the suppliers could (and did) look to other unaffiliated buyers of their goods.  *See id.* at 1358.  The same principles apply here.

Additionally, Plaintiff's arguments are based on selective and inaccurate characterizations.  *See* Pl. Br. at 25-26.  For example, Plaintiff asserts (incorrectly) that Commerce was wrong to state that Neelson was only Win-Tel's *third* largest supplier of ceramic tiles for export—but it is *Plaintiff* whose characterization is inaccurate because it ignores that Win-Tel itself produced the vast majority of the ceramic tile it sold, making Commerce's statement accurate.  *See Final IDM* at 13 (P.R. 434).  Likewise, Plaintiff's claims about the importance of Neelson in Win-Tel's supply chain provide a skewed picture because they rely on statistics limited to Win-Tel's unaffiliated suppliers, excluding Win-Tel and its affiliated supplier Theos.  *See* Pl. Br. at 25.  The record shows, however, that unaffiliated suppliers like Neelson only account for [     ] percent of Win-Tel's sales, and that "Win-Tel/ Theos first uses its own capacity and if the capacity is insufficient then for any excess order quantity, Win-Tel approaches Neelson for supply{.}"  Win-Tel AQR at Ex. A-19(a) Part 1 (P.R. 207-12; C.R. 130-54); Win-Tel SAQR at S-7 (P.R. 314-15; C.R. 488-504).

Similarly, Plaintiff's comparison of the small percentage of Win-Tel's sales for which Neelson served as supplier ([     ] percent) to the wholly unrelated analysis Commerce performs to select mandatory respondents is clearly inapposite.  *See* Pl. Br. at 25-26.  Indeed, as the Government explained, Commerce does not find reliance solely based on the proportion of sales between parties, *even when that proportion is one hundred percent* (much less the small portion at issue here).  *See* Gov't Br. at 38 (citing *Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2019–2020*, 87 Fed. Reg. 20,817 (Apr. 8, 2022), accompanying IDM Cmt. 1).  Neelson's cohort of sales "pales in comparison to that supplied by Win-Tel and

PUBLIC VERSION

Theos." *Id.* at 39.  Plaintiff criticizes Commerce for describing this minor portion of Win-Tel's sales as "miniscule" in addition to small, *see* Pl. Br. at 25 (citing *Final IDM* at 13 (P.R. 434)), but Commerce did so in the context of Defendant-Intervenors showing that the level of reliance needed to find a "close supplier" relationship is typically much greater than Neelson's minor portion of Win-Tel's supplies.  *See* Respondents' Rebuttal Brief at 21-25 (P.R. 427; C.R. 997).

In any event, the record clearly supports Commerce's conclusion that the facts "make evident . . . that Win-Tel is not reliant upon Neelson, and do not provide the basis for finding that Win-Tel and Neelson are affiliated either through a close supplier relationship, or through a control relationship." *Final IDM* at 13 (P.R. 434).  Likewise, Plaintiff's comparison to *U.S. Steel Corp v. United States*, 179 F. Supp. 3d 1114 (Ct. Int'l Trade 2016), *see* Pl. Br. 26, is inapposite when the record indicates that Neelson made the vast majority of its sales to entities other than Win-Tel. *See* Win-Tel Rebuttal to Petitioner Comments on Supplemental Section A Questionnaire Response at 7-8, Ex. 5 (P.R. 353; C.R. 641-42); Respondents' Rebuttal Brief at 27 (P.R. 427; C.R. 997). *U.S. Steel* involved a situation in which the portion of sales between the supplier and respondent had "the potential to impact production, pricing, or cost decisions" and there were lingering concerns about both corporate and family relationships among the companies.  179 F. Supp. 3d at 1131-32.  Here, by contrast, the transactions between the companies were minor all around and Commerce thoroughly addressed Plaintiff's strained claims about corporate control based on the retired former Neelson partner, while indicating there was no basis to find a close supplier or control relationship.  *See Final IDM* at 13-14 (P.R. 434); *see also* Win-Tel Preliminary Affiliation and Collapsing Memorandum at 10 (P.R. 360; C.R. 646) ("Although there were transactions between Win-Tel and Neelson during the POI, the volume of those transactions was small, and we preliminarily find that they do not create the potential for manipulation.") (citation omitted).

PUBLIC VERSION

Thus, Plaintiff's arguments reduce to disagreements with Commerce's evaluation and weighing of the record evidence that do not provide a basis to overturn Commerce's reasonable determination and should therefore be rejected. *See Siemens Energy*, 992 F. Supp. 2d at 1324-25 (Court presumes that Commerce considered full record and will not reweigh evidence).

**V.    Commerce Did Not Abuse Its Discretion in Accepting Minor Corrections from Antiqa and Win-Tel at the Outset of Verification**

Plaintiff next challenges Commerce's acceptance of minor corrections from Antiqa and Win-Tel at the outset of February 2025 sales verifications conducted in Gujarat, India.  Pl. Br. at 26-31; *see* Antiqa Sales Verification Report at 1-4, Ex. VE-1 (P.R. 402; C.R. 897); Antiqa Minor Corrections (Feb. 19, 2025) (P.R. 391; C.R. 746-55); Win-Tel Sales Verification Report at 1-2, Ex. VE-1 (P.R. 401; C.R. 896); Win-Tel Minor Corrections (Feb. 26, 2025) (P.R. 395; C.R. 757-62).  This Court reviews such decisions as exercises of agency discretion. *See Maui Pineapple Co. v. United States*, 264 F. Supp. 2d 1244, 1262 (Ct. Int'l Trade 2003).

As an initial matter, Commerce's actions fully comply with the agency's practice.  As Commerce has explained:

> It is the Department's routine practice to review the corrections presented at the start of any verification and determine whether these changes relate to minor changes to previously-submitted data, or whether they reach the level of significant new factual information {"NFI"}.  Where the changes are minor, we generally accept the information as part of the administrative record in the form of a verification "exhibit" and we examine that information during the verification.

*Emulsion Styrene-Butadiene Rubber from Mexico: Final Affirmative Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 33,062 (Dep't Commerce July 19, 2017), accompanying Issues and Decision Memorandum Cmt. 3.  Indeed, Commerce routinely accepts such corrections at verification. *See*, *e.g.*, *Carbon and Alloy Steel Wire Rod from Italy: Final Determination of Sales at Less Than Fair Value*, 83 Fed. Reg. 13,230 (Mar. 28, 2018), accompanying Issues and Decision Memorandum Cmt. 1 ("the minor corrections presented at the cost verification were insignificant

- 31 -

and clearly inadvertent misclassifications of expenses for reporting purposes."); *Structural Steel Beams from Germany: Notice of Final Determination of Sales at Less Than Fair Value*, 67 Fed. Reg. 35,497 (May 20, 2002), accompanying Issues and Decision Memorandum Cmt. 5 ("The revisions SWT made were consistent with the type of information we accept at verification normally, namely, information that makes minor corrections to information already on the record or information which corroborates, supports, or clarifies information already on the record.").

Plaintiff's overarching claim that "{the} corrections were methodological in nature" is refuted by Commerce's and the Government's demonstration that they were in fact minor. *Compare* Pl. Br. at 28, 30-31 *with Final IDM* Cmts. 1-2 (P.R. 434) and Gov't Br. at 40-43. Having failed to show that the corrections were material to the margin calculation, Plaintiff instead relies on the fact that the minor corrections led the respondents to submit revised databases. *See* Pl. Br. at 29-30. The Government, however, correctly explains that "this Court has found that requesting a revised database incorporating corrections presented and examination at verification is not an acceptance of {NFI}." Gov't Br. at 43 (citation omitted). "Thus, the mere fact that the revised home and U.S. sales databases were provided along with the opening day corrections does not mean that these errors are 'significant.'" Respondents' Rebuttal Brief at 39 (P.R. 427; C.R. 997).

Plaintiff's challenge is also based in part on the timing of the revised database submission. *See* Pl. Br. at 28. Yet, Plaintiff omits that the minor corrections detailing these changes were filed in the midst of the February 2025 verifications—over a month before briefing commenced in late March 2025. *See* Antiqa Minor Corrections (P.R. 391; C.R. 746-55); Win-Tel Minor Corrections (P.R. 395; C.R. 757-62). Plaintiff accordingly had time to challenge these revisions, which it did, regardless of when Commerce instructed that the corrected databases be submitted. *See* Petitioner Case Brief at 24-25, 40-42 (P.R. 413; C.R. 987).

PUBLIC VERSION

Moreover, the below details from the record confirm that Commerce reasonably found that both (A) Antiqa's and (B) Win-Tel's corrections were minor.

## A.  Commerce Properly Accepted Antiqa's Minor Corrections

The below chart summarizes Antiqa's corrections, made prior to the start of verification and with supporting exhibits, with reference to the impact on the home market gross unit price ("GRSUPRH") or U.S. gross unit price ("GRSUPRU") of Antiqa's sales:

| Minor Correction | Value | Impact as a % of GRSUPRH or GRSUPRU | Verification Exhibit VE-1 Point no. |
|---|---|---|---|
| Correction in Short-Term Interest Rate Calculation | [        ] | [            ] of GRSUPRH | A. 1 |
| Omission of one debit note | [          ] | [        ] of GRSUPRH | A. 2(a) |
| Clerical error in one SEQH | [        ] | - | A. 2(b) |
| Omission of [                    ] | [          ] | [          ] of GRSUPRU | B. 1 |
| Omission of  [            ] in one invoice | [          ] | [          ] | B. 2 |
| Omission of small amount of [                    ] in case of 2 vendors | [                    ] | [            ] | B. 3 |

Respondents' Rebuttal Brief at 15 (P.R. 427; C.R. 997); Antiqa sales Verification Report at Ex. VE-1 (P.R. 402; C.R. 897); Antiqa Minor Corrections (P.R. 391; C.R. 746-55).

Plaintiff argues that "at least one of those corrections was methodological in nature and had an extension impact on the sales reporting." Pl. Br. at 28.  Plaintiff is wrong.  The alleged "methodological" change relates to container seal expenses of [                              ] recorded in Antiqa's general ledger and inadvertently omitted from its U.S. sales database—representing just [       ] percent of Antiqa's U.S. gross unit price (GRSUPRU), leading to a correction of [                ] per-SQM.  *See* Respondents' Rebuttal Brief at 16 (P.R. 427; C.R.

PUBLIC VERSION

997); Antiqa Sales Verification Report at Ex. VE-1 (P.R. 402; C.R. 897); Antiqa Minor

Corrections (P.R. 391; C.R. 746-55).  This is far too small to materially affect Antiqa's margin.

Moreover, Plaintiff ignores that:

- These were clerical or reporting oversights, not systemic or strategic omissions.

- None of the changes required Antiqa to alter its reporting structure or formulas,

- Every correction was quantifiable, verified, and tied to source documentation.

- Other corrections—such as freight recovery on four domestic invoices, short-term interest rate rounding, or minor errors in clearing & forwarding charges—have impact ranges of *less than [        ]*, which are routinely treated as *immaterial*.

Respondents' Rebuttal Brief at 16 (P.R. 427; C.R. 997) (emphases in original).

In short, as the respondents explained, "Antiqua fully cooperated by voluntarily and in

good faith disclosing these minor, non-methodological opening day corrections in good faith

before verification commenced" and "{t}he Department accepted these corrections in accord

with longstanding agency practice" while properly finding that there was "no indication of

withholding, deception, or failure to cooperate."  *Id*.; *see also Final IDM* at 7 (P.R. 434)

(determining that error "was clerical and an isolated omission" and that Antiqa "enabled

Commerce to conduct a thorough verification of the expense in question").  Thus, there is no

basis to compel Commerce's rejection of Antiqa's minor corrections.

## B.  Commerce Properly Accepted Win-Tel's Minor Corrections

Win-Tel primarily identified three minor errors, which it presented with detailed

explanations and supporting documentation.  *See* Win-Tel Sales Verification Report at 2, Ex. VE-

1 (P.R. 401; C.R. 896); Win-Tel Minor Corrections (P.R. 395; C.R. 757-62).  Win-Tel's proactive

identification and correction of these errors demonstrates a commitment to accurate reporting and

cooperation with the verification process. *See* Respondents' Rebuttal Brief at 39 (P.R. 427; C.R. 997). Critically, the errors affected only a small portion of Win-Tel's reported data:

1) An error in reporting "DBROKU" {referring to brokerage and handling expenses} for only one U.S. sale whose invoice quantity is [    ] SQM. This error effected the "DBROKU" of only [    ] percent of the total U.S. sales.

2) An error in reporting ZIP code in field DESTU for [  ] U.S. export invoices with quantity of [    ] SQM, out of a total of [    ] US export invoices with a quantity of [      ] SQM reported in the U.S. sales database, affecting only [  ] percent of total U.S. sales quantity.

3) A formula error affecting the allocation of packing costs. This error affected packing cost (PACKH/PACKU) reporting of only [  ] percent of the total packed quantity. Further the total packing cost remained unchanged, with the error only in allocating packing costs.

Respondents' Rebuttal Brief at 38-39 (P.R. 427; C.R. 997) (citations omitted); Win-Tel Sales Verification Report at 2, Ex. VE-1 (P.R. 401; C.R. 896); Win-Tel Minor Corrections (P.R. 395; C.R. 757-62). Indeed, Commerce "found that incorporating all the minor corrections has no effect on {Win-Tel's} calculated dumping margin." *Final IDM* at 10 (P.R. 434) (citation omitted).

Plaintiff incorrectly asserts that "Win-Tel's sales reconciliations . . . contained adjustments impacting [         ] sales that Win-Tel did not previously disclose." Pl. Br. at 30. In so doing, Plaintiff cites page 2 of Win-Tel's Sales Verification Report. *Id*. That report merely references the minor corrections Commerce accepted on the opening day, without expressing concerns about the sales reconciliation. *See* Win-Tel Sales Verification Report at 2 (P.R. 401; C.R. 896). The sales reconciliation presented as Win-Tel Verification Exhibits VE-11A and VE-11B is comprised of exhibits already submitted at the time of initial response—meaning there were no previously undisclosed adjustments or errors in Win-Tel's sales reconciliation. *See* Win-Tel Resubmission of Verification Sales Exhibits at Exs. SVE-11A, SVE-11B (Mar. 21, 2025) (P.R.

- 35 -

PUBLIC VERSION

409; C.R. 899-986).  Plaintiff likewise argues, without support, that the zip code and packing costs errors should have been rejected by Commerce.  Pl. Br. at 30.  It defies credulity to accept that Commerce was precluded from accepting these corrections as minor, given that they affected only [     ] percent of total U.S. sales and [      ] percent of the total packed quantity, respectively.  *See* Respondents' Rebuttal Brief at 38-39 (P.R. 427; C.R. 997).

In sum, Commerce properly accepted Win-Tel's minor corrections pursuant to its agency practice, given the extensive record evidence that the errors were minor.  There is no evidentiary or legal basis to compel Commerce's rejection of these minor corrections.

## VI.    Commerce Lawfully Granted Win-Tel's Scrap Offset

Commerce properly granted Win-Tel's scrap offset based on its verified finding that, although "Win-Tel does not track generation of scrap in the normal course of business, the record otherwise shows that Win-Tel does maintain records of the quantity of scrap generated."  Win-Tel Cost Verification Report at 13, Ex. CVE-11 (Feb. 21, 2025) (P.R. 392; C.R. 756); Win-Tel Cost Verification Exhibits at Ex. CVE-11 (Jan. 22, 2025) (P.R. 387; C.R. 682-743); *see also Final IDM* Cmt. 8 (P.R. 434); Gov't Br. at 43-46.  As the Government demonstrates, granting the offset was entirely consistent with Commerce practice and Win-Tel's reporting.  *See* Gov't Br. at 44-45; Win-Tel Section D Questionnaire Response at D-6, D-14, D-16, D-19–20, D-37, D-42, Ex. D-7.a (Sept. 19, 2024) ("Win-Tel DQR") (P.R. 276-77; C.R. 390-94, 400-04, 410-14, 420-29, 434-50).

Plaintiff incorrectly claims that the scrap offset is inaccurate because Win-Tel does not base it on the value of scrap produced during the POI, but rather on the value of scrap sold.  Pl. Br. at 32.  This allegation ignores the fact that Win-Tel does not assign a value to its scrap generation until the scrap is sold, as the scrap's value is negligible.  For example, Win-Tel's scrap sale value for the POI is Rs [      ], which is merely [      ] percent of Wint-Tel's total manufacturing cost.  *See* Respondents Rebuttal Brief at 34 (P.R. 427; C.R. 997).  Hence, the entire

- 36 -

PUBLIC VERSION

scrap sale is considered scrap generation and recorded as the scrap offset. *Id*. Yet, "while Win-Tel does not record the *value* of scrap generation, it does maintain records of the *quantity* of scrap generated in the normal course of business"—Win-Tel initially reported that the scrap sale quantity is [      ] kg, while the scrap generation quantity is [      ] kg. *Id*.; Win-Tel DQR at Ex. D-7.a (P.R. 276-77; C.R. 390-94, 400-04, 410-14, 420-29, 434-50). Commerce verified these facts and memorialized a screenshot of the scrap quantity movement in kilograms. *See* Win-Tel Cost Verification Exhibit CVE-11 at 4 (P.R. 387; C.R. 682-743).

Commerce further verified the overall yield, and the scrap quantity in kilograms aligned with the overall yield loss. *See* Win-Tel Cost Verification Exhibit CVE-11 at 12 (P.R. 387; C.R. 682-743); Respondents' Rebuttal Brief at 34 (P.R. 427; C.R. 997). Thus, the scrap sold during the POI is approximately equal to the scrap generated, and Plaintiff's challenge to the scrap offset is baseless. This Court should thus sustain Commerce's determination to grant the scrap offset.

## CONCLUSION

For these reasons, Plaintiff's motion for judgment on the agency record should be denied and judgment should be entered in favor of Defendant and Defendant-Intervenors.

Respectfully submitted,

/s/ Jordan C. Kahn
JORDAN C. KAHN

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881

*Counsel to Defendant-Intervenors Win-Tel
Ceramics Private Ltd and Antiqa Minerals*

/s/ Joshua E. Kurland
JOSHUA E. KURLAND

- 37 -

PUBLIC VERSION

JONATHAN T. STOEL
LINDSAY K. BROWN

HOGAN LOVELLS US LLP
Columbia Square Building
555 Thirteenth Street, NW
Washington, DC 20004-1109
Phone: +1.202.637.5600
Fax: +1.202.637.5910
E-mail: Joshua.kurland@hoganlovells.com

*Counsel to Defendant-Intervenor*
*M S International, Inc.*

Dated: April 29, 2026

**CERTIFICATE OF COMPLIANCE**

Pursuant to Standard Chambers Procedure section 2(B)(1), I hereby certify that this Response Brief complies with the word-count limitation requirement and contains 11,479 words, including an embedded graphic having 35 words, excluding the parts of the brief exempted from the word limitation. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the Response Brief.

/s/ Jordan C. Kahn
JORDAN C. KAHN

GRUNFELD, DESIDERIO, LEBOWITZ
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881

*Counsel to Defendant-Intervenors Win-Tel Ceramics Private Ltd and Antiqa Minerals*

Dated: April 29, 2026

15228838_1